**IN THE U.S. DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **Jacqueline Huskey and Riian Wynn, on behalf of themselves and all others similarly situated,** | Case No.: 22-cv-7014 |
| **Plaintiffs,** | Hon. Virginia M. Kendall |
| **v.** | |
| **State Farm Fire & Casualty Company,** | |
| **Defendant.** | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT**
**STATE FARM'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT ..................................................................................................................... 6

I.     PLAINTIFFS PLAUSIBLY ALLEGE CLAIMS OF DISCRIMINATION
UNDER THE FAIR HOUSING ACT. .................................................................. 6

     A.    Plaintiffs Have Stated Cognizable Claims for Relief Under the Fair
Housing Act. ................................................................................................ 7

          *1.*    *Section 3604(b)* ............................................................................ 8

          *2.*    *Section 3605* ................................................................................ 12

     B.    Plaintiffs Adequately Pled Their Disparate Impact Theory of
Discrimination ............................................................................................ 13

          *1.*    *Statistical Disparity* ..................................................................... 15

          *2.*    *Specific Policy* .............................................................................. 17

          *3.*    *Causation* ..................................................................................... 19

II.    THE MCCARRAN-FERGUSON ACT DOES NOT BLOCK PLAINTIFFS'
FAIR HOUSING ACT CLAIMS. ...................................................................... 20

III.   PLAINTIFF RIIAN WYNN HAS STANDING TO PURSUE INJUNCTIVE
RELIEF ON BEHALF OF HERSELF AND THE CLASS. .............................. 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Access Living of Metro. Chi., Inc. v. City of Chi.*,
  372 F. Supp. 3d 663 (N.D. Ill. 2019) ........................................................... 16, 17

*Adams v. City of Indianapolis*,
  742 F.3d 720 (7th Cir. 2014) ......................................................................... 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................... 5, 6

*BCBSM, Inc. v. Walgreen Co.*,
  512 F. Supp. 3d 837 (N.D. Ill. 2021) ............................................................. 6

*Brown v. Glanz*,
  2013 WL 6909959 (N.D. Okla. Dec. 31, 2013).............................................. 18

*Camarena v. Safeway Ins. Co.*,
  2022 WL 472245 (N.D. Ill. Mar. 27, 2002) ................................................... 24

*City of Edmonds v. Oxford House, Inc.*,
  514 U.S. 725 (1995)......................................................................................... 7

*Cohen v. Am. Sec. Ins. Co.*,
  735 F.3d 601 (7th Cir. 2013) ......................................................................... 25

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
  583 F.3d 690 (9th Cir. 2009)........................................................................... 9

*Connectors Realty Grp. v. State Farm*,
  2019 WL 5064699 (N.D. Ill. Oct. 9, 2019).................................................... 17

*Corbin v. Allstate Corp.*,
  140 N.E.3d 810 (Ill. App. 2019) ................................................................... 25

*Cramer v. Ins. Exch. Agency*,
  174 Ill. 2d 513 (1996) ................................................................................... 23

*Cty. of Cook v. Bank of Am. Corp.*,
  181 F. Supp. 3d 513 (N.D. Ill. 2015) ....................................................... 14, 16

*Cty. of Cook v. Bank of Am. Corp.*,
  2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) ................................................. 15

*Cty. of Cook v. HSBC N. Am. Holdings, Inc.*,
  136 F. Supp. 3d 952 (N.D. Ill. 2015) ............................................................ 18

*Cty. of Cook v. HSBC N. Am. Holdings, Inc.*,
  314 F. Supp. 3d 950 (N.D. Ill. 2018) ............................................................. 14, 15

*Dehoyos v. Allstate Corp.*,
  345 F.3d 290 (5th Cir. 2003) ............................................................. 20, 22, 25

*Doe v. Mut. of Omaha Ins. Co.*,
  179 F.3d 557 (7th Cir. 1999) ............................................................. 24, 25

*Flores v. United Airlines*,
  426 F. Supp. 3d 520 (N.D. Ill. 2019) ............................................................. 24

*Ga. State Conference of the NAACP v. City of LaGrange*,
  940 F.3d 627 (11th Cir. 2019) .............................................................9, 11

*Geinosky v. City of Chi.*,
  675 F.3d 743 (7th Cir. 2012) ............................................................. 6

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) ............................................................. 15

*Hennessy Indus. v. Nat'l Union Fire Ins. Co.*,
  770 F.3d 676 (7th Cir. 2014) ............................................................. 23

*Humana Inc. v. Forsyth*,
  525 U.S. 299 (1999) ............................................................. 20, 21, 22, 23, 25

*Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*,
  804 F.3d 826 (7th Cir. 2015) ............................................................. 6

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ............................................................. 18

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affs.*,
  2016 WL 4494322 (N.D. Tex. Aug. 26, 2016) ............................................................. 17

*Levenstein v. Salafsky*,
  164 F.3d 345 (7th Cir. 1998) ............................................................. 6

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
  558 F.2d 1283 (7th Cir. 1977) ............................................................. 7

*Mont v. United States*,
  139 S. Ct. 1826 (2019) .............................................................11

*Montero v. JPMorgan Chase & Co.*,
  2016 WL 7231604 (N.D. Ill. Dec. 14, 2016) ............................................................. 20

*Moore v. Liberty Nat'l Life Ins. Co.*,
    267 F.3d 1209 (11th Cir. 2001) .................................................................................. 22

*NAACP v. Am. Family Mut. Ins. Co.*,
    978 F.2d 287 (7th Cir. 1992) ........................................................ 8, 9, 10, 13, 21, 22, 23

*Nat'l Fair Hous. All. v. Deutsche Bank*,
    2018 WL 6045216 (N.D. Ill. Nov. 19, 2018) ........................................................... 13

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*,
    2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) .................................... 16, 18, 19, 20

*Spriesch v. City of Chi.*,
    2017 WL 4864913 (N.D. Ill. Oct. 26, 2017) .................................................... 18, 19

*Stevens v. Hollywood Towers & Condo. Ass'n*,
    836 F. Supp. 2d 800 (N.D. Ill. 2011) ........................................................................ 21

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ............................................................................................ 14, 15

*Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015) ............................................................... 6, 7, 13, 15, 19

*Trafficante v. Metro. Life Ins. Co.*,
    409 U.S. 205 (1972) ............................................................................................... 6, 7

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
    113 F. Supp. 3d 555 (D. Conn. 2015) ............................................. 9, 11, 12, 13, 21

*Wetzel v. Glen St. Andrew Living Cmty., LLC*,
    901 F.3d 856 (7th Cir. 2018) ................................................................ 9, 10, 11

*White v. Campanelli*,
    2017 WL 528380 (N.D. Ill. Feb. 9, 2017) ............................................................... 18

*White v. United States*,
    8 F.4th 547 (7th Cir. 2021) ....................................................................................... 7

**Statutes**

15 U.S.C. § 1012(b) ................................................................................... 20, 21, 22

215 ILCS 5/154.6(d) ......................................................................................... 23

215 ILCS 5/155(1) ............................................................................................. 23

42 U.S.C. § 3601 ............................................................................................. 2, 6

42 U.S.C. § 3604(b) ................................................................................. 2, 7, 8, 9, 10, 12

42 U.S.C. § 3605 ................................................................................................... 2, 7

42 U.S.C. § 3605(a) .................................................................................................. 12

42 U.S.C. § 3605(b)(1)(A) .................................................................................. 12, 13

775 ILCS 5/3-101 .................................................................................................... 21

**Rules**

Reinstatement of HUD's Discriminatory Effects Standard,
  88 Fed. Reg. 19450 (Mar. 31, 2023) ................................................................. 6, 7

**Regulations**

24 C.F.R. § 100.70(d)(4) ...................................................................................... 8, 10

## INTRODUCTION

On March 6, 2022, a storm blew the roof membrane off two attached townhomes—one owned by Plaintiff Riian Wynn, who is Black, and one owned by her neighbor, who is white. That same day, Wynn and her neighbor filed essentially identical homeowners insurance claims, seeking coverage for the same property damage caused by the same storm. They filed those claims with the same insurance company, Defendant State Farm Fire & Casualty Company ("Defendant" or "State Farm"). The similarities stopped there. State Farm did not delay in approving the white neighbor's claim. But State Farm gave Wynn's near-identical claim much more scrutiny. State Farm required Wynn to submit documentation that it did not require from her neighbor; to obtain estimates that it did not require from her neighbor; and to allow inspections that it did not require from her neighbor. As water damage spread throughout Wynn's home, State Farm forced Wynn to interact with State Farm employees at least 50 times before finally approving her claim. In the end, State Farm took three months longer to process Wynn's claim than it took for her neighbor's claim, even though both claims sought financial assistance for the same damage from the same storm, and even though their townhouses were literally attached to each other.

This was not an isolated occurrence. All across the Midwest, State Farm subjects Black homeowners' claims to more scrutiny than claims filed by similarly situated white homeowners. The culprit is State Farm's decision to employ an automated artificial-intelligence ("AI") system, instead of relying on human judgment, to decide how closely to scrutinize any given claim. More specifically, this inequality is the result of State Farm's decision to use an AI system that disproportionately flags claims by Black homeowners for greater scrutiny than claims by similarly situated white homeowners. State Farm could easily adjust its AI system to eliminate or reduce these discriminatory effects, but it has failed to do so.

Plaintiffs Riian Wynn and Jacqueline Huskey are Black homeowners who filed insurance claims that were subjected to, and affected by, State Farm's policy of delegating the initial review of claims to AI tools that systematically disadvantage Black homeowners. *See* First Amended Complaint ("Complaint" or "FAC"), ECF No. 23 at ¶¶ 11-12. On behalf of themselves and a class of similarly situated State Farm policyholders, *id.* ¶¶ 58-67, they allege that State Farm's conduct violates the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, which prohibits racial discrimination by homeowners insurance companies. The FHA prohibits not just disparate treatment, like intentional race-based discrimination, but also disparate impact, like when a company uses a facially neutral policy that causes unjustifiably discriminatory effects. Plaintiffs allege that State Farm violated the FHA by discriminating "in the provision of services" connected with the "terms, conditions, or privileges of sale ... of a dwelling," 42 U.S.C. § 3604(b), and by discriminating "in the terms or conditions" of a "residential real estate-related transaction," 42 U.S.C. § 3605.

In moving to dismiss Plaintiffs' claims, State Farm contends that the FHA does not reach *any* claims-processing conduct by homeowners insurance companies—that State Farm could have an *express* policy requiring Black homeowners to wait longer than white homeowners for necessary repairs, and the Fair Housing Act would still be "entirely agnostic." Mem. in Supp. of Mot. to Dismiss ("Mem."), ECF No. 25 at 15. That attempt to carve out claims-processing from the FHA's coverage has no basis in text, case law, or common sense. State Farm also posits that it is above the law because it keeps the precise nature of its AI system under wraps—*i.e.*, because Plaintiffs do not yet know the exact variables or dataset that State Farm's AI uses to produce the statistically significant racial disparities alleged in the Complaint. *Id.* at 9-12. That argument flouts elementary Rule 8 principles; Plaintiffs do not have to hack into State Farm's servers to state

a claim. State Farm fares no better in arguing that the McCarran Ferguson Act ("MFA") requires dismissal. The MFA is no obstacle because applying the FHA would not invalidate, impair, or supersede any provision of Illinois law—which, like the FHA, prohibits racial discrimination by insurance companies.

Plaintiffs have plausibly alleged that State Farm uses an automated AI claims processing system that adversely affects Black homeowners, and that State Farm has not taken available steps to eliminate or reduce those adverse effects. Those allegations straightforwardly state a disparate-impact claim under the Fair Housing Act. State Farm's motion should be denied.

## FACTUAL BACKGROUND

### A.  Background on Homeowners Insurance

Homeowners insurance is a prerequisite to home ownership, with banks and mortgage companies typically requiring borrowers to acquire coverage as a precondition for financing. FAC ¶ 21. It is also the vehicle by which homeowners protect their sizeable financial investment in their homes. *Id.* If disaster strikes, a homeowner can rest easy knowing that their policy will provide the financial assistance they need to repair any damage and preserve the value of their home. *Id.* Traditionally, homeowners insurance claims were processed, investigated, and resolved by human insurance adjusters. *Id.* ¶ 31. In more recent years, technology has revolutionized the field. As of at least 2018, State Farm decided to automate major aspects of claims processing, including by replacing human judgment with algorithmic AI models. *Id.* ¶¶ 37, 57.

### B.  Algorithmic Decision-Making Tools

Algorithmic AI models—often referred to as "machine-learning" models—can quickly analyze vast troves of data to detect patterns and assist in decision-making. *Id.* ¶ 24. Before these models become useful, however, they must be trained to perform the task they will be assigned. And as with humans, bad training leads to bad results. If an AI model is trained using a flawed

data set, that model will learn the wrong things and then make flawed recommendations. For example, if an AI model designed to assist with hiring is trained using historic hiring data from firms that systematically favored males over females, the model will learn to favor males. *Id.* ¶ 25. This is true even if the model is not explicitly told the gender of the candidates. In one prominent real-world example, an AI model started "prioritizing language more commonly used by males, penalizing the word 'women's' in resumes, and devaluing candidates who had graduated from all-women's colleges." *Id.*; *see also id.* ¶ 26. For this reason, academics and government actors have cautioned that machine-learning algorithms, when used without appropriate training and oversight, "can reproduce existing patterns of discrimination, inherit the prejudice of prior decision makers, or simply reflect the widespread biases that persist in society." *Id.* ¶ 27.

### C.    State Farm's Claims-Processing System

State Farm is the largest provider of homeowners insurance in the United States. *Id.* ¶ 2. Since at least 2018, it has used machine-learning algorithms and AI tools, instead of human judgment, to determine how to process the high volume of homeowners insurance claims it receives. *Id.* ¶ 4. Specifically, State Farm uses algorithmic decision-making tools to separate potentially fraudulent or complex ("high touch") claims from clearly legitimate or straightforward ("low touch" or "no touch") claims. *Id.* "High touch" claims are placed on a separate track and processed more slowly than "low touch" or "no touch" claims. *Id.* Algorithmic decision-making tools drive the workflow at State Farm by predicting whether a given claim might be fraudulent, deciding how much scrutiny it requires, and directing employee tasks in accordance with that assessment. *Id.*

State Farm's algorithmic decision-making tools are much more likely to flag claims from Black homeowners for extra scrutiny than claims from white homeowners. *Id.* ¶¶ 6, 14-20. This is because the algorithmic decision-making tools that State Farm uses were trained on historically

biased housing and claims data (*e.g.*, the AI models were taught to replicate the biases of prior generations of claims adjusters) and/or rely on inputs that are proxies for race (*e.g.*, zip codes, surnames, or biometric information). *Id.* ¶ 48; *see id.* ¶¶ 31-47. Black homeowners, because their claims are more likely to be flagged for scrutiny, are disproportionately more likely to have to submit extra claims documentation, to have to repeatedly interact with State Farm employees, and to experience substantial delays in having their claims approved. *Id.* ¶ 6. Indeed, detailed survey data from State Farm policyholders across the Midwest show large and statistically significant disparities between Black and white homeowners regarding: (1) the time it took State Farm to pay out claims; (2) the supplemental paperwork State Farm required as part of the claim adjudication process; and (3) the number of interactions claimants had with State Farm employees before having their claims paid out. *Id.* ¶¶ 14-20. State Farm could make manageable adjustments to its algorithmic AI models that would achieve its legitimate goals while reducing or eliminating this discriminatory impact, but it has not done so. *Id.* ¶¶ 45-47, 55.

State Farm's discriminatory claims-processing policies inflict multiple forms of harm on Black policyholders. Black policyholders are forced to endure substandard living situations for unreasonably long periods of time and must suffer the humiliation and expense of undue delay and administrative burden. *Id.* ¶¶ 48-51. Black State Farm policyholders also receive a less valuable insurance product than white policyholders because it takes them longer and more effort to obtain financial assistance from State Farm. *Id.* ¶ 52. And as the claims of Black homeowners drag on without resolution—with repairs not paid for or completed in a timely fashion—the values of Black homes disproportionately decrease relative to the values of white homes. *Id.* ¶ 56.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Plausibility does not mean probability: a court reviewing a 12(b)(6) motion must ask itself *could* these things have happened, not *did* they happen." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833 (7th Cir. 2015) (internal quotation marks omitted). When ruling on a 12(b)(6) motion, the court must accept all well-pleaded facts as true and construe all reasonable inferences in the light most favorable to the plaintiff. *BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 846 (N.D. Ill. 2021).[1]

## ARGUMENT

## I. PLAINTIFFS PLAUSIBLY ALLEGE CLAIMS OF DISCRIMINATION UNDER THE FAIR HOUSING ACT.

The FHA outlaws discrimination in the sale, rental, or financing of dwellings and in other housing-related services and activities. *See* Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. 19450, 19450 (Mar. 31, 2023); *Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 530 (2015) ("*Inclusive Communities*"). "The language of the Act is broad and inclusive," *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972), with a stated purpose of ensuring "fair housing throughout the United States," 42 U.S.C. § 3601; *see also Inclusive Communities*, 576 U.S. at 539 ("The FHA, like Title VII and the ADEA,

---

[1] Because State Farm's brief relies on a variety of sources outside of the complaint, *see* Mem. at 2 (quoting from website); *id.* at 2 n.2 (citing article on website); *id.* at 3 (citing filing in other litigation); *id.* at 10 n.5 (citing website), Plaintiffs note that a 12(b)(6) motion can be based "only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Plaintiffs did not attach any documents to their Complaint, and none of the sources State Farm cites are critical to that complaint and referred to in it. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) ("[T]his is a narrow exception aimed at cases interpreting, for example, a contract."). For these reasons, Plaintiffs urge the Court to disregard State Farm's references to extra-complaint materials and render its decision based solely on the Complaint's well-pled factual allegations.

was enacted to eradicate discriminatory practices within a sector of our Nation's economy."). Courts thus typically afford the FHA a generous construction. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1289 (7th Cir. 1977). As a general matter, FHA claims may be brought under theories of both disparate treatment and disparate impact. *Inclusive Communities*, 576 U.S. at 534.[2]

Plaintiffs allege violations of both § 3604 and § 3605 of the FHA under a disparate impact theory of discrimination. State Farm asserts that neither section permits claims of discrimination against an insurer arising from the homeowners insurance claims process, and that even if one could state such a claim, Plaintiffs have not adequately alleged disparate impact discrimination. State Farm is wrong on both counts.

**A.     Plaintiffs Have Stated Cognizable Claims for Relief Under the Fair Housing Act.**

Plaintiffs' discrimination claims sound in two separate provisions of the FHA: § 3604(b) and § 3605.[3] This brief will address each statutory provision in turn.

---

[2] State Farm insinuates in passing that the FHA does not allow disparate impact claims against insurers. Mem. at 4, 7. Because State Farm did not develop this argument, it is waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). Regardless, the text of the FHA contains no carveout for the insurance industry; there is no evidence that Congress contemplated any such carveout, *see* Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. at 19463; the U.S. Department of Housing and Urban Development has expressly rejected any such carveout, *see, e.g., id.* at 19451-52, 19463-65; and the Supreme Court has held—without hint of industry-specific limitation—that FHA claims can be proven via either disparate treatment or disparate impact, *see Inclusive Communities*, 576 U.S. at 534.

[3] The Complaint also alleged a violation of § 3604(a). FAC ¶¶ 68-75. Plaintiffs acknowledge, however, that Seventh Circuit precedent currently forecloses a § 3604(a) claim based on post-acquisition discrimination absent strict constructive eviction. Plaintiffs believe that, in keeping with the statute's broad remedial purpose, *Trafficante*, 409 U.S. at 209, § 3604(a) should be read broadly to prohibit discrimination in the administration of homeowners insurance policies. Plaintiffs allege that State Farm is engaging in a form of discrimination that makes it significantly riskier and less desirable for Black customers to acquire and maintain ownership of a dwelling.

1.    *Section 3604(b)*

Section 3604(b) of the FHA prohibits "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race."  42 U.S.C. § 3604(b).  Homeowners insurance is both a "condition[]" of sale and a "service" rendered in connection with a sale, so it is within the scope of § 3604(b).  *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992) ("*American Family*").  Indeed, a regulation promulgated by the U.S. Department of Housing and Urban Development ("HUD") expressly codifies the agency's longstanding view that § 3604(b) applies to the provision of homeowners' insurance.  24 C.F.R. § 100.70(d)(4).  Pursuant to that regulation, § 3604(b) prohibits not only "[r]efusing to provide … property or hazard insurance," but also "providing … insurance differently because of race."  *Id.*; *American Family*, 978 F.2d at 300-01.  Plaintiffs have stated a claim under § 3604(b) by alleging exactly that—*i.e.*, that "State Farm's claims processing policy provides insurance coverage differently on the basis of race."  FAC ¶ 73.

State Farm concedes that § 3604(b) prohibits discrimination in the *sale* of homeowners insurance but contends that it does not prohibit discrimination in the *processing* of homeowners insurance claims.  Mem. at 14-15.  That contention cannot be squared with the plain language of the statute, HUD's regulation, Seventh Circuit authority, or common sense.

As an initial matter, the statute's plain language unambiguously reaches the homeowners insurance claims process, not just the initial acquisition of such insurance.  Section 3604(b) protects not only against discrimination in the "terms, conditions, or privileges of sale or rental," but also discrimination "in the provision of services or facilities in connection therewith."  As the Seventh Circuit has held, this language encompasses "services" rendered throughout the course of

---

*See* FAC ¶¶ 48, 51-52, 56.  This perpetuates segregation and impacts the availability of housing. Plaintiffs pled this claim and discuss it here to preserve the matter for appellate review.

ownership, not just at the time of acquisition. *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 867 (7th Cir. 2018) (holding that § 3604(b) "encompasses conduct that follows acquisition"). Indeed, "[f]ew 'services or facilities' are provided prior to the point of sale or rental; far more attach to a resident's occupancy." *Id.* Courts across the country have likewise held that § 3604(b) applies to discriminatory conduct that occurs after the homeowner acquires her home. *See, e.g.*, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009) (concluding that "the reach of the statute encompasses claims regarding services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling"); *Ga. State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627, 631 (11th Cir. 2019) ("The statute does not contain any language limiting its application to discriminatory conduct that occurs prior to or at the moment of the sale or rental."); *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 569 (D. Conn. 2015) ("[T]he words 'privileges' and 'services or facilities' in [§ 3604(b)] connote continuing rights beyond the acquisition of housing.").

That logic applies to homeowners insurance just the same as it does to all other services. Lenders require homeowners to acquire a homeowners insurance policy at the point of sale, *American Family*, 978 F.2d at 290, but all services provided under that policy are provided post-sale. Indeed, the sole purpose of acquiring a homeowners insurance policy is to secure post-sale services, all of which are realized via the insurance claims process. The homeowners insurance claims process is thus both a "condition[]" of sale and a "service[]" rendered "in connection" with the sale of a dwelling. 42 U.S.C. § 3604(b). It is also the mechanism by which homeowners can continuously guard against known risks to a sizeable and important financial investment and thereby enjoy key "privileges" of purchasing a home, such as the ability to safely and comfortably reside in that home as well as to safeguard, maintain, and/or grow a sizeable financial investment

over time. *Id.* Plaintiffs allege that State Farm is discriminating in the way it provides requisite "services" to Black homeowners, thereby undermining important "privileges" of sale, *see* FAC ¶ 73—this plainly falls within the ambit of § 3604(b).

Even if § 3604(b)'s language were ambiguous, HUD's regulation is not: HUD has made clear that the FHA applies not just when a company "refus[es] to provide … property or hazard insurance for dwellings," but also when "property or hazard insurance for dwellings" is "provid[ed] … differently because of race." 24 C.F.R. § 100.70(d)(4). That is precisely what Plaintiffs allege here. The Seventh Circuit has already concluded that this regulation is reasonable and entitled to deference. *American Family*, 978 F.2d at 300. Under both the plain language of the statute and HUD's binding regulation, § 3604(b) prohibits discrimination in the insurance claims process.

State Farm observes that the Seventh Circuit has yet to specifically hold that § 3604(b) applies to the post-acquisition processing of homeowners insurance claims, Mem. at 14, but that is simply because that court has never faced that specific question. Seventh Circuit cases interpreting § 3604(b) all support Plaintiffs' claim that the statute reaches the conduct Plaintiffs allege here. Indeed, State Farm does not cite a single case rejecting *any* § 3604(b) claim, let alone a claim based on discrimination in the homeowners insurance claims process.

State Farm relies on brief, conclusory assertions about the plain language of § 3604(b), avoiding all mention of 24 C.F.R. § 100.70(d)(4). Its sole argument is that the Seventh Circuit's decision in *Wetzel*, 901 F.3d 856, forecloses the application of § 3604(b) to Plaintiffs' post-acquisition claim. Mem. at 14-15. It does not.

As an initial matter, the *Wetzel* Court approved the plaintiff's post-acquisition § 3604(b) claim, holding that the statute covers harassment suffered by a tenant *after* the leasing of a

10

dwelling.[4]  *See* 901 F.3d at 856-61.  *Wetzel*'s reasoning does nothing other than support the application of § 3604(b) here.  The *Wetzel* Court noted that the phrase "in the provision of services or facilities in connection therewith" "most naturally encompasses conduct that follows acquisition."  901 F.3d at 866-67; *see also Viens*, 113 F. Supp. 3d at 569 (relying on similar reasoning to conclude that § 3604(b) can support a claim of discrimination in the non-renewal and post-acquisition pricing of property insurance).

State Farm claims that *Wetzel* requires a sufficiently "direct" connection between the provision of services and the "terms, conditions, or privileges of sale."  Mem. at 14.  But this requirement is nowhere stated in *Wetzel*.  In fact, the Supreme Court has long recognized that the phrase "in connection with" "can bear a broad interpretation."  *Mont v. United States*, 139 S. Ct. 1826, 1832 (2019) (collecting cases on the interpretation of "in connection with" across various federal statutes).  Regardless, there is a close connection between the terms, conditions, and privileges of sale and the post-sale provision of services under a homeowners insurance policy.  Homeowners insurance is a service that flows from the acquisition of a dwelling.  One cannot have a homeowners insurance policy without first obtaining a dwelling.  In other words, the concept of homeowners insurance is "inextricably intertwined with the dwelling itself."  *Ga. State Conference of the NAACP*, 940 F.3d at 634 (holding that discrimination in the post-sale provision of basic utility services is covered by § 3604(b)).

State Farm contends that the "condition" that a homeowner have insurance before obtaining a mortgage is "entirely agnostic to the manner in which insurance claims are handled."  Mem. at 15.  That is absurd.  The insurance claims process is the *sole* way in which benefits under

---

[4] To the extent State Farm is tacitly suggesting that *Wetzel* and predecessor cases have set the outer bounds of § 3604(b)'s application, it is wrong.  *Wetzel* expressly disavowed identifying "the exclusive set of post-acquisition claims that would be possible under section 3604(b)."  901 F.3d at 866.

the policy (and thus the required security the lender demands) are realized: It is the means by which a lender can feel confident in its investment and the borrower can feel confident that he or she will enjoy the privileges of homeownership in exchange for incurring a significant debt. A lender would not make the loan and the borrower would not agree to assume a hefty debt if either knew that the policy would be administered unfairly, untimely, and vexatiously to the detriment of the dwelling and each party's financial security.

Homeowners insurance is undeniably a "service[]" "provi[ded] … in connection" with "the terms, conditions, or privileges of sale … of a dwelling." 42 U.S.C. § 3604(b). For this reason, Plaintiffs have stated a claim under § 3604(b).

2.    *Section 3605*

The FHA also makes it unlawful for entities that engage in "residential real estate-related transactions" "to discriminate against any person in making available such a transaction." 42 U.S.C. § 3605(a). The statute defines "residential real estate-related transaction" to include "[t]he making or purchasing of loans or providing other financial assistance … for … repairing[] or maintaining a dwelling." *Id.* § 3605(b)(1)(A). This language plainly applies to the homeowners insurance claims process, the primary purpose of which is to "repair[] or maintain[] a dwelling." Very few Americans have hundreds of thousands of dollars on hand to pay to rebuild their house if it burns down—instead, they rely on their insurer to provide the "financial assistance" needed to "repair[]" or "maintain[]" their dwelling in the rare case that catastrophe happens. *See Viens*, 113 F. Supp. 3d at 571 (rejecting the assertion that § 3605 applies solely to loans and subsidies, noting that "insurance provides the necessary financial assistance to 'repair[]' or 'maintain[]' a dwelling"). It is difficult to imagine what types of "other financial assistance" Congress was contemplating when it expressly included "repairs" and "maintenance" in the list of activities encompassed by § 3605(b)(1)(A) if not payment resulting from a property insurance claim.

12

State Farm contends that *American Family* forecloses the application of § 3605 here, *see* Mem. at 12-13, but *American Family* addressed a very different question: whether an insurance company provides "financial assistance" when it first sells (or refuses to sell) an insurance policy. *See* 978 F.2d at 297. *American Family*'s reasoning was premised solely on the nature of the financial transaction at the time an insurance policy is *acquired*, at which point "[p]ayment runs from the customer to the insurer." *Id.* But when an insurance claim is made by a homeowner, payment runs the other direction, from ***insurer to customer***. In other words, while the premium paid to the insurer when purchasing a policy is not "financial assistance … for … repairing or maintaining a dwelling," 42 U.S.C. § 3605(b)(1)(A), the insurer's payment to a policyholder making a claim for necessary repairs surely is. This transaction is just like a loan: "both provide financing when needed for a predetermined fixed price."[5] *Viens*, 113 F. Supp. 3d at 571. Thus, *American Family*'s reasoning does not address, let alone foreclose, claims of discrimination with respect to the insurance claims process.

In light of the plain language of the statute, the Court should hold that the insurance claims process implicates "financial assistance" to "repair[]" or "maintain[]" a dwelling.

**B.      Plaintiffs Adequately Pled Their Disparate Impact Theory of Discrimination.**

To state a disparate impact claim under the FHA, a plaintiff must allege "(1) a statistical disparity and (2) that the defendant maintained a specific policy which (3) caused the disparity." *Nat'l Fair Hous. All. v. Deutsche Bank*, No. 18 C 0839, 2018 WL 6045216, at *11 (N.D. Ill. Nov. 19, 2018); *see also Inclusive Communities*, 576 U.S. at 521. Here, Plaintiffs rely on defendant-

---

[5] In this way, the payment an insurer makes for a covered loss is nothing like "a loaf of bread purchased at retail price in a supermarket," *American Family*, 978 F.2d at 297: the "financial assistance" rendered by a property insurer is entirely unmoored from the value of the premium paid. Assistance corresponds to the customer's need, not the value of the money paid by the customer for the policy.

specific data collected from a recent survey of 648 white and 151 Black homeowners across the Midwest to allege that State Farm is disproportionately subjecting claims from Black homeowners to heightened scrutiny. FAC ¶ 15. Plaintiffs identify statistically significant disparities between Black and white homeowners regarding the time it took for State Farm to resolve their claims; the supplemental paperwork required by State Farm as part of the claim adjudication process; and the number of interactions claimants had with State Farm employees prior to having their claims paid out. *Id.* Plaintiffs tie these statistical disparities to a specific policy: State Farm's decision to employ an automated AI system—in lieu of human judgment—to determine how much scrutiny to give each homeowners claim it receives. *See id.* ¶ 4. Because of the way it was programmed, the system disproportionately flags claims by Black homeowners for greater scrutiny than claims by similarly situated white homeowners. *Id.* ¶ 40. It is plausible that State Farm's policy is causing the identified disparities because (1) all homeowners insurance claims are uniformly subject to the policy, *id.* ¶ 5; (2) the policy is what dictates claims adjuster workflow at State Farm and is thus the driver of requests for supplemental paperwork, number of employee interactions, and overall time to claim resolution, *id.* ¶ 4; and (3) AI tools like this have been known to cause bias in financial products generally and within home products specifically, *id.* ¶ 5. On the whole, Plaintiffs' "complaint easily satisfies the requirements of Rule 8(a) because it gives [State Farm] fair notice of the basis for [Plaintiffs' disparate impact] claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

State Farm's arguments to the contrary—supported largely by summary judgment cases—are grounded in a fundamental misconception of the law: A plaintiff is not required to prove a prima facie case of discrimination in her complaint. *See Cty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 521 (N.D. Ill. 2015) ("*Bank of Am. I*"); *Cty. of Cook v. HSBC N. Am. Holdings, Inc.*,

314 F. Supp. 3d 950, 967 (N.D. Ill. 2018) ("*HSBC II*") (noting that "[a] *prima facie* case is an evidentiary standard, and not a pleading requirement"); *cf. Swierkiewicz*, 534 U.S. at 515. That requirement "applies only at the summary judgment stage." *HSBC II*, 314 F. Supp. 3d at 967. At the motion to dismiss stage, a plaintiff need only "allege facts sufficient to support a causal connection between the challenged policy or policies and a disparate impact upon members of a protected class." *Id.* (citing *Inclusive Communities*, 576 U.S. at 542).

Insofar as State Farm is implying that the Supreme Court created a heightened pleading standard for FHA disparate impact claims in *Inclusive Communities*, State Farm is wrong. *See Cty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2018 WL 1561725, at *8 (N.D. Ill. Mar. 30, 2018) (rejecting defense argument that *Inclusive Communities* established new "rigorous, pleading-stage requirements"); *HSBC II*, 314 F. Supp. 3d at 967 (*Inclusive Communities* "did not alter the plausibility standard for pleading"). *Inclusive Communities* involved a decision reached after discovery and a bench trial. The Supreme Court granted certiorari to determine "whether disparate-impact claims are cognizable under the FHA," 576 U.S. at 528, not disparate impact pleading standards, *see id.* at 542 (framing its discussion of robust causality as one of "adequate safeguards at the prima facie stage"). In holding that disparate impact claims are cognizable under the FHA, the Supreme Court relied heavily on longstanding disparate-impact jurisprudence like *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). *See Inclusive Communities*, 576 U.S. at 530-533; *id.* at 540 (emphasizing that disparate impact liability has "always" been limited in the respects discussed in the case). *Inclusive Communities* extended that longstanding disparate impact law to the FHA—it did not alter the disparate impact pleading standard.

### 1. Statistical Disparity

Plaintiffs have sufficiently alleged statistical disparity at the pleading stage. "Disparate-impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to

support their claims. At the pleading stage, some basic allegations of this sort will suffice." *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014); *see Bank of Am. I*, 181 F. Supp. 3d at 522 ("Whether the [plaintiff's] statistics establish a prima facie case of disparate impact is not something I can or must decide at the pleading stage."). Here, Plaintiffs have offered both statistics and comparison in support of their claims: First, they detail the results of a survey of about 800 white or Black homeowners with State Farm homeowners insurance policies across the Midwest. FAC ¶ 14. That survey revealed statistically significant disparities between Black and white policyholders in terms of the time it took to process their claims, the amount of paperwork required to justify their claims, and the number of interactions with State Farm employees. *Id.* ¶¶ 14-15. Second, Plaintiffs describe Plaintiff Wynn's experience with State Farm. Despite suffering substantially the same storm damage as a white neighbor—*whose townhome was physically attached to her home*—Plaintiff Wynn was required to supply more paperwork, was subjected to more inspections, and was ultimately forced to wait about three more months for approval of her claim. *Id.* ¶ 12. Plaintiff Wynn's experience lines up exactly with the survey results.

State Farm nitpicks Plaintiffs' survey allegations, implying that Plaintiffs were required to supply a sophisticated multivariate analysis to survive a motion to dismiss.[6] *See* Mem. at 7-9. That is simply not the law. *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 C 839, 2019 WL 5963633, at *13 (N.D. Ill. Nov. 13, 2019) ("Plaintiffs are not required, at the pleading stage, to defend every nuance of their methodology."); *id.* at *14 ("It is not Plaintiffs' burden at the pleading stage to explain potential nondiscriminatory reasons for Defendants' conduct."); *see Access Living of Metro. Chi., Inc. v. City of Chi.*, 372 F. Supp. 3d 663, 671 (N.D. Ill. 2019) (denying

---

[6] State Farm misses the mark when it claims that survey cut-offs were arbitrary: the point is not that thirty days is acceptable while thirty-two days is not. The point is that it is not legally acceptable for white homeowners' claims to be resolved more quickly and with less suspicion than Black homeowners' claims. And that's exactly what Plaintiffs use the survey to plausibly allege.

similar defense argument where Plaintiff investigated a random sample of 300 housing developments to assess compliance with the FHA and ADA). "All the details that [State Farm] claims are lacking go to the substantiation of Plaintiff[s'] claims and methodology, which [State Farm] is free to explore in discovery." *Access Living*, 372 F. Supp. 3d at 672.[7]

### 2. Specific Policy

Plaintiffs' have also identified a sufficiently specific policy: State Farm's decision to employ an automated artificial-intelligence system, instead of human judgment, to decide how closely to scrutinize any given claim. FAC ¶¶ 4, 38. The system separates potentially fraudulent or complex ("high touch") claims from legitimate or straightforward ("low touch" or "no touch") claims, and structures claims adjuster workflow from there accordingly. *Id.* Because of the way it was programmed and trained, the system disproportionately flags claims by Black homeowners for greater scrutiny than claims by similarly situated white homeowners. *Id.* ¶ 40.

State Farm invokes buzzwords from two out-of-circuit cases, Mem. at 10, but tellingly fails to describe the allegations deemed insufficient in those cases, which pale in comparison to the detailed allegations here. *See, e.g.*, *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affs.*, No. 3:08-CV-0546-D, 2016 WL 4494322, at \*6 (N.D. Tex. Aug. 26, 2016) (addressing allegations that a "generalized policy of discretion" caused a disparate impact). State Farm

---

[7] State Farm offers only one Rule 12(b)(6) case in support of its attack on Plaintiffs' statistics. *See Connectors Realty Grp. v. State Farm*, No. 19 C 743, 2019 WL 5064699 (N.D. Ill. Oct. 9, 2019). But the allegations of statistical disparity in that case were qualitatively and quantitatively different from the allegations here. In *Connectors Realty*, the plaintiffs' analysis was not specific to State Farm, was attenuated from the plaintiffs' underlying theory of discrimination, and was very cursorily explained: the plaintiffs' description of the analysis comprised one paragraph (and three total sentences) of their complaint. *See Connectors Realty Grp. v. State Farm*, No. 19 C 743, ECF No. 24 at ¶ 40. The Court deemed this analysis "insufficient to demonstrate a disparity as to State Farm specifically, rather than the industry as a whole." *Connectors Realty*, 2019 WL 5064699, at \*7. Here, by contrast, the Complaint extensively details the nature of the survey, its State Farm-specific results, and their statistical significance. FAC ¶¶ 14-20.

likewise fails to identify a single case from this district (or any other) concluding that allegations like those here insufficiently pled a policy. In fact, defendants in this district have repeatedly raised similar arguments on motions to dismiss to no avail. *See, e.g.*, *Deutsche Bank Nat'l Tr.*, 2019 WL 5963633, at *16 (an "abdication" policy whereby defendants relinquished responsibility "suffices to state a policy for a disparate impact claim"); *Cty. of Cook v. HSBC N. Am. Holdings, Inc.*, 136 F. Supp. 3d 952, 966 (N.D. Ill. 2015) (holding that plaintiff stated a claim of disparate impact where they alleged that discretionary pricing policies "increased the costs for loans made to minority borrowers, thereby reducing their home equity, and caused a downward spiral of mortgage delinquencies and failures"); *cf. White v. Campanelli*, No. 14-cv-7215, 2017 WL 528380, at *7 (N.D. Ill. Feb. 9, 2017) (denying summary judgment motion in Title VII promotion case where a reasonable factfinder could infer that the formulation or evaluation of promotion interview questions caused disparate results). Plaintiffs have done much more than make "vague allegations of racial stereotyping." Mem. at 10 (quoting *Brown v. Glanz*, No. 12-cv-587, 2013 WL 6909959, at *6 (N.D. Okla. Dec. 31, 2013)). Plaintiffs have identified a specific practice within State Farm's homeowners insurance claims process—the use of AI-driven scrutiny flags—that they allege has an adverse impact on Black customers.

To the extent State Farm is suggesting that Plaintiffs' articulation of the policy fails because Plaintiffs did not describe in extensive detail the specific variables and weights used by a system that State Farm considers to be a trade secret and keeps closely under wraps, that is not the law. *See, e.g., In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) ("If private plaintiffs … are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information."); *Spriesch v. City of Chi.*, No. 17-cv-1952, 2017 WL 4864913, at *5 (N.D.

Ill. Oct. 26, 2017) (holding that a "more robust description of the policy" is not required where the "parties have enough factual content to conduct discovery on the policy"). Plaintiffs have identified State Farm's discriminatory policy as specifically as they need to at the pleading stage.

### 3. Causation

Finally, Plaintiffs have adequately alleged that State Farm's policy causes the identified statistical disparities. "The 'robust causality' required in a disparate impact claim …. involves an examination of whether a defendant's policies were properly pleaded as the cause of the discriminatory impact." *Deutsche Bank Nat'l Tr.*, 2019 WL 5963633, at *17. The requirement exists to protect defendants "from being held liable for racial disparities they did not create." *Inclusive Communities*, 576 U.S. at 542.

That risk is not implicated here. Plaintiffs seek to hold State Farm responsible not for racial disparities that exist independent of State Farm's conduct, but for the racial imbalance that State Farm's AI system creates by disproportionately flagging Black homeowners' claims for higher scrutiny. Contrary to State Farm's assertions, Plaintiffs have adequately identified "a chain of inferences explaining how the [policy in question] will cause a racially disparate impact," Mem. at 11: (1) State Farm has a policy of processing all homeowners insurance claims through an AI system used to determine how closely to scrutinize any given claim. FAC ¶ 4. (2) All homeowners insurance claims are uniformly subject to that policy. *Id.* ¶ 5. (3) The policy is what dictates claims adjuster workflow at State Farm and thus drives requests for supplemental paperwork, number of employee interactions, and overall time to claim resolution. *Id.* ¶ 4. (4) AI tools like this have been known to cause bias in financial products generally and within home products specifically.

*Id.* ¶ 5.   It is thus reasonable to infer that State Farm's policy is causing the alleged race-based disparity.[8]

For all these reasons, the Court should deny State Farm's motion and hold that Plaintiffs have adequately pled their FHA disparate impact claims.[9]

## II.   THE MCCARRAN-FERGUSON ACT DOES NOT BLOCK PLAINTIFFS' FAIR HOUSING ACT CLAIMS.

Congress passed the McCarran-Ferguson Act ("MFA") to ensure that federal statutes "would not automatically override state insurance regulation."  *Humana Inc. v. Forsyth*, 525 U.S. 299, 306 (1999).   The MFA operates as a preemption-blocker: Certain state insurance laws that would be preempted under ordinary Supremacy Clause principles are instead saved from preemption by the MFA.  *Id.*   As relevant here, the MFA provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).

As the statutory text makes clear, the MFA blocks federal law only when applying that federal law would "invalidate, impair or supersede" a state law or a declared state policy about the business of insurance.  *Id.*; *see Humana*, 525 U.S. at 307, 310; *Dehoyos v. Allstate Corp.*, 345 F.3d 290, 295 (5th Cir. 2003).   The MFA emphatically *does not* operate like reverse field preemption,

---

[8] Again, contrary to State Farm's repeated assertions, Plaintiff is not required to disprove all other possible causes of the alleged disparity at the pleading stage.  *See Deutsche Bank Nat'l Tr.*, 2019 WL 5963633, at *13-14.   A plaintiff need only adequately allege that the defendant's policy was the cause of the statistical disparity.

[9] Should the Court determine that there are any deficiencies in Plaintiffs' factual allegations, however, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15(a).   This is the first complaint challenged by Defendant, and motions for leave to amend are liberally granted absent prejudice, surprise resulting from delay, or futility.  *Montero v. JPMorgan Chase & Co.*, No. 14 C 9053, 2016 WL 7231604, at *4 (N.D. Ill. Dec. 14, 2016).   None of these limiting factors exist here.

automatically displacing any federal law's application to the field of insurance. To the contrary, the Supreme Court expressly "reject[ed] any suggestion that Congress intended to cede the field of insurance regulation to the States." *Humana*, 525 U.S. at 308. Instead, federal and state law can both validly apply and regulate the same insurance-related conduct when they run in harmony: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310. The *Humana* Court accordingly held that the MFA did not block RICO claims against an insurer, even though Nevada had its own "comprehensive administrative scheme that prohibits various forms of insurance fraud." *Id.* at 312. Federal and state policy goals—"combating insurance fraud"—were compatible, so there was no conflict and no role for the MFA to play. *Id.* at 313-14.

The MFA does not apply here for the same reason—*i.e.*, because disparate-impact liability under the FHA would not "invalidate, impair, or supersede" any provision of Illinois law. 15 U.S.C. § 1012(b). To the contrary, the FHA's policy goals are perfectly aligned with those of Illinois: "Illinois courts [look] to the Fair Housing Act in interpreting the Illinois Human Rights Act," and apply "the same analysis" to both. *Stevens v. Hollywood Towers & Condo. Ass'n*, 836 F. Supp. 2d 800, 808 (N.D. Ill. 2011); *see* 775 ILCS 5/3-101 *et seq.* Where, as here, state law "is consistent with the Fair Housing Act," the MFA does not prevent the application of federal law to homeowners insurance. *American Family*, 978 F.2d at 297. "Duplication is not conflict." *Id.*; *cf.* *Viens*, 113 F. Supp. 3d at 573 n.20 ("[T]he [Connecticut Fair Housing Act] provides similar (albeit broader) protection against housing discrimination as the FHA, which is strong indication that application of the [FHA] will not impair Connecticut's regulation of the insurance industry.").

State Farm cites a handful of state-law provisions that regulate the conduct of insurance companies, but never explains how applying the FHA would "invalidate," "impair," or "supersede" any of those provisions. 15 U.S.C. § 1012(b); *see Humana*, 525 U.S. at 307-08 (defining those terms). State Farm does not, for example, identify any provision of Illinois law that *approves* disparate impacts on Black policyholders or immunizes insurers against disparate-impact claims. That omission is fatal to State Farm's argument, as it was to other insurers' arguments in similar cases. In *American Family*, for example, the Seventh Circuit rejected an argument that applying the FHA to redlining claims would "invalidate, impair, or supersede" Wisconsin insurance law, explaining that the insurance company "has not drawn to our attention … any law, regulation, or decision in Wisconsin requiring redlining, condoning that practice, committing to insurers all decisions about redlining, or holding that redlining with discriminatory intent (or disparate impact) does not violate state law." 978 F.2d at 295-97; *accord Dehoyos*, 345 F.3d at 299 ("Defendants have not drawn the court's attention to any law, regulation, or decision in Texas or Florida requiring or condoning the credit-scoring practice at issue here."); *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1222 (11th Cir. 2001) (same with respect to life insurance). Likewise here, State Farm has not identified anything in Illinois law that requires, condones, or approves claims-processing systems that disparately impact Black policyholders. The MFA accordingly poses no obstacle to applying the FHA.

The specific provisions that State Farm cites do not help its argument. State Farm points to §§ 154.6(c)-(d) of the Insurance Code, which it says "closely regulate[] the claim-handling practices that Plaintiffs say caused their alleged injuries." Mem. at 4. But State Farm never even claims that the FHA would "invalidate, impair, or supersede" those two provisions. Nor could it, as those provisions require insurance companies to settle claims in a "prompt, fair and equitable"

manner, 215 ILCS 5/154.6(d) —a duty consistent with the FHA's requirements, FAC ¶¶ 48-56. State Farm next notes that the State Director of Insurance has authority to penalize Insurance Code violations, Mem. at 4, but the same was true in *Humana*, where "Nevada's Insurance Commissioner ha[d] the authority to issue charges if there is reason to believe the [Unfair Insurance Practices Act] has been violated." 525 U.S. at 312. That did not mean that applying RICO ran afoul of the MFA because, as noted *supra*, the MFA is not akin to field preemption and instead leaves ample room for "federal law [to be] applied in aid or enhancement of state regulation." *Id.* at 303; *see also American Family*, 978 F.2d at 295 (rejecting MFA argument even though Wisconsin "did not create a private right of action" to enforce its insurance laws).

State Farm's citation to § 155 of the Insurance Code is even further from the mark. *See* Mem. at 4-5. Section 155 is an attorney's fees provision. *See* 215 ILCS 5/155(1). It is hard to fathom how imposing substantive liability under the FHA could "invalidate, impair, or supersede" an attorney's fees provision, and State Farm provides no explanation. State Farm strains to portray § 155 as some kind of exclusive remedy for insurer wrongdoing, *see* Mem. at 5, but like all attorney's fees provisions, it "presupposes" an underlying cause of action with its own set of remedies. *Hennessy Indus. v. Nat'l Union Fire Ins. Co.*, 770 F.3d 676, 679 (7th Cir. 2014); *see also Cramer v. Ins. Exch. Agency*, 174 Ill. 2d 513, 524 (1996) ("[Section 155] was not intended to insulate an insurer from … tort actions."). State Farm argues that § 155 requires "willful" conduct that is not alleged here, Mem. at 5, but that is just an argument that Plaintiffs would not qualify for fees under § 155; it does not even begin to explain how § 155 would be "invalidated" or "impaired" by imposing substantive liability under the FHA.

State Farm's final MFA-related argument is that Plaintiffs' claims "would require this Court to assess the actuarial soundness of the prices Plaintiffs paid for their policies," which State Farm

claims is "within the exclusive province of the Illinois Department of Insurance." Mem. at 6. That argument is flawed in three respects. First, even if the argument were correct, it would not warrant dismissal. State Farm does not argue that determining *liability* would "step[] on the toes of state insurance commissioners," *id.* at 6, but only that calculating *damages* would—and on only one of Plaintiffs' damages theories. *See* FAC ¶ 52. Nothing about State Farm's argument would prevent Plaintiffs from proceeding on their other damages theories, *e.g.*, *id.* ¶ 51, or their request for injunctive relief, *id.* ¶ 7—and so nothing about the argument warrants dismissing Plaintiffs' claims, which is the only relief State Farm requests.

Second, State Farm mischaracterizes the one damages theory it challenges. Plaintiffs are not questioning the "actuarial soundness" of State Farm's prices. Nothing about this case would involve the Court in underwriting. Those are the fact patterns of the cases on which State Farm relies; the plaintiffs in those cases alleged that the rates they paid were based on improper, non-actuarial considerations. *See Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 558 (7th Cir. 1999) (alleging that coverage caps were not based on "bona fide risk classification"); *Flores v. United Airlines*, 426 F. Supp. 3d 520, 538 (N.D. Ill. 2019) (alleging that rate did not reflect "underwriting risk and insurer profit"); *Camarena v. Safeway Ins. Co.*, 2022 WL 472245, at *3 (N.D. Ill. Mar. 27, 2002) (alleging that insurer sold "its policies to minorities at prices and terms unreasonably in excess of … comparable insurance policies"). The federal claims in those cases would have required the courts to engage in underwriting. In contrast, the damages theory that State Farm challenges here focuses only on the diminution in value caused by State Farm's discriminatory claims-processing practices. *See, e.g.*, FAC ¶ 52.

Third, the premise of State Farm's argument—that "actuarial soundness of the prices Plaintiffs paid for their policies [is] an assessment within the exclusive province of the Illinois

24

Department of Insurance," Mem. at 6—is mistaken.  While the *Mutual of Omaha* Court assumed that the Illinois Department of Insurance reviews and approves homeowners insurance rates, *see* 179 F.3d at 564 (citing a national treatise), subsequent Illinois and Seventh Circuit decisions have clarified that Illinois regulators "lack the express authority to regulate property-insurance rates," *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013); *see also Corbin v. Allstate Corp.*, 140 N.E.3d 810, 814 (Ill. App. 2019) ("Illinois was left without any property, casualty, and motor vehicle insurance rating laws").  Accordingly, even if Plaintiffs' damages theory required an actuarial assessment (and it does not), that would not "step[] on the toes of state insurance commissioners," Mem. at 6, because those commissioners do not conduct such assessments.

In sum, State Farm cites a variety of state laws related to insurance but does not demonstrate that disparate-impact liability would "directly conflict" with any of those laws, would "frustrate any declared state policy" condoning disparate impacts, or would otherwise "interfere with [Illinois'] administrative regime."  *Humana*, 525 U.S. at 310.  Accordingly, "the McCarran-Ferguson Act does not preclude [the FHA's] application."  *Id.*; *accord Dehoyos*, 345 F.3d at 299.

## III.   PLAINTIFF RIIAN WYNN HAS STANDING TO PURSUE INJUNCTIVE RELIEF ON BEHALF OF HERSELF AND THE CLASS.

The Complaint alleges that Plaintiff Riian Wynn maintains a homeowners insurance policy with State Farm.  FAC ¶ 12.  State Farm does not dispute this fact.  Mem. at 15.  Thus, regardless of whether Plaintiff Huskey cancelled her policy with State Farm, Plaintiff Wynn's request for injunctive relief on behalf of both herself and the class survives.  FAC ¶ 12.

## CONCLUSION

For the foregoing reasons, the Court should deny State Farm's motion to dismiss Plaintiffs' Fair Housing Act claims.

Dated: June 29, 2023                     Respectfully submitted,


By: */s/ Aisha Rich*_____
**FAIRMARK PARTNERS, LLP**
Aisha Rich (*Pro Hac Vice*)
Alexander Rose (*Pro Hac Vice*)
Jamie Crooks (*Pro Hac Vice*)
Michael Lieberman (*Pro Hac Vice* Forthcoming)
1825 7th St NW, #821
Washington, DC 20001
Phone: (301) 458-0564
aisha@fairmarklaw.com
alex@fairmarklaw.com
jamie@fairmarklaw.com
michael@fairmarklaw.com

**SANFORD HEISLER SHARP, LLP**

David Tracey (*Pro Hac Vice* Forthcoming)
Albert Powell (*Pro Hac Vice* Forthcoming)
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Phone: (646) 402-5667
dtracey@sanfordheisler.com
apowell@sanfordheisler.com

**CENTER ON RACE, INEQUALITY, AND THE
LAW AT NEW YORK UNIVERSITY SCHOOL
OF LAW**
Deborah N. Archer (*Pro Hac Vice*)
Jason D. Williamson (*Pro Hac Vice*)
139 MacDougal Street
New York, NY 10012
Phone: (212) 998-6882
deborah.archer@nyu.edu
jason.williamson@nyu.edu

*Counsel for Plaintiff and the Proposed Class*