**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACQUELINE HUSKEY and RIIAN WYNN, on behalf of themselves and all others similarly situated, | ) ) ) | No. 22 C 7014 |
| | ) | |
| *Plaintiffs*, | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| STATE FARM FIRE & CASUALTY COMPANY, | ) ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Jacqueline Huskey and Riian Wynn, who are Black, brought claims under their homeowners insurance policies from Defendant State Farm Fire & Casualty Company. They claim State Farm handled their claims with greater scrutiny because of their race. For example, after Wynn and her white neighbor—also a State Farm policyholder—suffered similar roof damage, State Farm processed Wynn's and her neighbor's claims differently. Compared to her neighbor's claim, Wynn's claim took months longer to process, required additional paperwork and interactions, and ultimately, resulted in less coverage. Rather than discriminatory animus, Plaintiffs blame State Farm's use of algorithmic decision-making tools that allegedly resulted in statistically significant racial disparities in how the insurer processed claims. On behalf of a putative class, Plaintiffs bring disparate-impact claims under three sections of the Fair Housing Act (FHA), 42 U.S.C. §§ 3604(a) and (b) and § 3605. State Farm moves to dismiss. (Dkt. 24). For the following reasons, State Farm's Motion to Dismiss [24] is granted in part and denied in part.

## BACKGROUND

### A.    Plaintiffs' Homeowners Insurance Claims

Plaintiffs Jacqueline Huskey and Riian Wynn are Black homeowners who insured their homes through Defendant State Farm Fire & Casualty Company. (Dkt. 23 ¶¶ 11–12). Huskey had a State Farm homeowners insurance policy from around March 2021 until around February 2023. (*Id.* at ¶ 11). On June 12, 2021, hail damaged the roof of Huskey's home in Matteson, Illinois. (*Id.*) She filed a claim on her policy right away, yet she heard nothing from State Farm for over a month. (*Id.*) In August 2021, a State Farm adjuster visited Huskey's home and gave her an estimate for the damage to the inside of the home. (*Id.*) But the inspector refused to inspect the outside of Huskey's roof. (*Id.*) After Huskey called State Farm several times, State Farm sent a third-party adjuster to inspect the roof. (*Id.*) Eventually, almost four months after Huskey filed her claim, State Farm granted her claim in part—only covering repairs for internal damage. (*Id.*) Due to State Farm's delay in processing Huskey's claim, the unrepaired roof caused further water damage to her kitchen and bathrooms, and her home's value decreased. (*Id.*) In total, Huskey has spoken with State Farm employees between 20 and 30 times, and she has been unable to repair the damage to the roof. (*Id.*)

Wynn's story is similar. She has had a State Farm policy since 2015, when she bought her townhome in Evanston, Illinois. (*Id.* at ¶ 12). On March 6, 2022, the roof membrane of Wynn's home and the three neighboring townhomes blew off in a storm. (*Id.*) Water leaked into Wynn's home, damaging the interior. (*Id.*) Wynn's white neighbor, who was also a State Farm policyholder, experienced similar damage. (*Id.*) Although Wynn and her neighbor both filed claims on March 6, their experiences with State Farm differed. (*Id.*) In contrast to Wynn's neighbor's claim, State Farm scrutinized Wynn's claim by demanding additional documents, estimates, and

inspections. (*Id.*) Wynn had "dozens more interactions with State Farm employees than her neighbor," and her claim took about three months longer to resolve. (*Id.*) In the meantime, "Wynn's home experienced further damage, she lost use of her home, and her compensation was delayed." (*Id.*) Further, State Farm did not cover Wynn's repairs and mitigation to the same extent as for her neighbor. (*Id.*) Wynn had at least 50 interactions with State Farm employees, and her claim took over eight months to process. (*Id.*)

**B.      Racial Disparities in State Farm's Claims Handling**

According to a 2021 survey of about 800 Midwesterners with State Farm homeowners insurance, there are "large and statistically significant racial disparities between Black and white homeowners." (*Id.* at ¶¶ 14–15). These disparities concern (1) State Farm's claims-processing times, (2) the paperwork it required, and (3) the number of interactions between policyholders and State Farm employees. (*Id.* at ¶ 15). First, while State Farm processed 39% of white State Farm policyholders' claims within one month, State Farm processed only 30% of Black policyholders' claims at that rate—meaning, white claimants enjoyed almost one-third better odds than Black claimants of having State Farm process their claims within one month. (*Id.* at ¶ 16). The probability that this disparity reflects random chance is less than 5%, so it is statistically significant. (*Id.*)

Second, State Farm asked 46% of white policyholders to submit additional materials after filing their claims, compared to 64% of Black policyholders. (*Id.* at ¶ 17). So Black policyholders were 39% more likely than white policyholders to need extra paperwork. (*Id.*) There is less than a 1% chance of this disparity occurring by random chance. (*Id.*) Third, 51% of white policyholders had between one and three interactions with State Farm employees before resolving their claims, compared to 42% of Black policyholders. (*Id.* at ¶ 18). And 49% of white policyholders interacted three or more times with State Farm employees, compared to 58% of Black policyholders. (*Id.*)

This means the chances of having at least three interactions were around 20% higher for Black policyholders than for white policyholders. (*Id.*) The probability of this disparity occurring randomly is under 10%. (*Id.*) Plaintiffs believe these survey results could be the tip of the iceberg: the additional burdens State Farm imposes could frustrate some Black policyholders to the point of abandoning their claims. (*Id.* at ¶ 19).

**C.       State Farm's Algorithmic Decision-Making Tools**

These racial disparities, Plaintiffs allege, stem from State Farm's use of a discriminatory claims-processing policy that scrutinizes Black policyholders' claims more than white policyholders' claims. (*Id.* at ¶ 20). Since at least 2018, in its initial review of claims, State Farm has relied on algorithmic decision-making tools to predict the likelihood of fraud and determine whether to pay claims immediately or trigger further scrutiny. (*Id.* at ¶¶ 32, 57). Machine-learning algorithms "learn" from the inputted data—which can come from the internet or a specific database. (*Id.* at ¶ 24). Even when users do not input data about race, for example, algorithms can learn to combine other inputs correlated with race to produce discriminatory effects. (*Id.* at ¶ 25). "Antifraud algorithmic decision-making tools are particularly susceptible to racial bias." (*Id.* at ¶ 43). Creating a vicious cycle, a biased algorithm that imposes greater scrutiny on Black claimants will find more fraud among Black claimants, leading to even higher scrutiny. (*Id.*)

In its claims-processing and fraud-detection efforts, State Farm collects "extensive data about policyholders," which includes:

> classifications such as race, sex, marital status, familial status, and gender; physical characteristics and/or descriptions; education, employment, employment history, professional licenses or designations; financial information, medical information or health insurance information; personal property records, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies; biometric information such as genetic, physiological, behavioral and biological characteristics that can be used to establish individual identity, including but not limited to fingerprints, voiceprints, retina scans, and sleep, health or

> exercise data; internet usage information such as browsing history, search history, and information regarding customers' interaction with a website, application, or advertisement; geolocation data such as precise physical location or movements and travel patterns; and sensory data such as audio recordings of customer care calls.

(*Id.* at ¶¶ 33–34). Using this data, State Farm creates profiles for its customers that reflect their "preferences, characteristics, psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes." (*Id.* at ¶ 35). These profiles help State Farm process claims and prevent fraud. (*Id.*) State Farm stores, manages, and accesses these "vast troves of data" on its web-based Enterprise Claim System (ECS), on which State Farm's claims associates can find and update information on claims in real time. (*Id.* at ¶ 36). State Farm licenses a third-party system called Technology Analytics for Claims which "uses text-based queries of claims data from ECS" to detect potentially fraudulent claims. (*Id.*)

In addition, State Farm has relationships with several third-party vendors offering tools for insurance-claims automation, including Salesforce and Duck Creek Technologies. (*Id.* at ¶ 37). Since 2018 or earlier, State Farm has used Salesforce's Financial Services Cloud, which gives State Farm employees "a holistic view" of customers. (*Id.*) State Farm processes homeowners insurance claims through Salesforce's platform, which increases efficiency by providing templates and guidance for common service requests, automating customer-facing tasks, and using predictive analytics tailored to insurance. (*Id.*) In fiscal year 2019, State Farm was one of Duck Creek's best customers. (*Id.*) Duck Creek, which integrates with Salesforce, offers a program called Duck Creek Claims that "uses predictive modeling or rules-based decision making" to sort claims. (*Id.*)

With these or similar tools, State Farm automates its initial claims review, scrutiny determination, and assignment of claims handlers. (*Id.* at ¶ 38). The automated tools inform the customer experience: when the algorithm flags a claim for additional scrutiny, employees treat the

claimant with "more suspicion and less courtesy." (*Id.*) State Farm's algorithmic decision-making tools use inputs that correlate with race or learn from "historically biased housing and claims data." (*Id.* at ¶ 48). State Farm's algorithms cast greater suspicion on Black policyholders' claims, and as a result, impose additional process and delay. (*Id.* at ¶¶ 30, 32). Although State Farm could detect racial disparities on its ECS, "it either does not review its use of algorithmic decision-making tools for disparate impact in claims processing, or having reviewed it, has refused to choose a less discriminatory policy." (*Id.*) By using algorithmic decision-making tools, State Farm delays more claims than it denies—"slowing and complicating legitimate claims." (*Id.* at ¶ 54). At low cost, State Farm could test for bias and correct it. (*Id.* at ¶ 55).

### D.    Harm to Black Policyholders

Because of State Farm's use of algorithmic tools, Black claimants wait longer and exert more effort while State Farm processes their claims. (*Id.* at ¶¶ 48–52). Meanwhile, they "endure substandard living conditions for longer and suffer the humiliation and added expense of undue delay and administrative burden." (*Id.* at ¶ 51). Waiting for State Farm to resolve her claim, Huskey lived under a defective roof with water damage inside her home. (*Id.*) She spent hours trying, and failing, to receive compensation for the roof damage. (*Id.*) Similarly, Wynn "endured months of water leakage, and then many more months of unaddressed water damage to the interior of her home," spending "countless hours trying to persuade State Farm that her claim was legitimate." (*Id.*) Because Black State Farm claimants wait longer and exert more effort, Plaintiffs allege, they "receive a less valuable insurance product" than white policyholders. (*Id.* at ¶ 52).

Plaintiffs sued State Farm on December 14, 2022, (Dkt. 1), and amended their complaint on March 31, 2023, (Dkt. 23). On behalf of a putative class, they allege disparate-impact race discrimination, in violation of the FHA, 42 U.S.C. §§ 3604(a) and (b) (Count I), and 42 U.S.C.

6

§ 3605 (Count II). (Dkt. 23 ¶¶ 68–82). Plaintiffs seek injunctive and declaratory relief, damages, and attorneys' fees and costs. (*Id.* at 27). State Farm now moves to dismiss Plaintiffs' Amended Complaint. (Dkt. 24).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). The plaintiffs "must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiffs plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)).

In the discrimination context, plaintiffs "must advance plausible allegations that [they] experienced discrimination because of [their] protected characteristics." *Kaminski*, 23 F.4th at 776 (citing *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021)); *see also Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 (7th Cir. 2015) (explaining that plaintiffs need only identify "the type of discrimination" they allegedly suffered, "by whom, . . . and when" (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)). At this stage, the Court accepts the well-pleaded factual allegations in the plaintiffs' complaint as true, drawing reasonable inferences in their favor. *KAP Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022) (citing *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016)).

Then, Rule 12(b)(1) motions to dismiss for lack of jurisdiction "are meant to test the sufficiency of the complaint, not to decide the merits." *Ctr. for Dermatology & Skin Cancer, Ltd.*

*v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). While the plaintiffs bear the burden of showing that subject-matter jurisdiction is proper, the Court still accepts the well-pleaded factual allegations in the complaint as true and draws reasonable inferences in the plaintiffs' favor. *Id.* at 588–89.

## DISCUSSION

State Farm challenges Plaintiffs' Amended Complaint on four grounds. (Dkt. 25). It argues that: (1) Plaintiffs' claims are beyond the scope of the FHA; (2) Plaintiffs fail to state a claim for disparate impact; (3) the McCarran-Ferguson Act bars Plaintiffs' claims; and (4) Huskey lacks standing to pursue injunctive relief. (*Id.*)

## I.      Fair Housing Act

The FHA's purpose is to eliminate discrimination in housing. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 539 (2015); 42 U.S.C. § 3601. Its language is "broad and inclusive." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). Plaintiffs here allege violations of three sections of the FHA: §§ 3604(a) and (b) (Count I), and § 3605 (Count II). State Farm argues first that these sections do not reach Plaintiffs' claims.

### A.      Section 3604(a)

Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race." 42 U.S.C. § 3604(a). The statute "requires that the plaintiffs' dwelling be made truly unavailable, or that defendants deprived plaintiffs of their privilege to inhabit their dwelling." *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (en banc); *see also Watters v. Homeowners' Ass'n at Preserve at Bridgewater*, 48 F.4th 779, 787 (7th Cir. 2022). "Availability, not simply habitability, is the right that § 3604(a) protects." *Bloch*, 587 F.3d at 777 (citations omitted). Thus, to adequately plead that a defendant made a dwelling

"unavailable," it is not enough for a plaintiff to allege "a mere diminution in property values." *Id.* at 776–77. By analogy to constructive eviction at common law, a plaintiff usually "must show her residence is 'unfit for occupancy,' often to the point that she is 'compelled to leave.'" *Id.* at 777 (quotation omitted). Plus, to avoid waiving her claim, the plaintiff must vacate her home "within a reasonable time." *Id.* at 778.

In *Bloch*, the Seventh Circuit suggested that "unavailability" might reach some cases where plaintiffs did not vacate their properties. *See id.* at 778 & n.6 ("Perhaps a future case may require us to reconsider our understanding of constructive eviction, depending on how the Supreme Court treats the potentially analogous concept of constructive termination." (citing *Marcoux v. Shell Oil Prods. Co.*, 524 F.3d 33 (1st Cir. 2008), *cert. granted sub nom. Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 557 U.S. 903 (2009))). Yet, the Supreme Court's later decision in *Mac's Shell* seems to have closed this narrow window of possibility. *See Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 559 U.S. 175, 184 (2010) ("[A] plaintiff must actually sever a particular legal relationship in order to maintain a claim for constructive termination."); *see also, e.g.*, *Lewis v. Schmidt*, 2011 WL 43029, at *10 (N.D. Ill. Jan. 4, 2011) ("[I]t appears," after *Mac's Shell*, "that the Seventh Circuit would hold that a plaintiff cannot state a § 3604(a) 'make unavailable or deny' claim without having vacated the premises.").

Responding to State Farm's motion to dismiss, Plaintiffs concede "that Seventh Circuit precedent currently forecloses a § 3604(a) claim based on post-acquisition discrimination absent strict constructive eviction." (Dkt. 33 at 7 n.3).[1] The Court agrees that neither Plaintiff adequately

---

[1] Nonetheless, "to preserve the matter for appellate review," Plaintiffs contend that State Farm's discriminatory conduct "makes it significantly riskier and less desirable for Black customers to acquire and maintain ownership of a dwelling," which "perpetuates segregation and impacts the availability of housing." (*Id.*) Of course, to the extent Plaintiffs' theory clashes with the Seventh Circuit's interpretation of § 3604(a), *see Bloch*, 587 F.3d at 776–79, this Court is obliged to apply binding precedent.

alleges a § 3604(a) violation. While waiting for State Farm to process her claim, Huskey alleges she faced "water damage to her kitchen and to two bathrooms caused by leaks in the unrepaired roof." (Dkt. 23¶ 11). Huskey therefore complains of "mere diminution" in her property value. *See Bloch*, 587 F.3d at 777.

Wynn comes closer to stating a claim, but no cigar. After a storm blew off her home's roof membrane, she alleges, water leaked into her home, damaging the interior. (Dkt. 23 ¶ 12). During State Farm's delay in processing her claim—approximately three months longer than her white neighbor's similar claim—Wynn's "home experienced further damage, she lost use of her home, and her compensation was delayed." (*Id.*) Wynn's vague complaint that "she lost use of her home" does not permit a plausible inference that State Farm's discriminatory delay rendered her home "unfit for occupancy," thus "compell[ing] her to leave." *See Bloch*, 587 F.3d at 777.

With the words "lost use of her home," Wynn may intend to convey that her home became unfit for occupancy at some point after the storm. Yet, the most natural inference from Wynn's allegations is that the water damage from the storm made Wynn's home unlivable. In other words, Wynn does not connect the dots between her home's uninhabitability and State Farm's alleged race discrimination. Nor does Wynn specify when "she lost use of her home," which undermines any inference that she vacated her home within a reasonable time after it became uninhabitable. *Cf. Bloch*, 578 F.3d at 778. Since neither Plaintiff has adequately alleged that State Farm made their homes "unavailable," they cannot proceed under § 3604(a).

## B.     Section 3604(b)

Section 3604(b) prohibits "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race." 42 U.S.C. § 3604(b). "Subsection (b)'s language is broad"—covering

both pre- and post-acquisition housing discrimination. *Bloch*, 578 F.3d at 779–80. Indeed, the prohibition on discrimination "in the provision of services or facilities in connection" with the sale of a dwelling "most naturally encompasses conduct that follows acquisition." *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 867 (7th Cir. 2018) (citing *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009)). Yet, the statute does not "provide a blanket 'privilege' to be free from all discrimination from any source": there must be some connection between the challenged discriminatory conduct and the "terms, conditions, or privileges that accompanied or were related to the plaintiffs' purchase of their property." *Bloch*, 587 F.3d at 780 (holding that § 3604(b) extended to a condo association board's alleged discriminatory enforcement of an agreement connected to plaintiffs' condo purchase).

In *American Family*, the Seventh Circuit held that § 3604 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992), *cert. denied*, 508 U.S. 907 (1993). The Court observed that the statute's plain text did not permit rejection of the plaintiffs' argument "that property insurance is a 'service' rendered 'in connection' with the sale of the dwelling." *Id.* at 298. Yet, the FHA's failure to define the word "service" and use of passive voices makes the statute ambiguous: it could—but need not—bear the plaintiffs' reading. *Id.* The Court then gave "great weight" to a Department of Housing and Urban Development (HUD) regulation, which says that § 3604 prohibits "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently because of race." *Am. Fam.*, 978 F.2d 287, 300–01 (quoting *Trafficante*, 409 U.S. at 210, and 24 C.F.R. § 1000.70(d)(4)); *see also* 42 U.S.C. § 3614a (giving HUD authority to "make rules . . . to carry

out this subchapter"). The text of § 3604 is "sufficiently pliable" to allow that reading. *Am. Fam.*, 978 F.2d at 300.

Here, Plaintiffs assert that "State Farm's claims processing policy provides insurance coverage differently on the basis of race." (Dkt. 23 ¶ 73). Since lenders require borrowers to obtain homeowners insurance, it is a "service" that insurers provide "in connection" with the sale of a dwelling. *See Am. Fam.*, 978 F.2d at 297–98; *see also Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) ("Homeowner's insurance can also be seen as a 'service' connected to the sale of a dwelling."). Contrary to State Farm's contention, homeowners insurance neither ceases to be a "service" nor loses its connection to the sale of a dwelling once the insured moves into their new home. *See Wetzel*, 901 F.3d at 867 ("Few 'services or facilities' are provided prior to the point of sale or rental; far more attach to a resident's occupancy."); *cf. Ga. State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627, 634 (11th Cir. 2019) ("[I]t is practically impossible when considering housing to separate the 'sale or rental of a dwelling' from the concept of obtaining basic utility services."). Indeed, the phrase "'in connection with' can bear a 'broad interpretation.'" *Mont v. United States*, 139 S. Ct. 1826, 1832 (2019) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006), and citing *United States v. Am. Union Transp., Inc.*, 327 U.S. 437, 443 (1946)). Plaintiffs' theory also fits within HUD's interpretation of § 3604, which the Seventh Circuit has deemed "tenable" and deserving of deference. *See Am. Fam.*, 978 F.2d at 300–01.

State Farm objects that the Seventh Circuit has not yet applied § 3604(b) to insurance claims-processing. True. Nor is the Court aware of any binding precedent standing in the way of Plaintiffs' proposed interpretation. No doubt, Plaintiffs are seeking relief for a contemporary harm by testing the FHA's boundaries. But their reading is consistent with the Seventh Circuit's

interpretation of the FHA to date, and § 3604(b)'s pliability weighs in their favor. *See Am. Fam.*, 978 F.2d at 300. Accordingly, the text of § 3604(b) does not foreclose Plaintiffs' claim.

### C.    Section 3605

Next, § 3605 prohibits any "entity whose business includes engaging in residential real estate-related transactions" from "discriminat[ing] against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race." 42 U.S.C. § 3605(a). A "residential real estate-related transaction" includes "[t]he making or purchasing of loans or providing other financial assistance . . . for purchasing, constructing, improving, repairing, or maintaining a dwelling." *Id.* § 3605(b)(1)(A).

The *American Family* Court considered this section too. In short fashion, the Seventh Circuit held that insurers are not entities who engage in covered transactions under § 3605:

> It would strain language past the breaking point to treat property or casualty insurance as "financial assistance"—let alone as assistance "for purchasing . . . a dwelling." Insurers do not subsidize their customers or act as channels through which public agencies extend subsidies. They do not "assist" customers even in the colloquial sense that loans are "assistance" (a lender advances cash, with repayment deferred). Payment runs from the customer to the insurer. Insurance is no more "financial assistance" than a loaf of bread purchased at retail price in a supermarket is "food assistance" or a bottle of aspirin bought from a druggist is "medical assistance."

*Am. Fam.*, 978 F.2d at 297.

Here, Plaintiffs attempt to escape from beneath *American Family* with artful framing: they do not allege discrimination in their purchase of homeowners insurance, but instead, in State Farm's handling of their claims. Like a loan, Plaintiffs contend, an insurer's processing of a claim provides the policyholder with "financial assistance" to repair or maintain their home. Plaintiffs rely on a district-court decision outside this Circuit—expressly disagreeing with *American Family*. *See Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 571 (D. Conn. 2015)

13

("Insurance bears an analytical similarity to a loan in that both provide financing when needed for a predetermined fixed price—interest in the case of a mortgage and premiums in the case of insurance."); *see also Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 58 (D.D.C. 2002) (disagreeing with *American Family* and concluding that the language "*other* financial assistance" is broad enough to reach homeowners insurance).

Plaintiffs' effort to distinguish *American Family* is unconvincing. Section 3605 bans discrimination by an "*entity* whose business includes engaging in residential real estate-related transactions." 42 U.S.C. § 3605(a) (emphasis added). Although the Seventh Circuit interpreted the statute under different facts, its holding was that insurers are not in the business of covered transactions. *See Am. Fam.*, 978 F.2d at 297. For this Court, of course, *American Family* is binding, and it controls here.

## II.   Disparate-Impact Liability

Content that Plaintiffs' claims fall within § 3604(b) of the FHA, the Court considers whether Plaintiffs adequately allege disparate impact. In *Inclusive Communities*, the Supreme Court recognized the viability of disparate-impact claims under the FHA. *Inclusive Communities*, 576 U.S. at 545–46. FHA disparate-impact claims help root out discriminatory intent—allowing "plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Inclusive Communities*, 576 U.S. at 540. Yet, disparate-impact liability must have limits to "avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed solely on a showing of a statistical disparity." *Id.* at 540. The absence of safeguards could lead defendants to adopt constitutionally suspect racial quotas. *Id.* at 542–43. Disparate-impact cases therefore require careful examination and "prompt resolution." *Id.* at 543.

14

Where a disparate-impact claim depends on a statistical disparity, it "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 542. A "robust causality requirement" protects defendants against liability "for racial disparities they did not create." *Id.* at 542. To establish a *prima facie* disparate-impact case, therefore, plaintiffs must "allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection." *Id.* at 543. This boils down to three elements: (1) a statistical disparity; (2) a specific policy; and (3) a causal connection. *Id.* at 542–43.

As other courts in this District have noted, *Inclusive Communities* did not displace the pleading standard for discrimination claims. *See, e.g.*, *County of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 967 (N.D. Ill. 2018) (observing that *Inclusive Communities* "did not alter the plausibility standard for pleading" (quotation omitted)); *County of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 992 (N.D. Ill. 2018) (recognizing, after *Inclusive Communities*, that the test remains whether a "disparate impact claim surmounts the plausibility hurdle"); *County of Cook v. Bank of Am. Corp.*, 2018 WL 1561725, at *8–9 (N.D. Ill. Mar. 30, 2018) (same; rejecting argument that *Inclusive Communities* erected "rigorous, pleading-stage requirements"). Surviving dismissal only requires the plaintiff to "allege enough facts to allow for a *plausible* inference that the adverse action suffered was connected to her protected characteristics"—not to "allege facts aligning with her claim's every element, which she will have to prove for her claim to survive summary judgment." *Kaminski*, 23 F.4th at 777. For now, it is not even necessary "to plead a prima facie case of employment discrimination." *Id.*; *accord Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (holding that "an employment discrimination plaintiff need not plead a prima facie case of discrimination"). State Farm's efforts to tilt the playing field—by insisting that *Inclusive*

*Communities* demands heightened scrutiny and relying on summary-judgment decisions—are in vain.

First, Plaintiffs rely on survey evidence showing three distinct, statistically significant disparities between the experiences of Black versus white State Farm policyholders. That survey of around 800 State Farm policyholders plausibly suggests that when Black policyholders file claims, relative to white policyholders, State Farm imposes longer wait times, and it demands extra paperwork and additional interactions. State Farm attempts to poke holes in the survey methodology, quibbling with the lines drawn in the response categories and possible absence of multivariate analysis controlling for potentially influential variables besides race.[2] (Dkt. 25 at 8). Yet, Plaintiffs' burden at the pleading stage is to allege a plausible—rather than airtight—statistical disparity. *See, e.g., Nat'l Fair Hous. Alliance v. Deutsche Bank Nat'l Tr.*, 2019 WL 5963633, at *13 (N.D. Ill. Nov. 13, 2019) ("Plaintiffs are not required, at the pleading stage, to defend every nuance of their methodology."); *Access Living of Metro. Chi., Inc. v. City of Chicago*, 372 F. Supp. 3d 663, 672 (N.D. Ill. 2019) ("[A]ll of the details that the City claims are lacking 'go to the substantiation of Plaintiff's claims and methodology,' which 'the City is free to explore in discovery.'"). Bolstering the plausibility of the statistical disparity is the stark contrast which Plaintiffs' Amended Complaint describes between Wynn's experience and that of her similarly situated white neighbor.

Second, Plaintiffs point to a specific policy: State Farm's decision to use algorithmic decision-making tools to automate claims-processing. Plaintiffs need not pin down the policy with greater precision at this stage. *See, e.g., County of Cook v. HSBC N. Am. Holdings Inc.*, 136 F.

---

[2] From the description of the survey in Plaintiffs' Amended Complaint, there is no indication—one way or the other—whether the survey used regression analysis or otherwise controlled for factors other than race. (*See* Dkt. 23 ¶¶ 14–20). To deduce from silence that the survey methodology is flawed would run counter to this Court's obligation to draw inferences in Plaintiffs' favor.

Supp. 3d 952, 966 (N.D. Ill. 2015) (finding plaintiffs adequately alleged a policy by pleading that the defendants "increased the costs for loans made to minority buyers"); *cf. In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017) ("If private plaintiffs . . . are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information." (quotation omitted)).

Third, Plaintiffs plausibly allege a connection between State Farm's policy and the statistical racial disparities. From Plaintiffs' allegations describing how machine-learning algorithms—especially antifraud algorithms—are prone to bias, the inference that State Farm's use of algorithmic decision-making tools has resulted in longer wait times and greater scrutiny for Black policyholders is plausible. No more is necessary. Plaintiffs have adequately alleged a disparate-impact claim under § 3604(b) of the FHA.

## III.   McCarran-Ferguson Act Preemption

Yet, the battle is not over: "to prescribe or penalize the behavior of insurers" through federal law, Plaintiffs "must reckon with the McCarran-Ferguson Act," 15 U.S.C. § 1012(b). *Am. Fam.*, 978 F.2d at 293. The Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b); *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 532 (7th Cir. 2018). The FHA does not "specifically relate[] to the business of insurance." *Am. Fam.*, 978 F.2d at 295 (quoting 15 U.S.C. § 1012(b)). So the question is whether its application here would "invalidate, impair, or supersede" any Illinois insurance law. *See Humana, Inc. v. Forsyth*, 525 U.S. 299, 307 (1999) (quoting 15 U.S.C. § 1012(b)).

By enacting the McCarran-Ferguson Act, the Supreme Court explained in *Humana*, Congress did not "cede the field of insurance regulation to the States" or create "any sort of field preemption." *Id.* at 308–09. On the other hand, neither does the Act provide "a green light for federal regulation whenever the federal law does not collide head on with state regulation." *Id.* at 309. Rather, the statute embodies a middle ground between those extremes: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran–Ferguson Act does not preclude its application." *Id.* at 310. Under that standard, the *Humana* Court rejected a McCarran-Ferguson challenge to claims under the Racketeer Influenced and Corrupt Organizations Act (RICO). 525 U.S. at 311. Nevada had enacted a "comprehensive administrative scheme that prohibits various forms of insurance fraud," giving enforcement authority to Nevada's insurance commissioner. *Id.* at 311–12. Yet, the Court perceived no conflict between state and federal policy: by providing a private cause of action and treble damages, RICO "appears to complement Nevada's statutory and common-law claims for relief." *Id.* at 313–14; *see also, e.g.*, *Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1038 (N.D. Ill. 2014) ("Courts that have considered McCarran-Ferguson challenges to housing discrimination claims since *Humana* have looked to the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred." (collecting cases)).

Circling back to *American Family*, the Seventh Circuit held that the McCarran-Ferguson Act does not preempt an FHA claim challenging discriminatory "redlining." *Am. Fam.*, 978 F.2d at 297; *accord Dehoyos v. Allstate Corp.*, 345 F.3d 290, 295–96 (5th Cir. 2003) ("Every circuit that has considered the question has determined that federal anti-discrimination laws may be

applied in an insurance context, even where the state insurance agencies have mechanisms in place to regulate discriminatory practices." (collecting cases)). The defendant-insurer in *American Family* pointed to two Wisconsin laws prohibiting discrimination by insurers. *Am. Fam.*, 978 F.2d at 295. Although Wisconsin had banned "unfair discrimination," it did not permit private enforcement. *Id.* Thus, the Court noted the general "sense in which any overlap between state and federal law upsets a balance struck by one of the two legislatures":

> Laws enforced only by administrative agencies with limited budgets are less potent than laws enforced by both agencies and private litigants. One could say that a federal rule increasing the probability that a state norm will be vindicated (or augmenting the damages assessed in the event of violation) conflicts with a decision by the state that remedies should be limited or rare.

*Id.* Nonetheless, the Seventh Circuit found preemption unwarranted since the defendant failed to point out "any law, regulation, or decision in Wisconsin requiring redlining, condoning that practice, committing to insurers all decisions about redlining, or holding that redlining with discriminatory intent (or disparate impact) does not violate state law." *Id.* at 297 (citing *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992)). Nor was there any apparent frustration of state policy or interference with an administrative regime. *Id.* So Wisconsin law was consistent with the FHA as applied. *Id.*

The Seventh Circuit revisited the McCarran-Ferguson Act seven years later in *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999). There, the plaintiffs challenged their health insurance policies' caps on AIDS-related coverage as discriminatory under the Americans with Disabilities Act (ADA). *Id.* at 558–59. The Court held that the ADA does not require insurers to alter insurance policies "to make [them] equally valuable to the disabled and to the nondisabled." *Mut. of Omaha*, 179 F.3d at 563. Even if the ADA did reach so far, the McCarran-Ferguson Act would preempt it. *Id.* In the absence of a direct conflict, preemption still

19

applies if an interpretation of federal law would "interfere with a State's administrative regime." *Id.* (quoting *Humana*, 525 U.S. at 310). "State regulation of insurance is comprehensive and includes rate and coverage issues," so if the ADA required federal courts "to determine whether caps on disabling conditions . . . are actuarially sound and consistent with principles of state law," courts would "be stepping on the toes of state insurance commissioners." *Id.* at 564.

> Distinguishing *American Family*, the *Mutual of Omaha* Court continued:

> It is one thing to say that an insurance company may not refuse to deal with disabled persons; the prohibition of such refusals can probably be administered with relatively little interference with state insurance regulation . . . , and anyway this may be a prohibition expressly imposed by federal law because encompassed within the blanket prohibition of [the ADA], and so outside the scope of the McCarran-Ferguson Act. It is another thing to require federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law. Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws.

*Id.* at 564 (citing *NAACP*, 978 F.2d 287).

Here, State Farm argues that Plaintiffs' disparate-impact claims under the FHA would conflict with Illinois law or disrupt its administrative regime. State Farm points first to 215 ILCS 5/154.6(c)–(d)[3] and 215 ILCS 5/154.7.[4] Section 154.6 lists improper claims practices—without providing a private cause of action—and "§ 154.7 vests the State Director of Insurance with the

---

[3] In pertinent part, §§ 154.6(c) and (d) make it unlawful for a company to "[f]ail to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies;" or "[n]ot attempt[] in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear." 215 ILCS 5/154.6(c)–(d).

[4] Section 154.7 provides, in part:

> Whenever the Director finds that any company doing business in this State is engaging in any improper claims practice as defined in Section 154.5, and that a proceeding in respect thereto would be in the public interest, he shall issue and serve upon such company a statement of the charges in that respect and a notice of hearing thereon pursuant to Article XXIV, which notice shall set a hearing date not less than 10 days from the date of the notice.

215 ILCS 5/154.7(1); *see also* 215 ILCS 5/154.5 ("It is an improper claims practice . . . to commit any of the acts contained in Section 154.6" either "knowingly" or "with such frequency to indicate a persistent tendency to engage in that type of conduct.").

authority to penalize such practices." *Bernacchi v. First Chi. Ins. Co.*, 52 F.4th 324, 330 (7th Cir. 2022) (citing *Am. Serv. Ins. Co. v. Passarelli*, 752 N.E.2d 635, 638 (Ill. App. Ct. 2001)). Then, § 155 of the Illinois Insurance Code recognizes private actions challenging insurers' conduct. 215 ILCS 5/155. That section "provides an extracontractual remedy for insurer misconduct that is vexatious and unreasonable"—"presuppos[ing] an action on the policy"—but it does not prevent a policyholder from bringing "a separate and independent tort action." *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 902–04 (Ill. 1996). To bring such a separate, private tort action against an insurer, a plaintiff must allege something more than "bad faith or unreasonable and vexatious conduct." *Id.* at 904.

State Farm has not shown that Illinois law requires or condones claims-processing policies with racially disparate effects,[5] so there is no direct conflict. *See Am. Fam.*, 978 F.2d at 297; *see also Dehoyos*, 345 F.3d at 299. Rather, disparate-impact liability under the FHA, as applied, seems to complement Illinois insurance law. *See Humana*, 525 U.S. at 313–14. Liability under the FHA for processing Black policyholders' claims differently aligns with State Farm's state-law obligation to "effectuate prompt, fair and equitable settlement of claims" in good faith. *See* 215 ILCS 5/154.6(d); *see also Am. Fam.*, 978 F.2d at 295 ("Duplication is not conflict."). Illinois law, like the FHA, bans racial discrimination by insurers. *See* 215 ILCS 5/424(3) (prohibiting "any unfair discrimination between individuals or risks of the same class or of essentially the same hazard and expense element because of the race, color, religion, or national origin of such insurance risks or applicants").

---

[5] If Illinois enacted a law along those lines, the FHA might preempt it. *See* 42 U.S.C. § 3615 ("[A]ny law of a State . . . that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid.").

Nor does the Court, at this point, perceive a danger of interfering with Illinois's administrative regime. *Cf. Mut. of Omaha*, 179 F.3d at 563. Illinois law gives the Director of Insurance authority to enforce the prohibition of specified improper claims practices, State Farm stresses, but that was true in *Humana* too, where McCarran-Ferguson preemption did not apply. *See Humana*, 525 U.S. at 312; *see also Am. Fam.*, 978 F.2d at 295 (holding no preemption despite the absence of a private right of action under Wisconsin law). Plaintiffs' claim is that State Farm handled claims of similarly situated policyholders differently because of race. On its face, that does not ask the Court to delve into actuarial soundness. *See Mut. of Omaha*, 179 F.3d at 564. There is daylight between an insurers' outright refusal to deal with persons with protected traits, *see Am. Fam.*, 978 F.2d at 297, and determining the actuarial soundness of limits on coverage, *see Mut. of Omaha*, 179 F.3d at 564. And State Farm has not shown that resolving Plaintiffs' disparate-impact claim will require considering whether State Farm's allegedly discriminatory claims-handling practices are actuarially sound and consistent with Illinois law.

Leaning heavily on one of Plaintiffs' damages theories—that Black State Farm policyholders "receive a less valuable insurance product" than white policyholders, (Dkt. 23 ¶ 52)—State Farm argues Plaintiffs' claim implicates actuarial soundness. State Farm may be right that calculating the relative value of insurance policies is off limits under the McCarran-Ferguson Act. *Cf. Camarena v. Safeway Ins. Co.*, 2002 WL 472245, at *7 (N.D. Ill. Mar. 27, 2002) (finding that examining and comparing "the rates defendants charges for the coverage and claims handling services it provides" would involve the court in consideration of actuarial soundness and consistency with state law). But that alone does not sink Plaintiffs' claim. There is no indication that State Farm's *liability* would hinge on its practices' actuarial soundness or consistency with Illinois law. Nor does Plaintiffs' other damages theory raise such concerns. (*See* Dkt. 23 ¶ 51

("Black policyholders endure substandard living conditions for longer and suffer the humiliation and added expense of undue delay and administrative burden.")).

Ultimately, the McCarran-Ferguson Act provides "a defense to liability," *Mut. of Omaha*, 179 F.3d at 562. At this point, it is not clear from Plaintiffs' complaint that the Act nips their claims in the bud. That may change as this litigation proceeds. If Plaintiffs make a *prima facie* showing of disparate-impact liability—which is not their burden at present—State Farm says it plans to show that its allegedly discriminatory policy "has a sufficient non-discriminatory business justification." (Dkt. 41 at 14–15). That, State Farm argues, would ask the Court to consider whether there are non-discriminatory alternative practices available to State Farm consistent with Illinois insurance law. (*Id.*); *see Inclusive Communities*, 576 U.S. at 533. For now, State Farm's concern is speculative. While the Seventh Circuit's reading of the McCarran-Ferguson Act is prophylactic to a degree, *see Mut. of Omaha*, 179 F.3d at 564, State Farm's arguments veer into the realm of field preemption. The Act is not so expansive. *See Humana*, 525 U.S. at 309. If through discovery, it later becomes clear that State Farm's liability under the FHA depends on the actuarial soundness of its claims-handling practices in a way that interferes with Illinois's insurance policy or administrative regime, State Farm may raise its McCarran-Ferguson defense again.

## IV.     Standing to Pursue Injunctive Relief

Finally, State Farm challenges Huskey's standing to seek injunctive relief. (Dkt. 25 at 15). Article III of the Constitution limits federal jurisdiction to "cases" and "controversies." U.S. Const. art. III § 2; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Thus, the party "invoking the power of a federal court must demonstrate standing to do so." *Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 772 (7th Cir. 2022) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). Plaintiffs need "standing for each claim that they press and for each form of relief that they seek."

*TransUnion*, 141 S. Ct. at 2208. For prospective injunctive relief, a plaintiff does not have standing unless she is facing a "real and immediate threat" of future injury. *Access Living of Metro. Chi. v. Uber Techs., Inc.*, 958 F.3d 604, 613 (7th Cir. 2020). Huskey is no longer a State Farm policyholder. (Dkt. 23 ¶ 11; Dkt. 25-1). Without a State Farm policy, Huskey faces no apparent threat of injury from State Farm's allegedly discriminatory claims-handling process. *See Access Living*, 958 F.3d at 613. Plaintiffs do not contend otherwise. (Dkt. 33 at 25). Thus, Huskey's claim for injunctive relief is dismissed.

## CONCLUSION

For the reasons above, State Farm's Motion to Dismiss [24] is granted in part and denied in part. Plaintiffs' claim under 42 U.S.C. § 3604(a) of the FHA in Count I is dismissed without prejudice. So is Plaintiffs' claim under § 3605 in Count II. Huskey's claim for injunctive relief is dismissed for lack of subject-matter jurisdiction. Plaintiffs' remaining claim in Count I, under § 3604(b) of the FHA, survives. Plaintiffs may amend their Complaint, consistent with this Opinion, by October 2, 2023.

_____
Virginia M. Kendall
United States District Judge

Date: September 11, 2023