**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JACQUELINE HUSKEY and RIIAN WYNN, on behalf of themselves and all others similarly situated, | Case No. 22-cv-7014 |
| Plaintiffs, | Hon. Virginia M. Kendall |
| v. | Magistrate Judge Sheila M. Finnegan |
| STATE FARM FIRE & CASUALTY COMPANY, | |
| Defendant. | |

**DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S ANSWER**
**TO PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Defendant State Farm Fire and Casualty Company ("State Farm") hereby answers

Plaintiffs' First Amended Class Action Complaint ("Complaint," Dkt. 23) as follows:

1. This is a class action brought by Jacqueline Huskey and Riian Wynn ("Plaintiffs"), on behalf of themselves and similarly situated homeowners insurance policyholders,[1] against State Farm Fire & Casualty Company ("Defendant" or "State Farm") under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. Plaintiffs seek remedies for themselves and the class for the discriminatory effects of State Farm's homeowners insurance claim processing policy. Plaintiffs allege and aver as follows:

**ANSWER:** State Farm admits that Plaintiffs purport to assert claims pursuant to 42 U.S.C.

§ 3604(b) on behalf of themselves and a putative class. State Farm denies that the Complaint

asserts claims under any other section of the Fair Housing Act, as the Court's Order of September

---

[1] For purposes of this Complaint, the term "home" includes single-family detached houses; single-family attached houses; condominiums or cooperatives; mobile or manufactured homes: and any other type of dwelling that is covered by an HO-01, HO-02, HO-03, HO-05, HO-06, HO-07, or HO-08 homeowners insurance policy. The term "homeowners insurance policyholders" contemplates persons with insurance policies designed to cover losses and damages to a dwelling when used principally as a personal private residence, and not solely for rental or other commercial purposes.

11, 2023 (Dkt. 52) dismissed all claims that Plaintiffs sought to assert other than their claims under

§ 3604(b). State Farm denies that it has violated § 3604(b) (or any other statute), denies that it has

any State Farm "homeowners insurance claim processing policy" that has "discriminatory effects,"

denies that Plaintiffs have sustained any injury or damages as a result of any alleged wrongdoing

by State Farm, denies that Plaintiffs are entitled to any recovery from this action, and denies that

any class could appropriately be certified in this case.

2.      State Farm is the largest provider of homeowners insurance in the United States.
        As a homeowners insurance provider, it is legally obligated to provide coverage to
        and address the claims of its policyholders in a non-discriminatory manner.

**ANSWER:** State Farm admits that in 2022 State Farm Fire and Casualty Company, with

its affiliates, was the largest provider of homeowners insurance in the United States as measured

by direct written premium. The second sentence of Paragraph 2 is a legal conclusion to which no

answer is required or given. To the extent a response is required, State Farm admits that it is

obligated to provide coverage to and address the claims of its policyholders in accordance with

applicable law.

3.      While there have been many previous accounts of discrimination in the insurance
        industry, this Complaint provides concrete data showing that claims submitted to
        State Farm by Black homeowners are systematically subjected to greater scrutiny,
        causing significant financial and dignitary harm.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to

what Plaintiffs intend by the allegation that "there have been many previous accounts of

discrimination in the insurance industry," and therefore denies the same. State Farm denies the

remaining allegations contained in Paragraph 3.

4.      This discrimination is the result of a specific policy: State Farm's decision to
        employ an automated system—in lieu of human judgment—to determine how the
        high-volume of homeowners insurance claims it receives should be processed by
        its claims handlers. Specifically, State Farm uses machine-learning algorithms and
        artificial-intelligence tools (collectively "algorithmic decision-making tools") to
        screen out potentially fraudulent or complex ("high touch") claims from legitimate

or straightforward ("low touch" or "no touch") claims. "High touch" claims are processed much more slowly than "low touch" or "no touch" claims. On information and belief, algorithmic decision-making tools drive claims handler workflow at State Farm by predicting whether a given claim might be fraudulent, deciding how much scrutiny it thus requires, and directing employee tasks in accordance with that assessment.

**ANSWER:** State Farm denies the allegations contained in Paragraph 4.

5. All homeowners insurance claims at State Farm have been uniformly subject to this policy during the Class Period, including those of Plaintiffs and the proposed Class. It is thus reasonable to attribute a systematic difference in the rate of claims subjected to heightened scrutiny to State Farm's policy of using algorithmic decision-making tools to screen and address all policyholder claims. This causal connection is unsurprising: Algorithmic decision-making tools have been known to cause bias in financial products generally and within home products specifically.

**ANSWER:** State Farm denies the allegations contained in Paragraph 5.

6. State Farm's automated system—for a variety of reasons that State Farm should know about and could easily prevent—is much more likely to flag claims from Black homeowners for greater scrutiny than claims of white homeowners. Because their claims are more likely to be flagged for scrutiny, Black homeowners are disproportionately more likely to have to submit more claims documentation, to have to interact more with State Farm employees, and to experience substantial delays in payment for their claims. As a result, Black homeowners experience greater inconvenience, loss to the value of their homes, and negative impacts on their quality of life as necessary repairs remain unaddressed for months on end. These delays mean that Black State Farm policyholders receive a less valuable product than white State Farm policyholders. And had Black policyholders known that they would be treated differently and ultimately worse by State Farm than their white counterparts, they either would not have purchased a policy from State Farm or would not have purchased a policy for the price that they paid.

**ANSWER:** State Farm denies the allegations contained in Paragraph 6.

7. The delays and extra administrative hurdles that Black homeowners have experienced and are experiencing because of State Farm's discriminatory claims processing policy cause tangible financial harm, and are unreasonable, vexatious, and humiliating. Accordingly, Plaintiffs seek damages as well as declaratory and injunctive relief.

**ANSWER:** State Farm admits that Plaintiffs purport to seek damages, and that Plaintiff Wynn also seeks declaratory and injunctive relief, but denies that Plaintiffs have sustained any injury or damages as a result of any alleged wrongdoing by State Farm, denies that Plaintiffs are

entitled to any recovery from this action, and denies the remaining allegations contained in Paragraph 7.

## I.     JURISDICTION AND VENUE

8.      This Court has jurisdiction over Plaintiffs' FHA claims under 28 U.S.C. § 1331 and 42 U.S.C. § 3613(a).

**ANSWER:** Admitted.

9.      The Court has general personal jurisdiction over State Farm because it is domiciled in Illinois.

**ANSWER:** Admitted.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, State Farm regularly conducts business in this District, and the named Plaintiffs reside in this District.

**ANSWER:** State Farm admits that venue is proper in this judicial district. State Farm lacks knowledge or information sufficient to form a belief as to whether Plaintiff Huskey currently resides in this judicial district, admits on information and belief that Plaintiff Wynn currently resides in this judicial district, admits that it regularly conducts business in this judicial district, denies that engaged in any conduct in this or any other judicial district that violates the FHA, and denies any remaining allegations contained in Paragraph 10.

## II.    PARTIES

11.     Jacqueline Huskey ("Huskey") is a Black resident of Matteson, Illinois, where she owns a single-family manufactured home. Huskey had a homeowners insurance policy with State Farm on her home in Matteson between approximately March 2021 and February 2023. She paid approximately $700 annually to maintain coverage on her home. On June 12, 2021, the roof of Huskey's home was damaged by hail. She promptly filed a homeowners insurance claim with State Farm. This was her first time ever filing such a claim with State Farm. Huskey did not hear back from State Farm with respect to her claim until more than a month after filing, on July 22, 2021. On August 11, 2021, State Farm sent an adjuster to inspect the damage, but the adjuster declined to conduct an inspection of the outside of the roof and only provided an estimate for the damage to the inside of the home. Huskey had to call State Farm representatives several times before the company ultimately

agreed to send a third-party adjuster to inspect the outside of the roof. Nearly four months after Huskey filed her claim, State Farm granted it, but only for the cost of internal repairs. Huskey still has not reached a resolution with State Farm as to the damage to the outside of her roof and has been unable to repair it. As a result of State Farm's delay, Huskey experienced further damage to her home—water damage to her kitchen and to two bathrooms caused by leaks in the unrepaired roof—and a decrease to her home's overall value. She estimates that she has had 20 to 30 conversations with State Farm regarding this claim, including as recently as May 2022.

**ANSWER:** On information and belief, State Farm admits that Huskey is Black. State Farm admits that Huskey had a manufactured home insurance policy with State Farm on her property in Matteson, Illinois that was in effect in June 2021 when her home was damaged, and admits that Huskey's premium on that homeowners policy for the period from September 22, 2020 to September 22, 2021 was $717. State Farm denies that the allegations contained in Paragraph 11 fully or accurately set forth the facts relating to the claim for damage to her insured property that Huskey made to State Farm in 2021. Further answering, State Farm states that on July 22, 2021 contractor Michael Bloomquist of Lighthouse Restorations contacted State Farm and reported hail and wind damage to Huskey's roof. Based on publicly available data on hail events in the area of Huskey's home, State Farm identified Huskey's date of loss as June 12, 2021. A State Farm Claim Specialist contacted Huskey on July 22, 2021, the same day her loss was reported, and scheduled an inspection for August 4, 2021. At Huskey's request, the inspection was subsequently rescheduled to August 11, 2021. State Farm inspected Huskey's interior damage on August 11, 2021, but could not inspect the roof due to weather. On August 12, 2021, State Farm made an actual cash value payment to Huskey for the interior damage to her property. The same day, State Farm also scheduled a roof inspection to be conducted by a third-party adjuster. The roof inspection occurred on August 23, 2021. On August 24, 2021, State Farm made a supplemental payment to Huskey for the damage to her roof. State Farm denies all the remaining allegations contained in Paragraph 11.

12.     Riian Wynn ("Wynn") is a Black resident of Evanston, Illinois, where she owns a two-story townhome that is attached to three similar townhomes. Wynn has had a homeowners insurance policy with State Farm on her townhome in Evanston since she purchased the home in 2015. She currently pays an annual premium of $857 to maintain coverage on her home. In the early morning hours of March 6, 2022, a severe storm blew the roof membrane off all four townhomes, including Wynn's. The damage to the townhomes was so severe that it made the local news. Consequently, water from the storm leaked into Wynn's home, causing damage to the interior of her home. One of Wynn's adjoining neighbors, who is white and also has a State Farm policy, suffered similar damage to her townhome. Wynn and her neighbor both filed claims with State Farm on March 6 for the same property damage issues. This was Wynn's first time ever filing a homeowners claim with State Farm. Wynn's claim received significantly more scrutiny by State Farm than her neighbor's claim did. That scrutiny manifested in demands for additional documentation and estimates not required of her neighbor, additional inspections not required of her neighbor, and dozens more interactions with State Farm employees than her neighbor was required to have. In the end, Wynn's claim for similar interior damage and water mitigation from the same storm in a connected townhouse took approximately three months longer to process than her white neighbor's claim did. During that time, Wynn's home experienced further damage, she lost use of her home, and her compensation was delayed. And ultimately, State Farm refused to cover repairs and mitigation for Wynn to the same extent that it did her neighbor. All told, Wynn's claim took over eight months to resolve; she estimates that she had to interact with State Farm employees at least 50 times during the claims process to get her claim approved.

**ANSWER:** On information and belief, State Farm admits that Wynn is Black. State Farm admits that Wynn's townhome in Evanston, Illinois is part of a structure that includes three other townhomes, that Wynn's property has been insured under a State Farm homeowners policy since 2015, that Wynn's premium for that policy for the period from March 16, 2021 to March 16, 2022 was $736, that Wynn's premium for that policy for the period from March 16, 2023 to March 16, 2024 is $857, that Wynn's insured property was damaged by a weather event on March 6, 2022, that the townhome owned by one of Wynn's adjoining neighbors was also insured by State Farm, and that the neighbor's property also suffered damage from the March 6, 2022 weather event. State Farm lacks knowledge or information sufficient to form a belief as to the allegation in Paragraph 12 that the damage to the townhomes was so severe that it made the local news. State Farm denies that the allegations contained in Paragraph 12 fully or accurately set forth the facts relating to the

claim for damage to her insured property from the March 6, 2022 weather event that Wynn submitted to State Farm. Further answering, State Farm states that it inspected Wynn's damage on March 12, 2022, six days after the loss. On March 15, 2022, State Farm issued an actual cash value payment to Wynn, based on State Farm's estimate, for replacement of her roof, repair of her damaged siding, and repair of her interior damage. As State Farm learned additional information about Wynn's loss it made supplemental payments for the roof replacement; repair of a damaged shed; repair of the interior damage; pack out, storage and pack-back of the contents of Wynn's property to facilitate the repairs; and additional living expenses incurred by Wynn during the repairs, which were completed before the repairs to her State Farm-insured neighbor's property. State Farm lacks knowledge or information sufficient to form a belief as to the race of Wynn's neighbor. State Farm denies all the remaining allegations contained in Paragraph 12.

13.     Defendant State Farm Fire & Casualty Company is an Illinois corporation with its principal office in Bloomington, Illinois. It sells homeowners insurance policies in many states across the country, including Illinois, Indiana, Michigan, Missouri, Ohio, and Wisconsin. It issued homeowners insurance policies to Huskey and Wynn and sustained those policies during the statute of limitations period. It is a subsidiary of State Farm Mutual Automobile Insurance Company, a large insurance company that sells homeowners insurance policies across the country. In 2021, State Farm's total revenue was more than $82 billion. It is the largest provider of homeowners insurance in Illinois, Indiana, Michigan, Missouri, and Ohio, and the second largest in Wisconsin. By recent estimates, State Farm has approximately 53,000 employees, 19,000 independent agents, and 87 million customer accounts. It handles approximately 24,000 claims each day.

**ANSWER:** State Farm Fire and Casualty Company admits that it is an Illinois stock insurance company with its principal office in Bloomington, Illinois, that it is licensed in all 50 states and the District of Columbia, and that it sells homeowners insurance policies in the states of Illinois, Indiana, Michigan, Missouri, Ohio, and Wisconsin. State Farm lacks knowledge or information sufficient to form a belief as to what Plaintiffs intend by the allegation that State Farm sells homeowners insurance policies in "many states across the country." State Farm admits that

Huskey had a manufactured home insurance policy with State Farm that was in effect on June 12, 2021, admits that Wynn had a homeowners policy with State Farm that was in effect on March 6, 2022, and states that the allegation in Paragraph 13 concerning "the statute of limitations period" is a legal conclusion to which no answer is required or given. State Farm admits that State Farm Fire and Casualty Company is a wholly-owned subsidiary of State Farm Mutual Automobile Insurance Company, and that in 2022 State Farm Fire and Casualty Company was the largest provider of homeowners insurance, as measured by direct written premium, in Illinois, Indiana, Michigan, Missouri, and Ohio, and the second largest in Wisconsin. State Farm lacks knowledge or information sufficient to form a belief as to the "estimates" to which Paragraph 13 refers. State Farm denies the remaining allegations contained in Paragraph 13.

### III.  FACTS

#### A.  Black Homeowners Suffer a Disparate Impact When Submitting a Claim to State Farm

14.  In 2021, YouGov—a reputable online polling provider that employs industry best practices and an internal quality assurance process—surveyed about 800 white or Black homeowners with State Farm homeowners insurance policies across the Midwest[2] to assess whether there were racial disparities in State Farm's homeowners insurance claim submission and adjudication process. Among other data points, the survey collected information on where the homeowners were located; how long their claims process took; whether they were asked to submit additional paperwork after making a claim; how many interactions with a claims handler were required to resolve the claim; and the ultimate outcome of their claim submission.

**ANSWER:**  State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14, and therefore denies same.

15.  The survey of 648 white State Farm policyholders and 151 Black State Farm policyholders showed large and statistically significant racial disparities between Black and white homeowners regarding 1) the time it took for claims to be paid out by State Farm; 2) the supplemental paperwork required as part of the claim

---

[2] The survey defined the "Midwest" as Illinois, Indiana, Michigan, Missouri, Ohio, and Wisconsin.

adjudication process; and 3) the number of interactions claimants had with State Farm employees prior to having their claims paid out.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15, and therefore denies same. Further answering, State Farm denies that it engages in racially discriminatory claims handling and denies that it has any claims handling policy that results in a racially disparate impact.

16.   The survey revealed that thirty-nine percent of white State Farm policyholder respondents had their claim paid out in one month or less from time of submission; by contrast, only 30% of Black homeowner respondents were paid out at the same rate. That means white homeowners were almost a third more likely than Black homeowners to have their claim processed expeditiously (in less than a month). This racial disparity is statistically significant; it would occur less than 5% of the time as a result of random chance.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16, and therefore denies same. Further answering, State Farm denies that it engages in racially discriminatory claims handling and denies that it has any claims handling policy that results in a racially disparate impact.

17.   The survey results also showed a disparity in the administrative burdens imposed on white and Black homeowners in the Midwest. Only 46% of white State Farm policyholder respondents were asked to procure additional materials beyond those required to initiate the claims submission process. By contrast, 64% of Black State Farm policyholder respondents were asked to gather such materials. Thus, Black policyholders were 39% more likely to have to submit extra paperwork to justify their claims. Again, this racial disparity is statistically significant; it would occur less than 1% of the time as a result of random chance.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17, and therefore denies same. Further answering, State Farm denies that it engages in racially discriminatory claims handling and denies that it has any claims handling policy that results in a racially disparate impact.

18.   The survey also identified a statistically significant disparity by race for how many interactions with State Farm employees were required of homeowners while their claim was being processed. Some 51% of white policyholder respondents resolved

their claims after only one-to-three interactions with State Farm employees, contrasted with only 42% of Black respondents. Only 49% of white respondents reported needing three or more interactions with someone at State Farm to resolve their claim, contrasted with 58% of Black respondents—meaning that Black policyholders were about 20% more likely than white policyholders to require three or more interactions with State Farm before claim resolution. This racial disparity would occur less than 10% of the time as a result of random chance.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18, and therefore denies same. Further answering, State Farm denies that it engages in racially discriminatory claims handling and denies that it has any claims handling policy that results in a racially disparate impact.

19. Thus, Black State Farm policyholders disproportionately experience administrative burdens. They must put in more work and have more conversations, all while under greater suspicion, just to get the same pay out as their white neighbors. And these results represent only a portion of the true harm. It is reasonable to assume that some Black policyholders simply give up on pursuing their claims due to the frustration of these added burdens.

**ANSWER:** State Farm denies the allegations contained in Paragraph 19.

20. On information and belief, this race-based disparate impact is caused by State Farm's discriminatory claims processing policy, which disproportionately subjects claims filed by Black homeowners to greater scrutiny than those filed by white homeowners, as described further below.

**ANSWER:** State Farm denies the allegations contained in Paragraph 20.

**B.     Modern Race Discrimination and Algorithmic Bias**

21. Homeowners insurance is a prerequisite to home ownership, with banks and mortgage companies generally requiring borrowers to acquire coverage as a precondition for financing. It is also the vehicle by which homeowners protect the sizeable financial investment they undertook when purchasing their home: If disaster strikes, a homeowner can rest easy knowing that their policy will cover necessary repairs such that they will still have a place to live and that their home's value will be preserved. In tandem, purchasing property and protecting it with insurance can, over time, facilitate upward financial mobility and create generational wealth.

**ANSWER:** State Farm admits that mortgage lenders generally require borrowers to have homeowners insurance, and that one reason homeowners may purchase insurance coverage is to

protect their investment in their home. State Farm lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 21.

22.     Though home ownership is a critical vehicle for building wealth in the United States, it has long been a lopsided one: In 2020, 73.7% of white families owned homes, compared to only 44% of Black families. This gap, driven by a host of factors, is exacerbated by existing administrative barriers that can be both humiliating and financially onerous. Indeed, in 2021, economists at Freddie Mac found that 12.5% of homes in majority Black areas were appraised below the price agreed upon by the buyer and seller, compared to just 7.4% of homes in majority-white areas. In recent years, researchers have also determined that, relative to their home value, Black homeowners pay higher mortgage rates at origination and post-origination of the loan, spend more on mortgage insurance, face a higher share of maintenance costs, and pay more in property taxes than white homeowners, resulting in a higher homeownership cost burden. These higher costs leave Black homeowners more reliant on their homeowners insurance policies than white homeowners when property damage occurs.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22.

23.     In the insurance industry, as elsewhere in our society, racial discrimination has shifted from overt to covert. Even though race-based redlining is now illegal, discrimination has persisted through practices such as using credit-based insurance scores, and discriminatory underwriting guidelines that use age and home value as a proxy for race. Inequitable practices such as these make it more difficult for Black homeowners to build wealth through homeownership at the same rate as white homeowners.

**ANSWER:**   To the extent the allegations contained in Paragraph 23 relate to insurance companies other than State Farm, or to the "insurance industry" generally, State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent Plaintiffs intend the allegations contained in Paragraph 23 to relate to State Farm, they are denied.

24.     Today, discrimination is perpetuated by the modern trend toward automation and data mining. Institutions like insurance companies use algorithmic models to quickly analyze vast troves of publicly available information ("data mining") to detect patterns and assist in making future decisions ("data analytics"). So-called "machine-learning" algorithms are designed to learn based upon the algorithm's access to a designated data set or an algorithm-driven search for data residing on the internet or in a confined database.

**ANSWER:** To the extent the allegations contained in Paragraph 24 relate to insurance companies other than State Farm, or to the "insurance industry" generally, State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations. To the extent Plaintiffs intend the allegations contained in Paragraph 24 to relate to State Farm, they are denied.

25. Unfortunately, algorithms too often have discriminatory effects, even where demographic data such as race are not included as inputs. This is because algorithms can "learn" to use omitted demographic features by combining other inputs that are correlated with race (or another protected classification), like zip code, college attended, and membership in certain groups. To illustrate, Amazon famously abandoned a facially neutral hiring algorithm in 2017 because of its disparate impact on female candidates. There, the training data presented to the algorithm consisted of resumes submitted to Amazon by applicants over a 10-year period, without presenting data to the algorithm explicitly indicating the applicants' gender. But most of these applicants were white males. Rather than sort candidates by qualifications or merit, the algorithm learned to favor male candidates by prioritizing language more commonly used by males, penalizing the word "women's" in resumes, and devaluing candidates who had graduated from all-women's colleges.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25.

26. Algorithmic decision-making and data analytics are not, and should not be assumed to be, race neutral or gender neutral. Too often, they reinforce and even exacerbate historical and existing discrimination. For example, in 2019, a bombshell study found that a clinical algorithm that many hospitals were using to determine which patients need care was biased: Black patients assigned the same level of risk—and thus allocated the same health care resources—were much sicker than white patients. This happened because the algorithm had been trained on historical health care spending data, which reflects a history in which Black patients had less money to spend on their health care than white patients. From this, the algorithm falsely concluded that Black patients were healthier than equally sick white patients.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27. Academics and government actors alike have cautioned that when approached without appropriate forethought and oversight, data analytics "can reproduce existing patterns of discrimination, inherit the prejudice of prior decision makers, or simply reflect the widespread biases that persist in society. It can even have the perverse result of exacerbating existing inequalities by suggesting that historically

disadvantaged groups actually deserve less favorable treatment." Indeed, according to Federal Trade Center ("FTC") Commissioner Kelly Slaughter, "[i]n recent years, algorithmic decision-making has produced biased, discriminatory, and otherwise problematic outcomes in some of the most important areas of the American economy. . . . These harms are often felt most acutely by historically disadvantaged populations, especially Black Americans and other communities of color."

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

28.     The susceptibility of data analytics and algorithmic decision-making to bias is becoming a hot button topic in the insurance industry today. For example, in 2022, the California Department of Insurance released the bulletin Allegations of Racial Bias and Unfair Discrimination in Marketing, Rating, Underwriting, and Claims Practices by the Insurance Industry, which declared that:

technology and algorithmic data are susceptible to misuse that results in bias, unfair discrimination, or other unconscionable impacts among similarly-situated consumers. A growing concern is the use of purportedly neutral individual characteristics as a proxy for prohibited characteristics that result in racial bias, unfair discrimination or disparate impact. **The greater use by the insurance industry of artificial intelligence, algorithms, and other data collection models have resulted in an increase in consumer complaints relating to unfair discrimination in California and elsewhere. . . .**

Irresponsible use of "Big Data" also has the potential to reduce transparency for consumers. Many external data sources used by insurers and other licensees utilize geographical data, homeownership data, credit information, education level, civil judgments, and court records, which have a strong potential disguise bias and discrimination. Other models and algorithms purport to make predictions about a consumer's risk of loss based on arbitrary factors such as a consumer's retail purchase history, social media, internet use, geographic location tracking, the condition or type of an applicant's electronic devices, or based on how the consumer appears in a photograph.

**The use of these models and data often lack a sufficient actuarial nexus to the risk of loss and have the potential to have an unfairly discriminatory impact on consumers.** [emphases added]

**ANSWER:** State Farm admits that Paragraph 28 quotes portions of California Department of Insurance Bulletin 2022-5. State Farm otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.

29. And as recently as 2023, the National Association of Insurance Commissioners' ("NAIC") Special Committee on Race and Insurance affirmed its intent to research and analyze disparate treatment and unfair discrimination in property and casualty insurance by looking at, among other things, proxy variables for race, potential bias in underlying data, and use of third-party data.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29.

30. As described in more detail below, State Farm's policy of delegating to its algorithmic decision-making tools the initial review of claims disproportionately subjects the claims of Black policyholders to greater suspicion—and thereby greater administrative process and delay. In this way, State Farm is reproducing and exacerbating existing patterns of race discrimination.

**ANSWER:** State Farm denies the allegations contained in Paragraph 30.

**C.    State Farm's Policy: Outsource Decisions on Claims Processing to Algorithmic Decision-Making Tools**

31. The claims processing aspect of the insurance industry is notoriously opaque, with little oversight or regulation geared toward increasing transparency for consumers and regulators alike. Insurance companies such as State Farm do not typically publish their claims processing guidelines, their claims processing algorithms, their claims outcomes, or other related data. What the industry readily confirms, however, are the basics of the traditional, if outdated, home insurance claim process: A homeowner who has suffered a loss submits a claim; the insurance company assigns an adjuster to assess the loss and apply the wording of the homeowner's policy to the adjuster's interpretation of the facts of the case. The adjuster can choose whether to request more information, go to the scene, request other evaluations, or meet with witnesses.

**ANSWER:**   State Farm admits that it does not publish its internal documents and information relating to its processing of claims. State Farm further admits that the process of adjusting a claim made to State Farm under a State Farm homeowners policy may involve an investigation and assessment of the facts of the loss by one or more assigned claims employees and/or external claim resources and application of the applicable policy language to those facts. State Farm further admits that investigation of the facts of a loss may include requests for more information, on-site inspection of the property, and witness interviews. State Farm lacks

knowledge or information sufficient to understand what Plaintiffs intend by the allegation that an

adjuster can "request other evaluations." To the extent the allegations contained in Paragraph 31

relate to insurance companies other than State Farm, or to the "insurance industry" generally, State

Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

To the extent Plaintiffs intend any of the other allegations contained in Paragraph 31, other than

those discussed above, to relate to State Farm, they are denied.

32.    In recent years, however, State Farm made the decision to automate claims processing, or major aspects of it, and thereby replace human judgment with algorithms. Many claims are now handled without conversations with the homeowner or follow-up investigation.  State Farm instead delegates to its algorithmic decision-making tools the initial assessment of the homeowners insurance claims it receives. These tools are designed to, among other things, predict the likelihood of fraud and to sort "no touch" or "low touch" claims (which are paid out immediately or near immediately) from "high touch" claims (which trigger additional scrutiny). State Farm has delegated initial claims assessment to these tools for the duration of the Class Period.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 32.

33.    State Farm mostly keeps the nature of its claims processing policy confidential from Plaintiffs and the proposed Class, asserting that disclosing details publicly would undermine antifraud efforts. But those few disclosures that have been made—by State Farm and its third-party vendors—reveal that State Farm harnesses a variety of tools to collect extensive data about policyholders and uses that data in claims processing and fraud detection. Indeed, State Farm increasingly fancies itself a tech company and a "leader within the AI [(artificial intelligence)] space," with an in-house staff of approximately 1800 software engineers. The company describes itself as at the "cutting edge of analytics" and actively recruits and hires employees with a background in data analytics, to "turn data into actionable insights by leveraging a combination of Natural Language Processing, Machine Learning, Artificial Intelligence, or other data science tools and concepts."

**ANSWER:** State Farm admits that it does not publish its internal documents and

information relating to its processing of claims, including information related to the procedures by

which State Farm attempts to identify potentially fraudulent claims, the public disclosure of  which

would undermine antifraud efforts. State Farm further admits that the quotations included in

Paragraph 33 appear on publicly available webpages relating to State Farm career opportunities. State Farm denies the remainder of the allegations contained in Paragraph 33.

34.     The nature and quantity of personal consumer information that State Farm cultivates is staggering. According to its website, State Farm collects data and information on its policyholders including: classifications such as race, sex, marital status, familial status, and gender; physical characteristics and/or descriptions; education, employment, employment history, professional licenses or designations; financial information, medical information or health insurance information; personal property records, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies; biometric information such as genetic, physiological, behavioral and biological characteristics that can be used to establish individual identity, including but not limited to fingerprints, voiceprints, retina scans, and sleep, health or exercise data; internet usage information such as browsing history, search history, and information regarding customers' interaction with a website, application, or advertisement; geolocation data such as precise physical location or movements and travel patterns; and sensory data such as audio recordings of customer care calls.

**ANSWER:** State Farm admits that the list of categories of information contained in Paragraph 34 appears to be taken from a portion of the www.statefarm.com website, which contains disclosures for all business areas of all State Farm entities. Further answering, State Farm states that the portion of the website from which the allegations in Paragraph 34 are taken concerns California privacy rights and disclosures, pursuant to the California Consumer Privacy Act. State Farm denies that these disclosures have any relevance to Plaintiffs or alleged members of their putative Class (none of whom are California consumers), and denies that it collects these categories of information about all consumers or all State Farm Fire and Casualty Company policyholders. State Farm admits that for homeowners insurance, State Farm collects information about the property to be insured and may collect certain financial information (*i.e.*, credit-based insurance information for rating or underwriting), and otherwise denies that it collects any of the categories of information listed in Paragraph 34. State Farm denies that it requests, collects, predicts or uses race or physical characteristics information in claim handling. State Farm denies that any of the categories of personal information set forth in Paragraph 34, or any other personal information

16

about a policyholder, is used in the routing or assignment of homeowners claims, and denies the remaining allegations contained in Paragraph 34.

35. State Farm uses this data in a variety of ways, including "creating a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities and aptitudes," and for a variety of purposes, including processing claims and "protect[ing] against fraud."

**ANSWER:** State Farm admits that the first quoted language in Paragraph 35 appears to be taken from a portion of the www.statefarm.com website, which contains disclosures for all business areas of all State Farm entities. Further answering, State Farm states that the portion of the website from which the first quoted language appears to be taken concerns California privacy rights and disclosures, pursuant to the California Consumer Privacy Act. State Farm denies that these disclosures have any relevance to Plaintiffs or alleged members of their putative Class (who are not California consumers), and denies the remaining allegations contained in Paragraph 35.

36. State Farm also uses a combination of internal and third-party tools to leverage the vast troves of data it collects to process homeowners insurance claims. Data regarding policyholders and their claims are stored, managed, and accessed primarily through State Farm's Enterprise Claim System ("ECS"), a proprietary web-based system used by State Farm claims associates. ECS operates as an electronic file where information about a claim may be found and updated in real time. In addition to providing a web-based interface for the entry and storage of claim data, State Farm executes automated processes based on code and data relationships. As an example, State Farm has disclosed that it licenses a third-party vendor's proprietary system, Technology Analytics for Claims ("TAC"), which uses text-based queries of claims data from ECS to help detect and identify claims that might be fraudulent.

**ANSWER:** State Farm admits that it stores, manages, and accesses information regarding claims made by its policyholders using a proprietary electronic database referred to the Enterprise Claim System ("ECS"). State Farm further admits that it licenses a third-party vendor's proprietary system, Technology Analytics for Claims ("TAC"), which uses text-based queries of claims data

to help detect and identify potentially fraudulent claims. State Farm denies the remaining allegations contained in Paragraph 36.

> 37.    In fact, State Farm has maintained relationships with multiple third-party vendors that offer software, integrations, and applications focused on insurance claims automation. Two such vendors have been Salesforce, a customer relationship management software company,[3] and Duck Creek Technologies, an insurance-specific software and analytics company that provides comprehensive claims management and fraud-detection tools. Since at least 2018, State Farm has used Salesforce's Financial Services Cloud to give agents and employees "a holistic view" of customers. In 2019, State Farm's Chief Digital Officer Fawad Ahmad expressly confirmed that State Farm's homeowners insurance claims "flow[] through Salesforce." Salesforce's platform purports to increase efficiency by offering (1) predefined templates and step-by-step guidance for managing common service requests like the initiation of a claim; (2) automating customer-facing employee tasks; and (3) offering insurance-specific predictive analytics. Duck Creek identified State Farm as one of its largest FY 2019 customers in 2020 and 2021 SEC filings. Duck Creek provides a "comprehensive claims management solution" with "end-to-end claims workflows that enable high-touch to no-touch claim handling" called Duck Creek Claims. In practice, this means that Duck Creek Claims uses predictive modeling or rules-based decision making to determine how a claim should be treated (e.g., whether a claim, by type, is high touch, low touch, or no touch) and then structures workflow accordingly. Duck Creek integrates with Salesforce. Per Salesforce's website, "[t]ogether, Duck Creek and Salesforce deliver a comprehensive [property and casualty] servicing platform."

**ANSWER:** State Farm admits that it utilizes certain applications provided by Salesforce's Financial Services Cloud but denies that any of those applications involve "insurance claims automation." State Farm denies that it has a current relationship with Duck Creek Technologies. Further answering, State Farm states that it previously utilized a first notice of loss data collection tool licensed from Duck Creek but it has not had any relationship with Duck Creek since 2020. State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42 regarding the software, integrations and applications offered

---

[3] Salesforce defines customer relationship management software (also known as "CRM") as "a technology for managing all your company's relationships and interactions with customers and potential customers."

by Duck Creek and Salesforce. State Farm denies all the remaining allegations contained in

Paragraph 37.

38.     On information and belief, throughout the Class Period, State Farm has used
Salesforce's Financial Services Cloud, Duck Creek Claims, and/or other similar
internal and external algorithmic decision-making tools to process its homeowners
insurance claims, delegating to these tools the initial review of claims, the
determination of claim scrutiny level, and assignment of tasks to claims handlers.
State Farm's use of such tools cabins the discretion of its employees—by
automating communications and assigning tasks—and invariably informs the
mindset with which State Farm employees treat claimants. A claim flagged for
heightened scrutiny is treated with more suspicion and less courtesy by an
employee.

**ANSWER:** State Farm denies the allegations contained in Paragraph 38.

39.     All homeowners claims that State Farm receives have been uniformly subject to
processing via the above-described algorithmic decision-making tools during the
Class Period, including the claims of Plaintiffs and the proposed Class.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 39.

40.     Because State Farm's automated system determines how much scrutiny all
homeowners claims deserve and thus how they should be processed, and because
the adverse impact is systemic for Black homeowners as demonstrated by the
survey data, State Farm's policy of delegating the initial assessment of claims to its
algorithmic decision-making tools is the only plausible cause of the disparate
impact experienced by Black claimants. This is not surprising, as similar
algorithmic decision-making has been found to lead to discriminatory outcomes in
financial products generally and within home products specifically.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 40.

41.     On information and belief, the State Farm's algorithmic decision-making tools
incorporate biased historical data and troves of invasive personal consumer data,
which leads to disproportionate and unjustifiably high scrutiny for Black claimants
who, in turn, face additional administrative burdens and delay in resolution of their
meritorious claims.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 41.

42.     A wealth of literature discusses the potential for bias resulting from algorithmic
decision-making. As the FTC has acknowledged, algorithmic bias is everywhere.
Mounting evidence reveals that algorithmic decisions can produce biased,
discriminatory, and unfair outcomes in a variety of high-stakes economic spheres
including employment, credit, health care, and housing. In the housing context in

particular, tools infected with bias are integrated into home financing, leasing, marketing, sales, and zoning decisions. For example, a 2021 report analyzing more than 2 million conventional mortgage applications found that lenders who processed applicants through Fannie Mae and Freddie Mac's FICO algorithms were 80% more likely to reject Black applicants than financially equivalent white applicants.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42.

43. Antifraud algorithmic decision-making tools are particularly susceptible to racial bias. As the Center for Economic Justice ("CEJ") adeptly explained to the NAIC: "Biased antifraud algorithms become self-[fulfilling]—if there is racial bias in the claims you identify as potential[ly] fraudulent and investigate, there will be racial bias in the claims identified as fraudulent. You can't find fraud in a claim you don't investigate." Thus, where biased claims processing algorithms subject Black claimants to greater scrutiny, more fraud will be found among Black claimants, resulting in continuing and increasing scrutiny of Black claimants.

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43. Further answering, State Farm denies that it uses any biased claims processing algorithms, engages in racially discriminatory claims handling and denies that it has any claims handling policy that results in a racially disparate impact.

44. In a May 2021 letter to the NAIC Special Committee on Race and Insurance, the CEJ noted that "no attention has been given to potential racial bias in claims settlement and antifraud, despite the fact that these parts of the insurance operation utilize big data and AI as much or more than [they do] for pricing."

**ANSWER:** State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44.

45. Any reasonable effort to examine State Farm's claims processing policy for disparate impact would have detected the statistically significant racial discrepancies described above. This is particularly true because State Farm has access to all of the relevant data via its ECS and can tell with precision how race affects its algorithms' outputs. Thus, State Farm either does not review its use of algorithmic decision-making tools for disparate impact in claims processing, or having reviewed it, has refused to choose a less discriminatory policy.

**ANSWER:** State Farm denies that it has the "claims processing policy" alleged, denies that it engages in racially discriminatory claims handling, denies that it has any claims handling policy that results in a disparate impact, denies that ECS generally includes data on the race of policyholders, denies that it uses algorithmic decision-making tools in claims handling as alleged by Plaintiffs, and denies all remaining allegations contained in Paragraph 45.

46.     State Farm has acknowledged the risk of bias in its machine learning processes, but only in the underwriting context: In its application for U.S. Patent No. 11,315,191 (issued April 26, 2022), State Farm states that machine learning models could be trained to include bias if bias is present in the data sets used for training. The patent proposes identifying "undesired factors" to control for "undesired prejudice or discrimination," by teaching the machine learning to not consider those factors in setting a premium amount. No publicly available information indicates that State Farm has taught its technology to limit discriminatory outcomes in homeowners insurance claims processing. And the survey results discussed above demonstrate that the State Farm has not done so.

**ANSWER:**     State Farm admits that the quoted language in Paragraph 46 is taken from State Farm's application for U.S. Patent No. 11,315,191. State Farm denies that U.S. Patent No. 11,315,191 or any of the statements therein are related to homeowners insurance claims processing or have any relevance to the claims asserted by Plaintiffs in this action. State Farm denies that it uses algorithmic decision-making tools in claims handling as alleged by Plaintiffs, denies that it has the "claims processing policy" alleged, denies that it engages in racially discriminatory claims handling, denies that it has any claims handling policy that results in a disparate impact, and denies all remaining allegations contained in Paragraph 46.

47.     Further, a tacit acknowledgment of the potential for bias in some of its data only scratches the surface of alleged and actual discriminatory conduct and circumstances at State Farm. There is ongoing litigation in Michigan alleging that State Farm had a "rampant culture of racism and discrimination" and a hostile work environment where terms like "Colored People Can't Understand" and "mutt" were used to describe Black employees, while white employees were often promoted "over [] objectively and clearly more qualified African American candidate[s]." In the Northern District of Illinois, State Farm is also facing class claims that it violated 42 U.S.C. § 1981 by disproportionately "race matching" Black home and automobile agents to areas with high Black and nonwhite populations and low-

income communities (thereby inhibiting agents' opportunities to bring in clients and advance in their careers). State Farm has also previously paid $30 million to former clients for "blacklisting" policyholders who worked with certain lawyers—the majority of whom were Jewish—to a special fraud unit instead of paying their claims. Past and current examples of discrimination by and at State Farm are troubling unto themselves; they are especially troubling when considering that the algorithmic decision-making tools State Farm uses in its claims process are likely trained on historical inputs that are themselves racially biased.

**ANSWER:** State Farm admits that, as to the second sentence of Paragraph 47, there was an individual employment discrimination lawsuit filed in the Western District of Michigan. State Farm denied the allegations in that lawsuit and the court in that case has granted summary judgment in favor of State Farm and dismissed the case. State Farm admits, as to the third sentence of Paragraph 47, that that there is a lawsuit currently pending in the Northern District of Illinois, brought on behalf of a putative class of State Farm agents, asserting claims under 42 U.S.C. § 1981, all of which claims and allegations State Farm has denied. State Farm denies the allegations contained in the fourth sentence of Paragraph 47, denies that it engages in discrimination, denies that it uses algorithmic decision-making tools in claims handling as alleged by Plaintiffs, denies that it engages in racially discriminatory claims handling, denies that it has the claim processing policy alleged by Plaintiffs, denies that it has any claims handling policy that results in a disparate impact, and denies all remaining allegations contained in Paragraph 47.

### D. State Farm's Policy of Delegating Initial Review of Claims to Its Algorithmic Decision-Making Tools Disproportionately Impacts Black Policyholders

48. On information and belief, State Farm's algorithmic decision-making tools rely on inputs that are highly predictive of or are direct proxies for race and/or are trained on historically biased housing and claims data. These tools impact State Farm's determinations of how much scrutiny a claim deserves and, thereby, the workflow an assigned claims handler should follow in processing the claim. As a result, State Farm's policy of delegating the initial claims processing review to its algorithmic decision-making tools has subjected Black homeowners to longer wait times during which they frequently are forced to endure substandard living situations for unreasonably extended periods of time. This, in turn, has resulted in embarrassment and humiliation for Black homeowners—not to mention the extended devaluation of their homes. And the additional labor that Black homeowners must expend to

have their claims processed has resulted in inconvenience and loss of time which could have otherwise been put to valuable use.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 48.

49.     State Farm's delegation of the initial claims processing review to its algorithmic decision-making tools disproportionately and adversely affects Black homeowners relative to white homeowners and causes Black policyholders to expend comparatively more effort over a longer period than white policyholders to get their claims resolved.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 49.

50.     The challenges presented by State Farm's claims processing policy produce at least two distinct harms.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 50.

51.     First, Black policyholders have to endure substandard living conditions for longer and suffer the humiliation and added expense of undue delay and administrative burden. Plaintiff Jacqueline Huskey, for example, was forced to live with a defective roof and water damage to the interior of her home as her exterior roof claim has languished with State Farm. She has spent hours of her time diligently trying—yet inexplicably failing—to get her claim fully addressed. The same is true of Plaintiff Riian Wynn, who, alongside her teenage daughter, endured months of water leakage, and then many more months of unaddressed water damage to the interior of her home. She too spent countless hours trying to persuade State Farm that her claim was legitimate.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 51.

52.     Second, Black State Farm policyholders receive a less valuable insurance product for the same price as white State Farm policyholders because it takes Black policyholders longer and more effort to obtain repayment. Put differently, had Plaintiffs and members of the proposed class known that they would receive different and worse treatment by State Farm, they either would not have purchased homeowners insurance from State Farm or would not have been willing to pay as much as they did for their policies.

**ANSWER:**  State Farm denies the allegations contained in Paragraph 52.

53.     Considered from either vantage, the survey results discussed above substantiate the disparate impact of State Farm's discriminatory claims processing policy.

**ANSWER:**  State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53 regarding survey results, and therefore denies

same. State Farm denies that it uses algorithmic decision-making tools in claims handling as alleged by Plaintiffs, denies that it has a discriminatory claims processing policy, denies that it has the claims processing policy alleged by Plaintiffs, denies that it has a claims handling policy that results in a disparate impact, and denies all remaining allegations contained in Paragraph 53.

54.    State Farm has no legitimate business need to use algorithmic decision-making tools that rely upon data that include race and/or proxies for race and lead to discriminatory effects. State Farm may attempt to assert in the course of litigation that it has a legitimate business need to use these tools to efficiently assign claims and detect insurance fraud, but, on information and belief, State Farm is delaying many more claims than it is denying—thus, slowing and complicating legitimate claims brought by loyal policyholders like the named Plaintiffs. Any efficiency or fraud detection goal thus does not justify the added burdens to which State Farm is disproportionately subjecting Black policyholders.

**ANSWER:** State Farm denies that it uses algorithmic decision-making tools in claims handling as alleged by Plaintiffs, denies that it engages in racially discriminatory claims handling, denies that it has the claims processing policy alleged by Plaintiffs, denies that it has any claims handling policy that results in a disparate impact, and denies the remaining allegations contained in Paragraph 54.

55.    Even so, State Farm could deploy alternative claims processing policies that would eliminate or greatly reduce discriminatory impact. It would be straightforward and low cost for State Farm to prevent its algorithms from creating the disparate impact they do. Testing for bias, either by census tract or by inferred demographics, is a standard approach supported by regulators and academic research. Assessing an algorithm's output to examine whether it varies by race is trivial. Had State Farm taken even basic measures to identify bias, simple changes could have been implemented to remediate the bias. State Farm itself has acknowledged in its patent applications that it is able to identify "undesired factors" to control for "undesired prejudice or discrimination," by teaching its algorithmic decision-making tools not to consider those factors in setting a premium amount.

**ANSWER:** State Farm admits that the quoted language contained in Paragraph 55 is taken from State Farm's application for U.S. Patent No. 11,315,191. State Farm denies that U.S. Patent No. 11,315,191 or any of the statements therein are related to homeowners insurance claims processing or have any relevance to the claims asserted by Plaintiffs in this action. State Farm

denies that it uses algorithmic decision-making tools in claims handling as alleged by Plaintiffs, denies that it engages in racially discriminatory claims handling, and denies that it has any claims processing policy that results in a disparate impact. State Farm lacks knowledge or belief sufficient to form a belief as to the truth of the allegation that "[a]ssessing an algorithm's output to examine whether it varies by race is trivial," but states that it generally does not collect or maintain data on the race of its policyholders, and such data is generally not included in its ECS. State Farm denies the remaining allegations contained in Paragraph 55.

56.     Plaintiffs and the proposed Class continue to suffer harm because of State Farm's discriminatory policy, losing wealth from delayed payment, as well as from the additional time and paperwork required from them to process their claims. Additionally, as claims of Black homeowners drag on—with repairs not paid for nor completed in a timely fashion—the values of Black homes disproportionately decrease relative to the values of white homes. Unaddressed repairs can lead to other issues in the home: health and safety issues, citations for code violations, and even condemnation of a property. Finally, as claim delays persist, Black homeowners may arbitrarily and unreasonably be forced to live in substandard housing for extended periods of time. Studies have shown that living in substandard housing can impact both physical and mental health of homeowners and their families.

**ANSWER:** State Farm denies that the requirements for class certification are met here, denies that certification of the proposed class could be granted, and denies the remaining allegations contained in Paragraph 56.

57.     On information and belief, State Farm's current policy of delegating the initial review of homeowners insurance claims to its algorithmic decision-making tools has been in place since at least 2018, if not before, and has existed on a continuous basis since then. This policy has resulted in systemic and continuing racial discrimination in the processing of homeowners insurance claims in every year since 2018.

**ANSWER:** State Farm denies the allegations contained in Paragraph 57.

## IV.     CLASS ALLEGATIONS

58.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

**ANSWER:** State Farm hereby incorporates by reference its responses to Paragraphs 1-57 as though fully set forth herein.

59. Plaintiffs sue on their own behalf under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

**ANSWER:** State Farm is unable to understand the allegations contained in Paragraph 59, as none of the Rules cited in Paragraph 59 concern claims brought by plaintiffs "on their own behalf," and therefore denies them.

60. Plaintiffs seek to bring a class action pursuant to the FHA on behalf of themselves and a class of similarly situated individuals defined as follows:

All Black individuals who maintained State Farm homeowners insurance policies at some time during the Class Period covering property in Illinois, Indiana, Michigan, Missouri, Ohio, and/or Wisconsin; who made a claim under such policy during the Class Period; and who were required to submit additional paperwork or information (beyond submission of the initial claim), had three or more interactions with State Farm claims handlers before claim resolution, and/or waited more than a month for claim resolution.

For purposes of this Class Definition, the term "homeowners insurance policy" is defined to include insurance policies designed to cover losses and damages to a dwelling used principally as a private personal residence, and not solely for rental or other commercial purposes. Such properties include single-family detached houses; single-family attached houses; condominiums or cooperatives; mobile or manufactured homes; and any other type of dwelling that is covered by an HO-01, HO-02, HO-03, HO-05, HO-06, HO-07 or HO-08 homeowners insurance policy.

The start date for the "Class Period" will be defined through discovery, which will reveal when State Farm began using its automated claims processing policy.

**ANSWER:** State Farm admits that Plaintiffs purport to bring this action on behalf of an alleged class as defined in Paragraph 60. State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, denies that it uses an automated claims processing policy as alleged by Plaintiffs, and denies all remaining allegations contained in Paragraph 60.

61.     Upon information and belief, the Class contains tens of thousands of individuals. State Farm is the largest issuer of homeowners insurance policies in North America, with approximately 18% of market share, and is the biggest homeowners insurance provider in Illinois, Indiana, Michigan, Missouri, and Ohio. It is the second biggest homeowners insurance provider in Wisconsin. The Midwest has close to one million Black homeowners. About 93% of homeowners have home insurance, and approximately 5% of policyholders submit a claim on their policy each year. The 2021 YouGov survey discussed *supra* by itself identified 134 Black State Farm respondents who would be members of the Class under the proposed definition above. On information and belief, the proposed Class is so numerous that joinder of all members would be impracticable.

**ANSWER:** State Farm admits that in 2022 State Farm Fire and Casualty Company, with its affiliates, was the largest provider of homeowners insurance, as measured by direct written premium, in the United States. State Farm admits that in 2022 State Farm Fire and Casualty Company was the largest provider of homeowners insurance, as measured by direct written premium, in Illinois, Indiana, Michigan, Missouri, and Ohio, and the second largest in Wisconsin. State Farm lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the third, fourth and fifth sentences of Paragraph 61. State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 61.

62.     All members of the proposed Class have been subject to, and affected by, State Farm's policy of delegating the initial review of homeowners claims to its algorithmic decision- making tools. Questions of law and fact common to the proposed Class predominate over questions affecting only individual members. These questions include, but are not limited to, the following:

     a.     Whether State Farm uses algorithmic decision-making tools to triage and process homeowners insurance claims, and the nature, scope, and operation of those tools;

     b.     Whether State Farm's algorithmic decision-making tools have caused racial discrimination in violation of the FHA;

     c.     Whether there are statistically significant disparities between the processing time, paperwork requests, and employee interactions for claims filed by

27

Black and white homeowners in the Midwest that are adverse to the Black homeowners;

d.    Whether there is a legitimate business necessity for State Farm's algorithmic decision-making tools;

e.    Whether substantially equally or more valid alternative means of claim processing are available that would eliminate or reduce the discriminatory impact; and

f.    Whether an order for declaratory and injunctive relief is appropriate.

**ANSWER:** State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, denies that there are any questions of law or fact common to the members of the proposed Class that predominate over questions affecting only individual members, denies that it uses algorithmic decision-making tools to triage and process homeowners insurance claims, denies that it engages in racially discriminatory claims handling, denies that it has any claims processing policy that results in a disparate impact, denies that Plaintiffs or the proposed Class are entitled to any relief, and denies all remaining allegations contained in Paragraph 62, including all subparagraphs.

63.    The claims of the individual named Plaintiffs are typical of the claims of the proposed Class and do not create any disabling conflicts with the interests of any other members of the proposed Class.

**ANSWER:** State Farm denies that Plaintiffs have asserted any viable claims against State Farm in this action, denies that it engaged in any improper conduct in the handling of Plaintiffs' property damage claims, denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 63.

64.    The individual named Plaintiffs will fairly and adequately represent the interests of the proposed Class. The Plaintiffs and the proposed Class are represented by

attorneys who are qualified to pursue this litigation and have experience in class actions.

**ANSWER:** State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 64.

65. A class action is superior to other methods for the efficient and fair adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

**ANSWER:** State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 65.

66. In the alternative, State Farm has acted or refused to act on grounds generally applicable to the proposed Class, making appropriate final injunctive relief or corresponding declaratory relief with respect to the proposed Class as a whole.

**ANSWER:** State Farm denies that the requirements for class certification under any subsection of Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 65.

67. Finally, if the Court decides not to certify the Class under Rule 23(b)(2) or (3), class certification is appropriate with respect to each of the common issues, including those identified above and any other common issues that may be identified during the litigation, pursuant to Federal Rule of Civil Procedure 23(c)(4).

**ANSWER:** State Farm denies that the requirements for class certification under any subsection of Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 67.

## V.    CAUSES OF ACTION

<u>COUNT ONE</u>
**VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. § 3604(a) & (b)**
**(Individually and on Behalf of the Class)**

68.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

**ANSWER:**  State Farm hereby incorporates by reference its responses to Paragraphs 1-68 as though fully set forth herein.

69.    Pursuant to the FHA, "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

**ANSWER:** Paragraph 69 is a statement of law as to which no answer is required or given. To the extent a response is required, State Farm admits that Paragraph 69 quotes Section 3601 of the FHA. State Farm denies that Plaintiffs have asserted any viable claims against State Farm under the FHA and denies that State Farm has engaged in any conduct that violates the FHA.

70.    Pursuant to 42 U.S.C. § 3604(a), "[i]t shall be unlawful . . . [to] otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

**ANSWER:**  Pursuant to the Court's Memorandum Opinion and Order of September 11, 2023 (Dkt. 52), Plaintiffs' claim for violation of 42 U.S.C. § 3604(a) has been dismissed, so no answer to Paragraph 70 is required or given.

71.    Pursuant to 42 U.S.C. § 3604(b), "[i]t shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

**ANSWER:**  Paragraph 71 is a statement of law as to which no answer is required or given. To the extent a response is required, State Farm admits that Paragraph 71 quotes Section 3604(b) of the FHA. State Farm denies that Plaintiffs have asserted any viable claims against State Farm under the FHA and denies that State Farm has engaged in any conduct that violates the FHA.

72.    According to 24 C.F.R. § 100.70, promulgated by the U.S. Department of Housing and Urban Development pursuant to 42 U.S.C. § 3604:

(b) [i]t shall be unlawful . . . to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.

(d) Prohibited activities relating to dwellings under paragraph (b) of this section include, but are not limited to:

. . .

(4) Refusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently because of race . . . .

**ANSWER:** Paragraph 72 is a statement of law as to which no answer is required or given. To the extent a response is required, State Farm admits that Paragraph 72 quotes a portion of a regulation promulgated by the U.S. Department of Housing and Urban Development pursuant to Section 3604 of the FHA. State Farm denies that the quoted regulation applies to insurer claim handling, denies that Plaintiffs have asserted any viable claims against State Farm under the FHA or the quoted regulation, and denies that State Farm has engaged in any conduct that violates the FHA or the quoted regulation.

73.    Homeowners insurance is a service rendered in connection with a sale of a dwelling. State Farm provided homeowners insurance to the proposed Class representatives and all proposed Class members, which they needed to maintain ownership of their home. State Farm's claims processing policy provides insurance coverage differently on the basis of race and has thus resulted in discrimination with respect to the named Plaintiffs as well as all proposed Class members. State Farm's claims processing policy violates Section 3604 of the FHA and constitutes actionable discrimination on the basis of race.

**ANSWER:** State Farm admits that it issued a Manufactured Home policy to Plaintiff Huskey and a Condominium policy to Plaintiff Wynn. State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 73.

74. In addition to tangible financial harm due to State Farm's delay in payments to Black policyholders, the discriminatory effects of its claims processing policy has caused Plaintiffs and the proposed Class significant frustration, inconvenience, and humiliation on account of their race.

**ANSWER:** State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 74.

75. The proposed Class Representatives and the proposed Class are aggrieved as defined in the FHA by virtue of having been subject to State Farm's discriminatory claims processing policy, which artificially, arbitrarily, and unnecessarily subjects the claims of Black policyholders to greater scrutiny than those of White policyholders.

**ANSWER:** State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, denies that certification of the proposed class could be granted, and denies all remaining allegations contained in Paragraph 75.

<u>**COUNT TWO**</u>
**VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. § 3605**
**(Individually and on Behalf of the Class)**

Pursuant to the Court's Memorandum Opinion and Order of September 11, 2023 (Dkt. 52), this Count has been dismissed.

**VI. JURY DEMAND**

83. Plaintiffs, on behalf of themselves and the proposed Class, hereby request a trial by jury.

**ANSWER:** State Farm admits that Plaintiffs request a trial by jury. State Farm denies that the requirements for class certification under Federal Rule of Civil Procedure 23 are met here, and denies that certification of the proposed class could be granted.

<u>**STATE FARM'S ADDITIONAL AND AFFIRMATIVE DEFENSES**</u>

State Farm asserts the following additional and affirmative defenses, without assuming the burden of proof as to any such defenses or any portions thereof that would otherwise rest with

Plaintiffs. State Farm repeats and incorporates the foregoing answers and denials to the allegations of the Complaint as though fully set forth herein. State Farm expressly reserves the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

### FIRST ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the asserted class are barred because 42 U.S.C. § 3604(b) does not apply to insurance claim handling.

### SECOND ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the asserted class are barred because disparate impact liability under 42 U.S.C. § 3604(b) does not apply to insurers.

### THIRD ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the asserted class fail because (i) they have not identified and cannot prove a relevant statistical disparity as required to establish disparate impact liability under 42 U.S.C. § 3604(b); (ii) they have not pointed to and cannot point to a specific policy that purportedly caused a relevant statistical disparity; and (iii) they have not identified and cannot prove the requisite robust causal connection between any relevant statistical disparity and any specific State Farm policy.

### FOURTH ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the asserted class are barred by the McCarran-Ferguson Act, 15 U.S.C. § 1011, et seq.

### FIFTH ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs lack standing to assert the claims for relief in the First Amended Complaint on their own behalf or on behalf of the alleged members of the purported class.

## SIXTH ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the purported class are barred, in whole or in part, because they have not suffered any injury or damage as a result of any conduct of State Farm.

## SEVENTH ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the purported class are barred, in whole or in part, by the doctrines of laches, waiver, estoppel, and/or unclean hands.

## EIGHTH ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the purported class are barred to the extent that they were fully compensated for their loss.

## NINTH ADDITIONAL AND AFFIRMATIVE DEFENSE

Plaintiffs' claims and the claims of the alleged members of the purported class are barred, in whole or in part, by the statute of limitations.

## TENTH ADDITIONAL AND AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action under Fed. R. Civ. P. 23(a) because: (a) Plaintiffs are not adequate class representatives and cannot fairly and adequately protect the interests of the purported class; (b) Plaintiffs' claims are not typical of the claims of purported class members; (c) adjudication of separate actions by individual class members would not be dispositive of other class members' interests or establish incompatible standards of conduct for State Farm; and (d) none of the other requirements for maintaining this action as a class action have been satisfied. Accordingly, any adjudication of Plaintiffs' individual claims or those of the purported class on the basis of generalized class-wide proof will not satisfy the requirements of

Rule 23 and further would violate State Farm's due process and other rights under the Illinois and United States Constitutions.

### ELEVENTH ADDITIONAL AND AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action under Fed. R. Civ. P. 23(a)(l) because the asserted class is not properly defined or readily ascertainable. Accordingly, any adjudication of Plaintiffs' individual claims or those of the asserted class on the basis of "generalized classwide proof" will not satisfy the requirements of Rule 23 and further would violate State Farm's due process and other rights under the Illinois and United States Constitutions.

### TWELFTH ADDITIONAL AND AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action under Fed. R. Civ. P. 23(a)(l) because the asserted class is overbroad because it includes numerous individuals who could not have suffered any cognizable harm from the conduct alleged by Plaintiffs. Accordingly, any adjudication of Plaintiffs' individual claims or those of the asserted class on the basis of "generalized classwide proof" will not satisfy the requirements of Rule 23 and further would violate State Farm's due process and other rights under the Illinois and United States Constitutions.

### THIRTEENTH ADDITIONAL AND AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action under Fed. R. Civ. P. 23(b)(2) because State Farm has not acted or refused to act on grounds generally applicable to the proposed class, because the First Amended Complaint does not seek equitable relief that is both appropriate respecting the proposed class as a whole and final, because the predominant relief sought by the First Amended Complaint is monetary damages, and because the proposed class is not sufficiently cohesive to permit certification under Rule 23(b)(2). Accordingly, any adjudication of Plaintiffs' individual claims or those of the asserted class on the basis of "generalized classwide proof" will

not satisfy the requirements of Rule 23 and further would violate State Farm's due process and other rights under the Illinois and United States Constitutions.

## FOURTEENTH ADDITIONAL AND AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action under Fed. R. Civ. P. 23(b)(3) because any adjudication of Plaintiffs' individual claims or those of the purported class will require individualized inquiry on the questions of injury and damages, such that imposition of liability and any award of damages or other relief against State Farm on the basis of generalized class-wide proof will not satisfy the requirements of Rule 23. Accordingly, any adjudication of Plaintiffs' individual claims or those of the asserted class on the basis of "generalized classwide proof" will not satisfy the requirements of Rule 23 and further would violate State Farm's due process and other rights under the Illinois and United States Constitutions.

## FIFTEENTH ADDITIONAL AND AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action under Fed. R. Civ. P. 23(c)(4) because Rule 23(c)(4) does not create an independent basis for certification but requires Plaintiffs to satisfy both the prerequisites of Rule 23(a) and one of the three categories of Rule 23(b). Because Plaintiffs cannot satisfy those requirements, any adjudication of Plaintiffs' individual claims or those of the asserted class on the basis of "generalized classwide proof" will not satisfy the requirements of Rule 23 and further would violate State Farm's due process and other rights under the Illinois and United States Constitutions.

## SIXTEENTH ADDITIONAL AND AFFIRMATIVE DEFENSE

This action cannot be maintained as a class action under Fed. R. Civ. P. 23(c)(4) because there is no issue that can be resolved on a classwide basis and will materially advance the litigation. Accordingly, any adjudication of Plaintiffs' individual claims or those of the asserted class on the

basis of "generalized classwide proof" will not satisfy the requirements of Rule 23 and further would violate State Farm's due process and other rights under the Illinois and United States Constitutions.

### JURY DEMAND

State Farm demands a trial by jury on all issues so triable.

Dated:  October 9, 2023                              Respectfully submitted,

/s/ Sondra A. Hemeryck
Sondra A. Hemeryck
Patricia Brown Holmes
Joseph A. Cancila, Jr.
Sarah E. Finch
Lauren Abendshien
RILEY SAFER HOLMES & CANCILA LLP
70 West Madison Street, Suite 2900
Chicago, Illinois 60602
Telephone:      312.471.8700
Facsimile:      312.471.8701
shemeryck@rshc-law.com
pholmes@rshc-law.com
jcancila@rshc-law.com
sfinch@rshc-law.com
labendshien@rshc-law.com

*Attorneys for Defendant State Farm Fire and Casualty Company*