1    **TRANSCRIPTION OF DIGITAL RECORDING**

2              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
3                      EASTERN DIVISION

4    JACQUELINE HUSKEY and RIIAN       ) Case No. 22-CV-7014
     WYNN, on behalf of themselves     )
5    and all others similarly          )
     situated,                         ) STATUS HEARING
6                     Plaintiffs,      ) (held via
                                       ) teleconference)
7    vs.                               )
                                       )
8    STATE FARM FIRE & CASUALTY        ) Chicago, Illinois
     COMPANY,                          ) Date: February 22, 2024
9                     Defendant.       ) Time: 9:30 a.m.
     ──────────────────────────────────────────────────────────

10
     ──────────────────────────────────────────────────────────
11         AUDIO TRANSCRIPTION OF RECORDED STATUS HEARING
               HELD VIA TELECONFERENCE BEFORE
12    THE HONORABLE MAGISTRATE JUDGE SUNIL R. HARJANI
               UNITED STATES MAGISTRATE JUDGE
     ──────────────────────────────────────────────────────────

13                  A P P E A R A N C E S

14   For the Plaintiffs:    James W. Crooks, Esq.
                            Fairmark Partners, LLP
15                          1825 7th Street, NW, Suite 821
                            Washington, DC  20001
16                          619-507-4182
                            (appeared via teleconference)
17                              -and-
                            Alexander Rose, Esq.
18                          Fairmark Partners, LLP
                            68 Jay Street, Suite 323
19                          Brooklyn, New York  11201
                            617-642-5569
20                          (appeared via teleconference)

21
     (Appearances continued on the next page.)
22

23

24

25   TRANSCRIBER:           Annette M. Montalvo
                            Office: 312-818-6683

```
 1    APPEARANCES:   (Cont'd)

 2
      For the Plaintiffs:          Albert Powell, Esq.
 3                                 Sanford Heisler Sharp, LLP
                                   1350 Avenue of the Americas
 4                                 31st Floor
                                   New York, New York  10019
 5                                 646-402-5650
                                   (appeared telephonically)
 6                                      -and-
                                   Sharon Kim, Esq.
 7                                 Sanford Heisler Sharp, LLP
                                   17 State Street, 37th Floor
 8                                 New York, New York  10004
                                   646-402-5650
 9                                 (appeared telephonically)
                                        -and-
10                                 Jason D. Williamson, Esq.
                                   Center on Race, Inequality,
11                                 and the Law
                                   NYU Law School
12                                 139 MacDougal Street, 4th Floor
                                   New York, New York  10012
13                                 646-269-3933
                                   (appeared telephonically)

14

15    For the Defendant:          Joseph A. Cancila, Jr., Esq.
                                   Sondra A. Hemeryck, Esq.
16                                 Sarah E. Finch, Esq.
                                   Riley Safer Holmes & Cancila LLP
17                                 70 West Madison Street, Suite 2900
                                   Chicago, Illinois  60602
18                                 312-471-8724
                                   (appeared via teleconference)

19

20

21
      Proceedings recorded by Liberty digital-recording system;
22    transcript produced by audio transcription.
     ─────────────────────────────────────────────────────────
23    Transcriber:               Annette M. Montalvo, CSR, RDR, CRR
                                  Official Court Reporter
24                                United States Courthouse, Room 1902
                                  219 South Dearborn Street
25                                Chicago, Illinois  60604
                                  312-818-6683
```

1    (TRANSCRIBER NOTE:  Counsel are reminded to please state
2    their name before they speak, for accurate speaker
     identification, and to consider using a separate telephone
3    line for their audio connection, and not a speaker phone or
     computer internal microphone, in order have a clearer audio
4    recording to aid in the transcription of the recorded
     proceedings.)

5

6    (Proceedings commenced at 9:37 a.m., in open court, via

7    teleconference, and are transcribed from a Liberty audio

8    recording, to wit:)

9         THE COURTROOM DEPUTY:  22-C-7014, *Jacqueline Huskey*

10   *v. State Farm Fire and Casualty Company*.

11        Would the parties please state your name for the

12   record, starting with plaintiffs' counsel.

13        MR. CROOKS:  This is Jamie Crooks of Fairmark

14   Partners on behalf of plaintiffs Jacqueline Huskey, Raiin

15   Wynn, and proposed class.

16        THE COURT:  Next.

17        MR. ROSE:  Alexander Rose, on behalf of Fairmark

18   Partners, on behalf of Jacqueline Huskey, Raiin Wynn, and

19   proposed class.

20        MR. WILLIAMSON:  Jason Williamson, the Center on

21   Race, Inequality and the Law, NYU Law School, for the

22   plaintiffs.  Good morning, Judge.

23        THE COURT:  Good morning.

24        MS. KIM:  Hi.  This is Sharon Kim from Sanford

25   Heisler Sharp, for the plaintiffs.

1        MR. CROOKS:  Albert, I think you introduced yourself,

2  but you may have been muted.

3        MR. POWELL:  Apologize for that.

4        This is Albert Powell, Sanford Heisler Sharp, for the

5  plaintiffs and the proposed class.

6        MR. CROOKS:  And that's everybody for plaintiffs,

7  Your Honor.

8        THE COURT:  Thank you.

9        MS. HEMERYCK:  Sondra Hemeryck, of Riley Safer Holmes

10  & Cancila, on behalf of the defendant, State Farm Fire and

11  Casualty.  I have two colleagues with me who will introduce

12  themselves.  And I did want to let Judge Harjani know that our

13  colleague Patricia Holmes would have liked to be here, but she

14  had to be on a flight this morning.

15        I think, Joe, you're on mute.

16        MR. CANCILA:  Good morning, Your Honor.  Joe Cancila

17  for defendant, State Farm Fire and Casualty.

18        MS. FINCH:  Good morning, Judge.  Sarah Finch, also

19  for State Farm.

20        MS. HEMERYCK:  That's all the defendant counsel,

21  Your Honor.

22        THE COURT:  Okay.  Thank you.

23        Good morning.  I am Judge Harjani, of course.  Nice

24  to see you virtually this morning.

25        So I have had an opportunity to review your status

1    reports, and I appreciate the work that you have done prior to
2    this hearing.

3         You know, we are about to undertake a pretty long
4    journey in discovery, and one that promises to be probably
5    somewhat complex.  And so I find in those kind of cases it is
6    always good for all of us to meet and talk, get our bearings
7    on what the plan is, and how we're going to get through this.

8         Your most recent report, which I have read closely, I
9    have a few things I want to talk to you about, but let's put
10   aside what we can put aside for now, which is we can put aside
11   the ESI protocol.  You are still working on it, and I will
12   certainly give you time to figure it out.

13        As I did say in the *Williams* case, I appreciate it is
14   not going to be easy.  The negotiation between both sides with
15   respect to how you are going to conduct ESI discovery, the
16   search terms, the connectors, the custodians, the date ranges,
17   are all going to be difficult negotiations.  But I still do
18   find that it is better than the other option.  The other
19   option being defendants simply do it and uphold their
20   obligation to reasonably conduct discovery.  I appreciate
21   that.  But the other option will lead to more discovery
22   disputes than the option that I prefer.  It will lead to more
23   requests for sanctions and to compel, more requests for
24   discovery on discovery.

25        So I've concluded in the more complicated cases such

1   as this one that it is worth the pain to do this up front.

2   And, in particular, for the defendants, what it does save you

3   is it saves you the potential having to redo searches, which I

4   do find is even more cumbersome than putting the pain up

5   front.  So, on balance, neither option is easy, but I find

6   that the better option is to front load the pain, if you will,

7   rather than do it on the back end.

8           So I will give you the time to work it through.  If I

9   have to decide things, I will decide it.  I prefer not to rule

10  on search terms and parameters.  It is not easy for a judge to

11  do that because it is unknown what the results are going to

12  look like.  Only the two of you who have deep knowledge of the

13  case can really understand what you're getting back and

14  whether it is helpful to your case or not.  It is much harder

15  for a judge to do so.  So I would prefer that you sort it out

16  on your own.

17          If you bring it to my attention, you are going to

18  have to bring a lot of other things to my attention, including

19  hit reports, how much relevant information is returned versus

20  irrelevant information.  You are going to have to bring

21  affidavits to my attention about burdens, including the cost

22  associated with running a particular search term versus the

23  one that you prefer.

24          So once I get involved, it is a lot more things that

25  you have to do to present to me, and that's going to obviously

1    require more time and effort and delay things.  So I say that

2    just to give you a heads up, which is I will do it if you want

3    me to do it, but I prefer if you do your best to work it out,

4    up front, so that when you run the searches and produce the

5    discovery, we can then move more smoothly into deposition

6    practice, rather than fighting over what was produced or what

7    was not produced.

8         Okay?  So that's kind of my general philosophy on ESI

9    protocols and searches.  Different judges have different

10   philosophies, and the Sedona principles can be read either

11   way.  But I read them in the way that I think makes the most

12   sense for the cases that I manage.

13        So we will put that aside.  We will put aside also

14   the issue -- we will resolve the issue, which is I agree that

15   coordination with *Williams*.  If you are not seeing the

16   benefits of it, we can leave that aside.  All I wanted you to

17   do is to think about it, and you have, and so we will put that

18   aside.

19        So the real question that I want to talk about was

20   how we're going to manage discovery and the phase one and

21   phase two process.

22        And, really, if I can drill down a little bit deeper,

23   I am trying to understand the differences involved in your

24   phase one approaches.  Because there seems to be overlap.  The

25   overlap with respect to machine learning, the algorithms,

1   artificial intelligence tools, that were used to make

2   decisions about homeowners insurance claims.

3          So my question then is what do the plaintiffs have

4   that's more than what the defendant has proposed.  And so what

5   does that look like, and why do you think you need it.  So

6   that's my first question.

7          And so, plaintiffs, you can go first, and then I will

8   let defendant respond after that.  Just to be aware, I may not

9   make any decisions today.  I am really just trying to get my

10  questions answered and explore what's the best way to manage

11  this.

12         So, with that, plaintiffs, go ahead.

13         MR. CROOKS:  Thank you, Your Honor.

14         I think when it comes to the differences with respect

15  to phase one, there are really sort of two differences,

16  broadly speaking, between what we submitted earlier this week.

17  The first is we have a sort of much broader definition of what

18  policies, procedures, processes, we believe we're entitled to

19  discover into.

20         We made clear in our complaint and our motion to

21  dismiss briefing why we would have to be forthright that we

22  don't know exactly the vendors that State Farm uses for these

23  claims processing, the exact mechanisms they use to prioritize

24  claims, or what that looks like.  I think our complaint

25  actually says the word that it's black box.

1        And so we -- our view is that without turning over

2   claims data, individual claims files for the class, which we

3   talk about in phase two, it's important for us in phase one to

4   get an understanding of how the claims process works

5   generally, and I think the difference there is that State

6   Farm's proposal, as I read it, would limit our discovery into

7   a much narrower, basically, their chosen definition of how

8   they'd like to read our complaint, which is much more narrow

9   than we receive.  That's number one.

10       And, number two, and I think this actually relates to

11  both phases, but it's certainly true of phase one, State

12  Farm's proposal both in what you have read and in our many

13  meet and confers on this issue is that, basically, any

14  class -- any class discovery is inappropriate because your

15  individual plaintiffs are going to lose.

16       And so, for instance, we got -- we sent out rogs a

17  month ago, and we got broad responses last night.  And one of

18  our interrogatories asked to please list the vendors that you

19  use to help with claims processing.  And after occasional

20  objections we got, look at your client's claims files, which

21  is obviously not responsive to that.

22       And then we have another rog where it says please

23  identify the roles and functions that vendors perform, and

24  they refused to answer and said that it's not relevant.

25       So I think we do have a fundamental disconnect in

1   terms of how class discovery should proceed in general, and

2   that includes in phase one.  We believe that especially for a

3   disparate impact claim, a disparate impact class claim, it's

4   necessary for us to understand how all members of the class

5   were treated, and how nonclass members, i.e., white homeowners

6   insurance holders were treated.

7          I fully take to heart your guidance in *Williams*.

8   We're not asking for every single person's claims file.  We

9   are asking at a high level for the -- you need to understand

10  how the claims processing mechanism works.  And so you

11  wouldn't limit that just to the sort of narrow AI tools that

12  State Farm has -- seems to be contemplating in phase one.

13         THE COURT:  Okay.  So talk to me about your

14  complaint.  Because you drafted it, and as it stands now, is

15  your language in it that talks about broader policies and

16  practices, that is beyond the algorithmic decision making

17  tools?

18         MR. CROOKS:  Yes.  The specific policies that we

19  point to and the policies that Judge Kendall when she was on

20  this case found to be (inaudible) alleged is their policy is

21  delegating to some sort of machine process.  Delegating the

22  initial sort of sorting of claims, and that's about as

23  specific as we could be, and Judge Kendall went out of her way

24  to say we don't need to be more specific in our complaint

25  (inaudible) motion to dismiss.  So we're not pretending that

1    we know exactly how they do it.  That's exactly what we are

2    trying to figure out in phase one.  And if we're entirely

3    wrong about this, if there isn't such processing, then we

4    would certainly revisit whether it makes sense to proceed with

5    this case and move into phase two.

6         But our allegation is that there's a policy

7    (inaudible) indicating some sort of automatic, automated

8    process, the initial sort of sorting of claims.  That's the

9    part -- we refer to AI decisionmaking tools, but if you read

10   how we claim that in the complaint, it's very broad because we

11   don't know.

12        THE COURT:  I hear you on that.  I guess -- honestly,

13   from what you said, and what I have read about State Farm's

14   phase one, they still sound like the same thing.  And so I'm

15   really wondering, are we just arguing over use of words here.

16   Because underlying all of this is a belief by plaintiff that

17   there's a claims processing system that uses computers, very

18   simple language, that has a disparate impact.  And that's what

19   it sounds like you, plaintiffs, want to look for, and it

20   sounds like what defendant is proposing.

21        So sticking with plaintiffs for a moment.  Am I wrong

22   about that?  Is that not it?  Or is there something more that

23   you're seeking?

24        MR. CROOKS:  I think that would cover most of what

25   we're interested in in phase one, but I also think their

1    policies, their sort of claims processing policies that don't

2    necessarily relate to machine learning, but generally govern

3    the claims management process (inaudible) as well, because

4    they will show us exactly the role that whatever system we get

5    information about plays.

6               THE COURT:  Uh-huh.

7               MR. CROOKS:  And then I think in terms of where

8    there's daylight, I think that the rog responses we got last

9    night certainly show, I mean, we ask which vendors do you use

10   to assist with claims processing.  Clearly discussed in the

11   complaint, (inaudible) motion to dismiss decision, and all we

12   got back was we gave you your plaintiffs' individual claims

13   files, that's all we're going to give you.  And then we ask,

14   what do those vendors do?  And they said not relevant.

15              So I don't -- there must be a disconnect between how

16   we are viewing phase one, because, number one, we're treating

17   this as a class case, which is appropriate for the motion to

18   dismiss in such a case, and, number two, we are asking

19   questions very much tied to our complaint, but they're sort of

20   saying, no, I promise that's not how we do it, you are way off

21   the mark, but they're not telling us that.  We need to see

22   that for ourselves.

23              THE COURT:  Okay.  So I won't take much stock into

24   the interrogatories.  Honestly, I have yet to meet a lawyer

25   who's been happy with interrogatory responses on the first

1   round.  Which is why you do 37.2s, and you have revisions.

2   And, unfortunately, that seems to be the way discovery

3   practices goes.  I wish I could change that and just have

4   answers that come off the bat that actually make people happy.

5   But between the objections and, you know, the lawyer-crafted

6   responses, interrogatory practice seems to be that way.  So I

7   won't put too much stock into that, just for now, if you will.

8           Let me just turn to defendant for a moment, which

9   is -- I think you see my struggle here.  I'm still trying to

10  understand the difference between phase one and phase two, in

11  that it seems like claims processing relates to computer based

12  decision making.  So what do you think it is that plaintiffs

13  want that's beyond that?

14          MS. HEMERYCK:  Thank you, Your Honor.

15          So what plaintiffs have asked for here, if you look

16  at what they said, how they describe what they want to see in

17  phase two, they have extremely broad statements.  Discovery

18  for State Farm's policies, practices, and procedures for

19  claims processing, including, but not limited to, discovery

20  into its data analytics and algorithm decisionmaking tool.

21  That is far broader than what Mr. Crooks just suggested.  I

22  mean, State Farm's policies, practices, and procedures for

23  claims processing?  That is an extraordinarily broad topic.

24  And it is -- and that is not what they allege, it is not their

25  theory, it is not their claim.

1          I would also say that Mr. Crooks is a little bit not

2    entirely accurate as to depositions plaintiffs have taken in

3    this case, and what they have alleged, and how they managed to

4    get past a motion to dismiss here.

5          So, you know, plaintiffs brought this case

6    alleging -- and it's largely on information and belief,

7    because as you said, they don't actually know.  They

8    essentially theorized the existence of something that, in

9    fact, doesn't exist.

10          But what they said was, and this is paragraph 4 of

11   their complaint, right there, fourth paragraph, that State

12   Farm, quote, uses machine learning algorithms and artificial

13   intelligence tools, which they then define collectively as

14   algorithmic decisionmaking tools, to screen out potentially

15   fraudulent or complex, what they call high touch, claims, from

16   legitimate or straightforward low touch or no touch claims.

17          THE COURT:  So I saw that.

18          MS. HEMERYCK:  That's what they allege.

19          THE COURT:  I saw that --

20          MS. HEMERYCK:  And --

21          THE COURT:  I don't mean to interrupt you, but I want

22   to go back to something you said, which is I saw the language

23   of State Farm's policies, practices, and procedures for claim

24   processing in the status report.

25          What does that look like to you?  Can you give me a

1    feel for why you're concerned about that?

2         MS. HEMERYCK:  It's -- well, it is really hard to

3    know, actually, what that means.  But, for example, let's talk

4    about vendors, right.

5         There are -- or practices that are used.  So there

6    are lots of different kinds of claims, right?  There are theft

7    claims, there are flood claims, there are hail claims.  There

8    are, you know, somebody drives their car into your garage

9    door.  There are tons and tons of different types of claims.

10   And there are, you know, policies and practices for processing

11   those claims.

12        But that's (inaudible) which have absolutely nothing

13   to do, almost all, have nothing whatsoever to do with any kind

14   of algorithmic decisionmaking tool.  So it is just going to

15   open up a huge, huge, hugely broad discovery.

16        THE COURT:  So, sorry, again.  Don't mind me.  I have

17   questions.  I am going to interrupt you --

18        MS. HEMERYCK:  No, no, please.

19        THE COURT:  -- and ask them.

20        As you sit here now, is it your understanding that

21   there are certain claims processing then that are all

22   algorithmic tools and certain claims processing that don't

23   involve algorithmic tools?

24        MS. HEMERYCK:  Frankly, there are almost no claims

25   processes that use algorithmic tools.  At all.  You know,

1    plaintiffs are just -- as I said, they kind of went out, they

2    searched the Internet, they got some information, and they

3    made up a theory.  But the fact is, there are virtually none.

4    And there is nothing, nothing, like what they allege.  There

5    is no algorithmic decisionmaking tool, no machine learning, no

6    artificial intelligence, that State Farm uses to screen claims

7    to decide are they potentially fraudulent, are they high

8    touch, are they low touch, are they -- there's no such thing.

9    It's a complete fiction.  And, you know, it got them past the

10   motion to dismiss, and --

11            THE COURT:  Right.  So I guess if I could stop you

12   there.

13            So if I were to hypothetically go with your plan on

14   phase one, what would you produce?

15            MS. HEMERYCK:  Well, for what we -- you know,

16   obviously, I'd go back and find --

17            THE COURT:  Right.  Because it sounds like nothing.

18            MS. HEMERYCK:  -- the request --

19            THE COURT:  Based on what you said, it sounds like

20   nothing.

21            MS. HEMERYCK:  No, that's not true because we have --

22   what we have said, what we have proposed -- and let me find my

23   proposal here.

24            THE COURT:  Sure.  It's on page 3 of the status

25   report.

1          MS. HEMERYCK:  Right.  Yes.

2          So we have said that we took -- that the first phase

3   of discovery should focus on nonstatistical data relating to

4   the threshold question of whether State Farm even uses machine

5   learning algorithms and artificial intelligence tools to

6   screen homeowners insurance claims as plaintiffs allege in the

7   manner they allege.

8          So that would -- so they can have discovery on, well,

9   okay, what algorithmic decisionmaking tools, if any, are you

10  using.  And, by the way, we have not -- and you're right,

11  Your Honor, I agree with you on the interrogatories.  You're

12  responding to interrogatories without the benefit of knowing

13  how this Court was going to decide the scope of discovery

14  phasing issue.

15         But in our view, as we said in the joint status

16  report, it would be entirely appropriate to limit the scope of

17  phase one discovery to whether there were any such algorithmic

18  decisionmaking tools that impacted these named plaintiffs.

19  Because if there aren't, there is no case, there can't be a

20  class, and we're done.  But that's not actually what we have

21  proposed --

22         THE COURT:  Uh-huh.

23         MS. HEMERYCK:  -- because we looked at your *Williams*

24  order.  And so we said, you can have -- we will agree, we

25  think the appropriate defensible scope, very reasonable scope,

1   is, look at what they allege in their complaint.  What they

2   alleged is a specific policy.  And they put that in, you know,

3   the first two or three individual status reports.  It is only

4   recently that they started to kind of runaway from that and

5   try to go with some broader theory that's not actually

6   alleged.  But they allege a specific policy.  They are

7   entitled to take discovery, reasonable, proportional

8   discovery, to find out whether that policy actually exists.

9   Whether those tools actually exist.  And so --

10          THE COURT:  Right.  But it sounds like what you're

11  saying, as you know it now, even if I were to credit that

12  process, it sounds like you'll have very little or nothing to

13  produce.  That's what I'm getting from your statements.

14          MS. HEMERYCK:  Right.  There will certainly be --

15  there are some tools that have some relationship to the

16  processing of homeowners insurance claims that are fairly

17  characterized, at least by the definition we're proposing, for

18  AI and machine learning, that would be discoverable.  And

19  plaintiffs can look at those, and they can evaluate them, and

20  they can say, are these tools doing anything like what we have

21  alleged.  And they can say, you know, they can take a 30(b)(6)

22  deposition of somebody to try to get at do you have any tools

23  like this, State Farm.  Do you have any tools that does this

24  thing that we allege, so.

25          THE COURT:  Okay.  So, I mean, it sounds like it

1    really comes down to my reading of the complaint, and what I

2    think is in there versus what's not in there.  And so I need

3    to take a deeper dive into the complaint, and a deeper dive

4    into Judge Kendall's motion to dismiss, to see how the

5    language of the allegations are crafted, and is it as narrow

6    as the defendant says it is, or is it broader as the

7    plaintiffs say it is.  That's where -- I understand the

8    difference now between the two theories.  I understand why

9    plaintiffs' proposal will open up a much larger category of

10   documents beyond those involving data in what makes an

11   algorithmic decisionmaking tool.  So I do have to read the

12   complaint a little bit deeper.

13          But, plaintiffs, I will give you a chance to reply,

14   if you will, to some of the things you heard.

15          MR. CANCILA:  Your Honor, could I add just two points

16   for State Farm?

17          THE COURT:  Sure.

18          MR. CANCILA:  For a moment.

19          THE COURT:  Go ahead.

20          MR. CANCILA:  So I think what -- just in addition to

21   the points Ms. Hemeryck has made, our point with the discovery

22   we're offering is we're indicating State Farm's willingness to

23   indicate here's a variety of algorithmic tools that State Farm

24   is using for homeowners insurance.  Here is the variety of

25   tools that we are using.  They don't happen to be of the

1    variety that plaintiffs contend State Farm is using.  But

2    here's a variety that we are using.  So that's the discovery

3    that is being proposed.

4          Now, plaintiffs can explore, you know, what those

5    tools are, that we are proposing to offer that discovery.

6    Here's the variety of algorithmic tools we are using for

7    homeowners insurance.

8          Now, we have proposed a definition of algorithmic

9    tools that is certainly different than what plaintiffs have

10   proposed.  So we have proposed a different definition.  And we

11   did want to flag that it is a different definition than

12   plaintiffs had proposed.  We didn't pull that out of thin air.

13   The definition that we have proposed is a definition that

14   came -- that it has been used by the National Association of

15   Insurance Commissioners.  The National Association of

16   Insurance Commissioners is interested in this whole topic of

17   what kinds of algorithmic tools are insurers using,

18   themselves, for homeowners insurance.

19         So the National Association of Insurance

20   Commissioners have surveyed insurers and asked insurers what

21   kind of algorithmic tools are you using.  And so that's a

22   definition that they have used, the National Association --

23         THE COURT:  Let me stop you there.

24         So I see your definition that you propose.  Tell me,

25   plaintiffs have a definition on page 2.  Tell me what you

1    don't like in that definition.  What do you think goes beyond

2    it?

3           MR. CANCILA:  It is meaningless because it uses terms

4    like "data analytics," "heuristics."  It has so many -- it has

5    so many terms loaded into it that it is impossible to

6    comprehend or understand.  You look at that definition, and

7    what does it mean?  There's so much vagueness to that term

8    that you would never be able to comprehend what it means.  But

9    if you have a specific term, such as one that an organization

10    that's not State Farm, but a National Association of Insurance

11    Commissioners have used itself -- well, you know, you're

12    looking at a neutral body that has propounded a term that, you

13    know, insurers have had to live with when it has been asked,

14    you know, tell us insurers --

15           THE COURT:  Okay.  I got it.  And I did see -- you

16    know, a few words caused me some concern, the word

17    "statistics," you know, isn't exactly a decisionmaking -- or

18    decision learning type, predictable outcome tool, right?

19    Statistics are just that.  Statistics.

20           MR. CANCILA:  Yep.

21           THE COURT:  So I get a few things here that you

22    are -- I mean, deep learning and machine learning seem to be

23    in line with what you're saying.  I don't think I have any

24    problems with that, right?  Deep learning, machine learning?

25           MR. CANCILA:  Oh, well, machine learning is a term

1   that needs to be defined, and that's what the NAIC did, is it

2   gave a definition to the term "AI" and "machine learning."

3   And that's the term that the NAIC defined.

4          THE COURT:  Okay.  But, I guess, I get that.

5          But you think machine learning would encompass other

6   things that's not relevant, which is does State Farm use, to

7   your knowledge, machine learning in some capacity that -- for

8   claims processing?

9          MR. CANCILA:  So machine learning and AI -- so, yes.

10  So the short answer would be, yes.

11         THE COURT:  Okay.

12         MR. CANCILA:  You know.  Algorithmic and machine

13  learning would be, yes.  Yes.

14         THE COURT:  So isn't that -- what I'm getting at is,

15  I agree with you, there's a few things here that cause me a

16  little concern, statistics, for example.  Other things to

17  assist with decisionmaking, I didn't like those words either,

18  I will give you that.

19         But it sounds like, though, there's some overlap,

20  again, meaning algorithmic decisionmaking tools does involve

21  some degree of artificial intelligence, algorithms, machine

22  learning, deep learning.  Those I am less concerned with.  I

23  am just trying to understand if you're still concerned with

24  them.

25         MS. HEMERYCK:  Your Honor, can I briefly respond to

1  this?

2         THE COURT:  Sure, sure.  I will give plaintiffs a

3  chance to respond to all of this.

4         MS. HEMERYCK:  Jump in here.

5         THE COURT:  Don't worry.

6         MS. HEMERYCK:  Thank you.

7         THE COURT:  I'm sure you're chomping at the bit to

8  respond --

9         MS. HEMERYCK:  Thank you.

10        THE COURT:  -- but let's finish defendants first.

11        Go ahead.

12        MS. HEMERYCK:  So here's part of the -- and to add-on

13  to what Mr. Cancila was saying.

14        What plaintiffs do in their complaint, and, again, I

15  want to go back to their allegation, right, they say, they

16  term, this is a quote, uses machine learning algorithms and

17  artificial intelligence tools, which they then collectively

18  define as "algorithmic decisionmaking tools."  So they have

19  already defined in their complaints, for purposes of their

20  theory, the term "algorithmic decisionmaking tool."  And they

21  defined it specifically, again, as machine learning algorithms

22  and artificial intelligence tools.

23        What we're proposing to do is to use -- now you have

24  to define those two terms, machine learning algorithms and

25  artificial intelligence tools, and we're proposing to use the

1    definition that's been used by the NAIC.

2           Plaintiffs now in their proposal here for the scope

3    of discovery, they want to go, again, way outside of their

4    complaint and redefine algorithmic decision making tools, to

5    not just be machine learning and artificial intelligence, but

6    as you say, statistics and data analytics --

7           THE COURT:  Okay.  I got it, I got it.

8           MS. HEMERYCK:  -- but we're not seeing --

9           THE COURT:  Thank you.  I got it.  And don't mind me.

10   I always just let you know when I understand the point so you

11   don't have to keep addressing the issue.  So --

12          MS. HEMERYCK:  Appreciate that.

13          THE COURT:  -- let me get plaintiffs' reply.  Like I

14   said, I'm not sure I'm going to make a decision today.  I need

15   to look at the complaint deeper.

16          But, plaintiffs, you can go ahead.

17          MR. CROOKS:  Sure, I think as an initial matter, the

18   National Association of Insurance Commissioners is not a party

19   to this case.  It is not who we consulted when we defined the

20   term on our complaint.  So I think the fact that this case

21   involves insurance does not mean that that is necessarily a

22   definition we should go with.  But, more importantly, from

23   what we've heard on these meet and confers and basically what

24   we've heard today, is that there is no automated machine

25   process that when the millions of claims State Farm gets

1    coming in every year, there's nothing that sorts those claims

2    into different categories.  Our complaint is about -- an

3    algorithm doesn't mean -- you know, it's easy to think ChatGPT

4    and sort of like the cutting edge of large language models.

5    An algorithm is a very broad term, and we mean it to say the

6    automated system that sorts claims from one another.

7          That's all -- if you look at our complaint, I think

8    it is used very closely to the second paragraph of our page 1.

9    I understand that statistics, as we wrote it there, looks like

10   we're just asking for anything data related.  We mean like a

11   statistical -- something that uses statistics to weigh claims

12   or sort them differently.  And we're happy to work with our

13   definition.  That would be fine to take "statistics" out,

14   which I agree, as you pointed out, sort of standing alone, it

15   may not make sense, but what we're getting at --

16          THE COURT:  Let me narrow that down, though.

17          In terms of the algorithmic decisionmaking tools,

18   tell me if I am right, it sounds like what you are looking

19   for, though, is the tools that can make some degree of

20   predictions, right?  So when they sort claims, they give you

21   some degree of conclusions, which is you should do this or you

22   shouldn't do this.  You are not just looking at an Excel

23   spreadsheet that's just giving you different categories.  You

24   want -- you are looking at predictive modeling, right?  You

25   want something that will give you a recommended outcome.

1          Am I right about that?

2          MR. CROOKS:  Basically, I think the only thing I

3   would modify, and I think it is the same thing, is basically

4   what is told to the claims adjustor, to the extent that

5   affects which claims adjustor or which steps it goes through,

6   I think that's another version of what you are saying.  But,

7   yes, you input -- a claim comes into the system, some

8   automated process then treats that claim differently than it

9   would treat another claim with different inputs.  And what we

10  are asking to understand is what we have alleged causes a

11  racially disparate impact, which there's no dispute that that

12  is plausibly alleged.  We're saying that that sorting process

13  eventually, you know, it either immediately or eventually

14  causes a disparate impact that we show in our complaint.

15          And so I am happy to work on definitions, but that

16  sorting process, that -- I think you're right, that, you know,

17  to the extent that there's a process that treats same claims

18  differently than others, as well as the nature of a disparate

19  impact claim.  I mean, what ways are things being treated

20  differently and why --

21          THE COURT:  Right.  But not just process.  You're

22  looking at a computer modeling process that allegedly treats

23  claims differently based on its own sort of generation of

24  predictable outcomes, right?  So it is not just a computer.

25  It is an algorithm that has built-in programming on it, and it

1    gives you a predictable outcome.  You should do this, you

2    shouldn't do that.  Right?  No different than, let's just say,

3    a very simple example, we've probably all done predictive

4    discovery modeling, right?  You know, you put in a big set of

5    documents, it tells you these are relevant, these are not

6    irrelevant, you know, based upon, you know, the programming.

7           Is that what you're kind of getting at?

8           MR. CROOKS:  Typically, yes.

9           And I think focusing too narrowly on particular

10   definitions will allow State Farm to say, here's a definition

11   we're using, nothing to see here.  And it just cannot be the

12   case that there's no automated process that assists State Farm

13   in deciding which claims go to different claims steps or

14   different adjustors or are treated differently.  It is just

15   not plausible that there is no system that assists them with

16   the tens of millions of claims they get each year.

17          THE COURT:  Okay.

18          MR. CROOKS:  So we are not --

19          THE COURT:  Let me take a look at the complaint

20   again, like I said.  I just need to figure out some more

21   detail from the complaint.  Let's put a pause on this one.

22   I'm not going to make a decision.  But you'll get a decision

23   pretty soon.  I promise you that.

24          I do have a 10:15 so I am going to end in a few

25   minutes here.  Besides --

1      MS. HEMERYCK:  Your Honor, can I address one thing

2  that Mr. Crooks just said?

3      THE COURT:  Very quickly, and then I want to move on

4  to if there's anything else.

5      MS. HEMERYCK:  It'll be very quick.  It'll be very

6  quick.

7      We have already told them, in fact, it's in the

8  interrogatory responses that they are complaining about, that,

9  you know, there is a loss intake tool that we have identified,

10  there is a claim routing tool that we have identified, and we

11  have said, we will give you documents relating to those two

12  tools.  Documents sufficient to understand how those operate.

13      So I don't really understand the complaint there,

14  but.

15      THE COURT:  Okay.  That's fine.  Like I said, give me

16  a little time to figure it out, the details.

17      All right.  Besides this, once I figure this out, I

18  will put a schedule in place for phase one and a schedule for

19  phase two.

20      I think what I do need from you, though, is some

21  proposed dates.  I'd rather you do it than I do it, because

22  you know better how long this is all going to take.  So once I

23  make a decision on phase one and phase two, I'd like you to

24  get together and give me some proposed dates.  Those dates are

25  going to be for written discovery to issue for notice of

1 depositions to issue, and then for completion of the phase one

2 discovery.  And then do the same things for phase two.

3    And in between phase one and phase two, if you want

4 to address anything, as I said in *Williams*, you are free to do

5 that, but I am not making any decisions, and I don't think

6 neither is Judge Cummings making any decisions now.  I think

7 the goal really is to manage discovery in an effective and

8 cost effective and efficient way, take things one step at a

9 time.  Finish phase one, move on to the next chapter of what

10 we need to do, rather than doing everything at once.  That's

11 really my philosophy behind sort of dividing this up.  And

12 nothing more than that.

13    Okay.  I do have to run.

14    Plaintiffs, anything, quickly, you need to address?

15    MR. CROOKS:  I think whatever you decide on phasing,

16 that you make clear that phase one encompasses class discovery

17 into individuals, not just our named plaintiffs, because

18 that's something we have gone back and forth with, and then

19 many, many times about.

20    THE COURT:  I don't see that being the case, and I

21 saw a footnote that suggested that was not the case from the

22 defendant.  So it is not going to be related to the named

23 plaintiffs.  I can make that clear, okay?

24    All right.  Defendant, anything else?

25    MS. HEMERYCK:  No, Your Honor.

1          THE COURT:  Okay.  Thank you for your time.

2    Appreciate it.  I will be in touch.

3          We're adjourned.

4          MS. HEMERYCK:  Thank you.

5          MR. CROOKS:  Thank you.

6      (Proceedings concluded at 10:14 a.m.)

7

8

9                      *  *  *  *  *

10

**REPORTER'S CERTIFICATE**

11

12         I, ANNETTE M. MONTALVO, certify that the foregoing is
     a correct transcript from the digital recording of proceedings
13   in the above-entitled matter to the best of my ability, given
     the limitations of using a digital-recording system.

14         Dated this 1st day of March, 2024.

15   /s/Annette M. Montalvo
     Annette M. Montalvo, CSR, RDR, CRR
16   Official Court Reporter

17

18

19

20

21

22

23

24

25