**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Jacqueline Huskey and Riian Wynn, on behalf of themselves and all others similarly situated,** | Case No.: 22-cv-7014 |
| ***Plaintiffs*,** | Hon. Jeffrey I. Cummings |
| **v.** | Magistrate Judge Jeffrey T. Gilbert |
| **State Farm Fire & Casualty Company,** | |
| ***Defendant*.** | |

## JOINT STATUS REPORT PER JANUARY 14, 2025 AND FEBRUARY 5, 2025 ORDERS

Plaintiffs Jaqueline Huskey and Riian Wynn ("Plaintiffs") and Defendant State Farm Fire and Casualty Company ("Defendant" or "State Farm"), by and through their respective counsel, submit this Joint Status Report.

By way of background, Plaintiffs assert disparate impact claims under § 3604(b) of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(b)*. See* First Amended Complaint ("FAC," Dkt. 23). Specifically, they allege that State Farm has a policy of using algorithmic decision-making tools to process homeowners insurance claims, and as a result of that policy, State Farm subjects claims of Black claimants to greater scrutiny than those of white claimants. Among other impacts, Plaintiffs allege that Black claimants are far more likely to have to submit extra claims documentation, repeatedly interact with claims handlers, and experience delays in having their claims approved. (*See id.*)

On February 23, 2024, then-Magistrate Judge Sunil R. Harjani ordered that discovery in this case be phased, with Phase I being "limited to algorithmic decision-making tools employed by State Farm to screen out potentially fraudulent or complex claims from straightforward homeowners insurance claims," which Judge Harjani identified as "the gravamen" of Plaintiffs' FAC. (Dkt. 79.)

At hearings on January 14, 2025, and February 5, 2025, this Court addressed certain disputes that arose between the parties during the course of Phase I. (Dkts. 144, 151.) Following the February 5 hearing, the Court ordered the parties to proceed with Phase I discovery with 30(b)(6) depositions, and thereafter to file a Joint Status Report laying out the following:

    a.   the parties' progress with the first phase of discovery in this case including, without limitation, those depositions;

1

b.  whether State Farm will be making any supplemental production(s) of documents based on or after those depositions and the timing of those productions;

c.  whether the parties have any disputes that need to be raised with the Court after the depositions; and

d.  any joint or separate proposal(s) about next steps in this case.

(Dkt. 151.)

Pursuant to the Court's Order, the parties conferred about these issues on May 7, 2025, and submit the following Joint Status Report.

### Plaintiffs' Position[1]

On September 11, 2023—over one and a half years ago—Plaintiffs defeated State Farm's motion to dismiss, initiating discovery into their allegations of class-wide disparate impact under § 3604(b) of the FHA. Yet, to date, Plaintiffs have not received any of the documents or information that are the hallmarks of class discovery. State Farm has not conducted ESI searches; produced emails, text messages, and other forms of communication; or produced fact witnesses for depositions. Nor has State Farm produced *any data*—discovery which is necessary for Plaintiffs to evaluate disparate impact. *See, e.g.*, *Chavez v. Ill. Police*, 251 F.3d 612, 637-38 (7th Cir. 2001) ("The Supreme Court has long noted the importance of statistical analysis 'in cases in which the existence of discrimination is a disputed issue.'" (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977)); *U.S. Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, No. 13-CV-04307, 2014 WL 3734361, at *1 (N.D. Ill. July 29, 2014) (granting motion to compel production of data because disparate impact plaintiffs "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused" a race-based disparity) (quoting *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988)). Instead, the parties have engaged in "limited" Phase I discovery focused on the algorithmic tools State Farm has identified as relevant to its claims process. *See* Dkt. 79.

Over the course of Phase I, Plaintiffs discovered that State Farm uses algorithmic tools in precisely the way Plaintiffs allege in their Complaint. The tools ███████████████████████████████████████████████████. Indeed, State Farm has *admitted*—in writing—after analyzin ████████████████████████████████████████████████████████. Ex. A (Markwardt Dep.) at 155:20-157:14; 160:7-15; 161:17-21; 192:11-25; 204:18-24; Ex. B (Markwardt Dep. Ex. 11) at 2, 4; Ex. C (Markwardt Dep. Ex. 12) at 2, 5; Ex. D (Markwardt Dep. Ex. 13) at 3; Ex. E (Markwardt Dep. Ex. 14) at 2, 5.

---

[1] State Farm did not give Plaintiffs any indication of their position—not in writing or orally—until **the day this Joint Status Report was due**. Accordingly, Plaintiffs have responded to State Farm's position in less than one day, and Plaintiffs request the opportunity to provide supplemental briefing to the extent the Court would find such briefing useful.

Phase I, however, remains incomplete in material respects. State Farm's productions, to date, have offered Plaintiffs a limited and fragmented window into certain of the tools—a problem augmented by State Farm's ill-prepared 30(b)(6) witnesses and <u>hundreds</u> of "scope" objections, including to questions as simple as when State Farm first used a tool; where the tools gather data from; and how the tools work.

On this record, Plaintiffs are entitled to further discovery on how State Farm's algorithmic tools work and whether those algorithmic tools have a disparate impact on Black plaintiffs. Given how critical such discovery is to the merits of Plaintiffs' claims, the sooner the Plaintiffs can obtain such discovery, the sooner the parties can seriously explore resolving this action.

In the spirit of the Court's efforts to limit discovery through phasing, Plaintiffs propose that the parties enter into Phase II of discovery focused on only 4 out of the 21 tools that State Farm disclosed in Phase I of discovery: ██████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
This Phase II would include full discovery into those four tools, through document requests, interrogatories, depositions, and data productions to evaluate their disparate impact. Further, Plaintiffs propose that, at the end of Phase II, the parties explore mediation.

## I.   **Progress with Phase I Discovery**

### a.   **Plaintiffs Have Learned that State Farm** ████████████████████████
████████████████████**—Just as Plaintiffs Alleged.**

Phase I discovery—though hamstrung in ways discussed elsewhere—has substantially borne out Plaintiffs' allegations. Plaintiffs allege that State Farm uses algorithmic tools to "screen out potentially fraudulent or complex ('high touch') claims from legitimate or straightforward ('low touch' or 'no touch') claims." FAC ¶¶ 5, 32. This automated sorting process affects the level of scrutiny claims are subjected to and speed with which claims are processed. *Id.*[2]

That is exactly what is happening at State Farm. ████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████ Ex. A (Markwardt Dep.) at 31:5-
10, 23-24; 34:12-14; 56:5-8; 57:9-16; 59:22-62:15. ████████████████████████
████████ Ex. F (Markwardt Dep. Ex. 7) at 6, 17. Though State Farm's 30(b)(6) designee was unprepared to answer questions in detail, her testimony (together with documents) suggested that

---

[2] Below, State Farm asserts that the complaint's allegations are centered on whether claims handlers are directed in specific tasks. This is incorrect.



Ex. A (Markwardt Dep.) at 124:19-125:5, 127:5-6, 148:22-149:1.[3]

*Id.* at 159:7-160:15.

Ex. B (Markwardt Dep. Ex. 11) at 4; Ex. A (Markwardt Dep.) at 155:20-157:14, 160:7-15, 161:17-21.

Ex. A (Markwardt Dep.) at 204:4-205:2.

*Id.* at 192:11-25. All told, the evidence shows an ongoing problem where



```
11   Q   Okay.  And looking at
12
13
14
15          is that right?
16   A   Yes.
17   Q   And so the purpose of this           tool
18 was to
19
20   A   Correct.
21   Q   And to
22
23   A   Right.
24   Q   Because that would result in more efficiencies?
25   A   Correct.
```

Ex. A (Markwardt Dep.) at 192:11-25.

---

[3] For context, the 30(b)(6) witness spoke with Mike Green, a State Farm employee during her lunch break, and returned with five pages of handwritten notes, including on &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;. The witness, unable to adequately prepare during her lunch break, failed to answer key questions about this tool. However, publicly available data shows that &#9608;&#9608;&#9608;&#9608;

Notably, with each discovery—in ███████████████ —State Farm ████████ ███████████████████████████████████████ *Id.* at 155:11; Ex. C (Markwardt Dep. Ex. 12) at 3 ██████████████████████ Specifically, State Farm ████████████████████████████████████████████ █████████ Ex. A (Markwardt Dep.) at 154:11-25, 155:9-19. There has been no discovery as to whether State Farm's ███████████ had any material change in the way Black claimants' claims are processed. Indeed, State Farm has not answered whether it evaluated any of its tools for bias. *See, e.g.,* Ex. A (Markwardt Dep.) at 226:15-227:15; Ex. G (Golden Dep.) at 66:4-12, 102:11-18, 105:11-106:4.

Though substantial discovery remains, the record already bears out significant aspects of Plaintiffs' Complaint. Just as Plaintiffs allege, State Farm ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ And, just as alleged, ████████████████████ ████████████████████████████████████████

### b. State Farm Impeded Phase I with Ill-Prepared 30(b)(6) Witnesses and Hundreds of "Scope" Objections.

During the 30(b)(6) depositions, State Farm's counsel objected thoroughly to basic questions about the tools as "beyond the scope" of the witnesses' designation, and the witnesses were ill-prepared to answer such questions even though they fell squarely within the scope of their deposition. Relevant exchanges from the depositions include and are certainly not limited to the following:

- Q. Which employees have control over ███████ ? MS. HEMERYCK: Objection. Beyond the scope. A. I don't know who has the control of … (Ex. A [Markwardt Dep.] at 31:11-14.)

- Q. When did State Farm begin using ███████ ? MS. HEMERYCK: Objection. Beyond the scope. You can answer if you know based on personal knowledge. A. Hold on. I'm looking at the wrong one. So the time frame in use is █████████████ . Q. And you are reading from the interrogatory responses which are Exhibit No. 5? A. Correct. (Ex. A [Markwardt Dep.] at 31:17-32:2.)

- Q. How did State Farm develop ███████ ? MS. HEMERYCK: Objection. Beyond the scope. You can answer if you know based on personal knowledge. A. I do not know. (Ex. A [Markwardt Dep.] at 34:15-19.)

- Q. Who was involved in developing ████████ ? MS. HEMERYCK: Same objection. Beyond the scope. A. I do not know. (Ex. A [Markwardt Dep.] at 34:20-24.)

- Q. How did State Farm decide on ████████████████████████████████ ? MS. HEMERYCK: Objection. Beyond the scope. A. I do not know. (Ex. A [Markwardt Dep.] at 34:25-35:3.)

- Q. What goals did State Farm have for the ███████ tool? MS. HEMERYCK: Objection. Beyond the scope of. You can answer if you know. A. I do not know. (Ex. A [Markwardt Dep.] at 35:4-8.)

- Q. Does SAS ████████████ have the capability to detect bias in the data that is being queried? MS. HEMERYCK: Objection; beyond the scope and vague and ambiguous. A. I don't know what other capabilities SAS, the SAS programs have other than kind of my experience in using them, which – so I don't know the answer to that. (Ex. G [Golden Dep.] at 66:4-12.)

- Q. So predictive models, regression models and, for instance, multi-variat [sic] relationship models could be used, but you don't know whether they actually are? MS. HEMERYCK: Objection; vague and ambiguous and beyond the scope. A. Yeah. I don't know what the SAS tool, SAS ██████████████ is used holistically at State Farm. This document outlines its capabilities. Whether or not those capabilities are used, I'm not sure. (Ex. G [Golden Dep.] at 70:24-71:4.)

- Q. And how are the features of SAS ████████████ different from those of SAS ████████████ █████? MS. HEMERYCK: Objection; beyond the scope. A. I'm not familiar with all the features of SAS ██████████, nor SAS ████████████, so I don't know what the differences are. (Ex. G [Golden Dep.] at 72:15-22.)

- Q. But SAS Data Studio is also a data interface tool that can be used to query data and report the results; correct? A. I believe that's what it says on the amended interrogatory table, yes. Q. So doesn't SAS ████████████ and SAS ████████████ serve the same function? MS. HEMERYCK: Objection; beyond the scope. But you can answer, if you know. A. My understanding is that they do serve the same function, or similar functions, potentially. (Ex. G [Golden Dep.] at 73:6-13.)

- Q. Walk me through step-by-step how [a claim] gets from being recorded in HAART to ████████████? MS. HEMERYCK: Objection. Beyond the scope. (Ex. H [Smoot Dep.] at 73:18-20.)

- Q. And over the course of the time that State Farm was using Duck Creek, did State Farm make changes to how it operated? MS. HEMERYCK: Objection. Beyond the scope. You can answer if you know. A. I don't know. (Ex. H [Smoot Dep.] at 134:1-6.)

- Q. Do you know whether Xactimate uses any predictive modeling? MS. HEMERYCK: Objection. Beyond the scope. A. Again, I'm not an employee of Xactware, and I do not have any control over what's in their software. To my knowledge, there is no predictive modeling in that application. It's simply taking the aspects such as material price, labor, contractor's overhead, profit, all those items, into play. Q. I guess to know for sure we would have to just ask Xactware? A. Correct. (Ex. H [Smoot Dep.] at 111:18-112:6.)

- Q. Do you know whether HAART has any interaction with the ███████████████
  ██████ too, or ████? MS. HEMERYCK: Objection. Beyond the scope. But you can
  answer if you know. A. I do not know. (Ex. H [Smoot Dep.] at 194:6-11.)

- Q. And information that's taken in on ████, where is that stored? MS. HEMERYCK:
  Objection. Beyond the scope. A. Again, I don't know that it is stored anywhere. Q.
  Where does that information – what database or system does that information sit in
  before it moves on to the next step with████? MS. HEMERYCK: Objection. Beyond
  the scope. A. Again, I'm not familiar with any database that may or may not be used.
  (Ex. H [Smoot Dep.] at 209:5-15.)

- Q. What team in State Farm built ████? MS. HEMERYCK: Objection. Beyond the
  scope. A. Yeah, I do not know – know the team that built State Farm – excuse me, that
  built ████. Q. And if any changes are made to ████, do you know what team makes
  those changes? MS. HEMERYCK: Objection. Beyond the scope. You can answer if
  you know based on your personal knowledge. A. I do not know. (Ex. H [Smoot Dep.]
  at 231:25-232:9.)

- Q. And is that the same with Verisk and ████? Or ████? MS. HEMERYCK: Objection.
  Compound. And beyond the scope. A. No. Any questions – any questions relative to
  ████, those will be directed to Lindsey. (Ex. I [Biddlecome Dep.] at 22:19-24.)

- Q. Does State Farm have a record anywhere of other searches it may have previously
  had access to through Accurint? MS. HEMERYCK: Objection. Beyond the scope. A.
  That, I do not know. (Ex. I [Biddlecome Dep.] at 198:7-10.)

- Q. Are you aware of any Shift Technologies products called "Force Fraud Detection"?
  MS. HEMERYCK: Objection. Beyond the scope. A. That specific term, I don't recall
  hearing. Q. Okay. So do you know if State Farm uses any tools from Shift Technologies
  called "Force Fraud Detection"? MS. HEMERYCK: Objection. Beyond the scope. You
  can answer based on your personal knowledge if it's used in respect to identification or
  investigation of potentially fraudulent claims. A. Specific to that term, I am not – again,
  I'm not aware of that term. ███████████████████████ (Ex. I [Biddlecome Dep.] at
  239:10-25.)

## II.    Proposal for Next Steps in Discovery: Phase II of Discovery Focused On Documents and Data For Four Tools

Though significant Phase I discovery remains outstanding with respect to various tools,[4]
Plaintiffs propose bracketing such discovery for the time being. Instead, Plaintiffs propose

---

[4] Plaintiffs reserve their right to seek further information about those tools, including for example
███ (Ex. I [Biddlecome Dep.] at 59:10-60:6 (testifying that State Farm ████████████████████
██████████████████████████████████████████████████, 233:17-19 ("I have no

proceeding to a Phase II focused on discovery for a limited subset of 4 out of the 21 algorithmic tools identified in Phase I: specifically, ████████████████████████████████. This Phase II discovery would include document requests, interrogatories, and fact and 30(b)(6) witnesses about the four tools. It would also include data necessary to evaluate whether the four tools exhibit a disparate impact on Black claimants.

Through Phase I of discovery, Plaintiffs have learned that each of the four proposed Phase II tools acts in a manner as alleged in the Complaint: ████████████████████████████████ ████████████████. Plaintiffs' proposed Phase II will allow Plaintiffs to fill in gaps from Phase I about these tools and begin evaluating whether, as alleged in the Complaint, these tools disproportionately subject Black claimants to such heightened delays and scrutiny. In this way, the proposed Phase II will put the parties in the best position to resolve the case prior to conducting the full discovery that will be necessary to prepare this case for trial. Indeed, Plaintiffs propose the parties attend a mediation at the end of Phase II.

Below are examples of some of the documents and information that were—rightfully or wrongfully—unavailable to Plaintiffs in Phase I and would fall with the scope of Phase II:

- Full reports and underlying data from ████████████████████████████████, including:

  o Reports and underlying data ████████████████████████████████ ████████████████████████████████ Ex. B (Markwardt Dep. Ex. 11) at 4; Ex. A (Markwardt Dep.) at 168:13-169:14, 172:1-17 (testifying that State Farm ████████████████████████████ ████████████).

  o Reports and underlying data on ████████████████████████████ ████████████████████████████████. Ex. A (Markwardt Dep.) at 185:3-17; *see also* Ex. D (Markwardt Dep. Ex. 13) at 6 (diagram indicating that ████████████████████████████), 8 (noting dates of study).

  o Reports and underlying data for ████████████████████████████ ████████████████████████████████

---

idea ████████████████."); **TAC** (Ex. I [Biddlecome Dep.] at 227:18-228:7 (describing ██ ██████); and **SAS** (*See* Ex. G [Golden Dep.] at 34:11-19 (witness does not recall having viewed documents related to SAS tools); Ex. H [Smoot Dep.] at 244:6-17 (testifying he is unfamiliar with "SAS" in response to questions about whether SAS in sued in claims processing)).

Plaintiffs' Phase II proposal is designed to promote efficiency in discovery by focusing on specific tools and obtaining data to determine if those tools create a disparate impact.

█████████ Ex. A (Markwardt Dep.) at 192:17-25 (testifying that the ██████ Tool's purpose is to █████████████████████ "result in more efficiencies"), Ex. E (Markwardt Dep. Ex. 14) at 2-3 (indicating that ████████████ █████████████████████████).

   o  Reports and underlying data from State Farm's ████████ performed to "inform the creation of ████████." Ex. A (Markwardt Dep.) at 203:19-21; *see also id.* at 204:13-205:2 (testifying that the ██████ Tool was created to correct inefficiencies resulting from ████████████████ ███████).

- Document productions and testimony on where ██████ data comes from, whether and how it is structured, cleaned, sorted, edited, or modified, and how the data is transmitted to █████. *See, e.g., id.* at 43:2-6, 45:9-13 (witness did not know source of ██████████ or how ██████████████); 45:22-25 (witness did not know how █████████████ ██████████████); 46:1-25 (witness did not know how ████████████████ █████████████████████); 52:3-6 (witness did not know how ███████ information is transmitted to ████████); 127:10-19 (witness could not answer question about ████████████████); 127:20-128:2 (witness did not know how ██████ █████████████████).

- Document productions and testimony on the development of ████████████████, including on State Farm's decision-making with respect to ████████████. *See, e.g., id.* at 34:25-35:8 (witness did not know how State Farm decided on ██████, or what goals it used ██████ to achieve); 73:1-74:15 (witness did not know State Farm's rationale for ████████████); 114:11-22 (witness did not know who developed ████████).

- Document productions and testimony—including third-party discovery, if needed—on the ████████████████████, including discovery into the use of ████████████. *See e.g., id.* at 148:22-149:1 (witness did not know what ████████████ referred to); Ex. J (Markwardt Dep. Ex. 8) at HUSKEYJAC00007288PROD; *see also* Ex. A (Markwardt Dep.) at 124:19-125:8 (testifying that State Farm utilizes ██████████████████ █████████████, but witness but "can't explain" what ███████████ is).

- For █████████████████████████, documents and testimony concerning the analysis and development of each tool. Ex. B (Markwardt Dep. Ex. 11) at 4; Ex. D (Markwardt Dep. Ex. 13) at 7-8 (laying out ████████████████); Ex. A (Markwardt Dep.) at 203:19-21 (testifying that State Farm ████████████████ to "inform the creation of ████████████"), 191:20-192:6 (testifying that State Farm ████████████ to inform the creation of ████████).

9

Additionally, Phase II should include discovery into data necessary to evaluate disparate impact associated with ███████████████████████████████. That data discovery should include:

- Discovery concerning the policyholder and claims-related data available in State Farm's electronic systems, including but not limited to the Electronic Claims System ("ECS"), ███████████████████████████████████.

- Once the above discovery is complete, production of the following data for homeowners insurance claims in Illinois, Michigan, Wisconsin, Indiana, Ohio, and Missouri from January 1, 2020 through the present:

  o **Claims data:** To be negotiated by the parties, including but not limited to, claimants' names, addresses, zip codes, other demographic information and the loss reporting channel or data feed (including HAART, iPhone, Android, etc.), as well as data showing the length of time for the claim to be processed, particularly data about claim events, such as date of first estimate upload, date of first inspection, dates of subsequent inspections, dates of documentation requests, date of close, and amount paid for each claim.

  o **Input data:** For each claim, the specific data inputs that were used by each Phase II tool.

  o **Output data:** For each claim, the specific outputs and/or outcomes generated by each Phase II tool.

Plaintiffs intend to use this data to conduct an initial analysis of the disparate impact of the Phase II tools and the damages arising from any such disparate impact. Plaintiffs expect such analyses may potentially put the parties in a posture to discuss resolving this matter.

Accordingly, Plaintiffs propose the parties make efforts to schedule a mediation following Phase II.

## III.  **The Court Should Reject State Farm's "Heads I Win; Tails You Lose" Approach to Discovery.**

Phase I of discovery was "limited" to identifying what algorithmic tools State Farm uses in the claims process. Dkt. 79. It did not include any materials typical of class discovery—no ESI searches; no text message or emails; and critically, no class *data*. *See, e.g.*, *Chavez*, 251 F.3d at 637-38 ("The Supreme Court has long noted the importance of statistical analysis in cases in which the existence of discrimination is a disputed issue.") (citation omitted). Indeed, it did not even encompass the basic steps in the claims process—i.e., how claims handlers perform their jobs. Now, having fought to keep all this class discovery at bay, State Farm asserts that discovery is over. *See, e.g.*, *Marshall v. Grubhub, Inc.*, No. 19-cv-3718, 2022 WL 1055484, at *4 (N.D. Ill. Apr. 5, 2022) (finding "myopic" defendant's discovery proposal that "might allow it to prove atypicality, but to the possible exclusion of discovery relevant to whatever arguments [plaintiff]

may present in response or in support of certification"). State Farm relies on its self-serving assertions that the claims process contains far too much discretion for a class to meet Rule 23's dictates.

The court should reject this "heads I win; tails you lose," approach to discovery for at least three reasons. First, State Farm's claims process (and the discretion of claims handlers) was not at issue in Phase I discovery. Second, State Farm's own data analysis indicates that ███████ ████████████ irrespective of any purported claim handler discretion. Third, State Farm misinterprets and misapplies Rule 23 precedent. Indeed, "the fact that the propriety of class certification will be disputed and the proper definition of any class will be debated does not render discovery relevant to that class, as defined by the Plaintiff, irrelevant." *Bilek v. Fed. Ins. Co.*, 344 F.R.D. 484, 490 (N.D. Ill. 2023) (internal quotation and citation omitted).

### i.   Phase I Did Not Cover the Claims Process—a Topic that Would Require Further Document Productions; 30(b)(6) Testimony; Fact Witnesses; and Data Analysis

State Farm takes the position below that the additional discovery Plaintiffs seek as part of a limited Phase II should not be allowed, in part, because "corporate witnesses" have allegedly testified that claims are handled in a completely individualized and discretionary manner. State Farm mischaracterizes the record and fails to acknowledge the significant gaps that still exist.

As an initial matter, State Farm has designated *no* corporate witness to testify about how claim handlers generally handle claims. Indeed, State Farm fought vociferously to avoid designating such a witness and won. In the February 5, 2025, status conference, counsel for State Farm asserted that they "cannot reasonably be expected to designate and prepare a corporate representative witness to testify on behalf of the company about, quote, State Farm's process for handling homeowners insurance claims." Ex. L (2/5/25 Hrg. Tr. [Dkts. 152, 154]) at 14:18-15:7; *see also id.* at 15:10-16 ("[T]here is a big difference in terms of burden and proportionality between having a witness who has experience as a claims section manager testifying based on his own personal knowledge and having to try to, first of all, figure out what the heck that topic means; and, second of all, prepare that witness to give binding testimony on whatever aspects of it plaintiffs plan to ask about."); *id.* at 16:10 ("[I]t is also beyond the scope of Phase I."); *id.* at 16:17-18 ("[I]t is also beyond, frankly, the scope of discovery under Rule 26(d)."). The Court largely agreed with State Farm's limitations of the 30(b)(6) designation, although, in Plaintiffs' understanding, left open whether more on the general claims process would eventually be required. *See also generally id.* at 18:22-22:17.

In addition to testimony, State Farm fought Plaintiffs' request for training materials that might provide a general overview of how the claims process works and won. *Id.* at 33:5-35:6 (State Farm counsel arguing that training materials beyond those about specific tools are not within the scope of Phase I); *id.* at 35:7-36:19 (Court's ruling that State Farm demonstrated undue burden in producing training materials beyond those it had already produced related to specific tools).

Even in its position outlined below, State Farm offers thin support for its assertion that there is nothing but discretion in its processing of claims. In fact, the limited record cites State Farm offers are practically the entirety of the evidence developed on this issue—which makes

sense because general claims handling was not part of Phase I. *See* Dkt. 79. Indeed, when Plaintiffs tried to explore more, State Farm objected on scope grounds. *See, e.g.*, Ex. H. (Smoot Dep.) at 81:12-22 ("Q. And what factors ███████████████████████████████████ for a claim? MS. HEMERYCK: Objection. Beyond the scope."), 93:15-22 ("Q. Okay. Today is there also a █████████████ Environment? A. Yes. Q. How long has that Environment existed? MS. HEMERYCK: Objection. Beyond the scope. You can answer if you know. A. I don't know how long the █████████ has been in place. It could have been possibly 2018, 2020."), 98:2-6 ("Q. Do claim handlers in the █████████ Environment have about the same number of claims they're handling as a claim handler in the ███████████ Environment?" MS. HEMERYCK: Objection. Beyond the scope."), 110:9-13 ("Q. Are there any other tools that claim handlers use to conduct their investigation of a claim besides Xactimate? MS. HEMERYCK: Objection. Vague and ambiguous. Beyond the scope and way overbroad.").

Having won significant limitations on what State Farm has been required to provide about the general claims process, the Court should not now allow State Farm to weaponize those very limitations to suggest the Plaintiffs have gathered insufficient evidence to proceed. If the claims process truly matters, additional discovery on the process is warranted. This discovery should include additional document productions, 30(b)(6) testimony, fact witness testimony, and data on the claims process. The latter (data) is particularly important as a way of determining whether professed "discretion" is in fact ever exercised in a way that is meaningful for this case. Indeed, the limited information produced to date, suggest that it is not.

### ii. State Farm Has Admitted That Routing Affects Claims Processing.

In any event, State Farm's own documents and the limited corporate testimony it has provided thus far shows that, with respect to ██████████████████████████, State Farm's assertion of unlimited discretion is **wrong**.

As discussed above, State Farm has admitted that ████████████████████████
██████████████:

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

Ex. E (Markwardt Dep. Ex. 14) at 2.

Indeed, State Farm's own internal studies show ████████████████████████████
████████████████████:



Ex. D (Markwardt Dep. Ex. 13) at 3.

Moreover, documents and testimony from State Farm provide evidence that the tools for which Plaintiffs seek limited Phase II discovery do impact how a claim handler processes a claim. For example, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. H (Smoot Dep.) at 291:12-17, 235:7-236:16, 238:8-15; Ex. K (Smoot Dep. Ex. 14) at HUSKEYJAC000014655PROD (noting the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). And, according to State Farm's corporate witness, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. H (Smoot Dep.) at 241:25-242:2.

Moreover, State Farm's internal documents show that the Company *expects* its employees ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. For example, the



Ex. F (Markwardt Dep. Ex. 7) at 17.

### iii. Defendants Mischaracterize The Standard Applicable to Pre-Certification Discovery.

Finally, below, State Farm mischaracterizes Rule 23 precedent in an effort to cut discovery off at the knees. State Farm's legal basis for these arguments are wrong.

*First*, State Farm primarily relies on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), to argue that additional data discovery should not be permitted because claims handlers allegedly exercise discretion. But, as outlined above, the algorithmic tools at issue in Phase II ███████ ███████████. Moreover, ███████████ ███████████. Further, as the Seventh Circuit has recognized, "an early discriminatory process can taint the entire process." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. Of Chic.*, 797 F.3d 426, 436 (7th Cir. 2015). In other words, even if State Farm claims handlers can exercise their discretion later—an assertion that remains unproven (and not part of Phase I)—it is entirely sufficient under *Dukes* if the initial, commonly applied sorting causes disparate impacts, even if there is some discretion later down the line. *See also McReynolds v. Merrill Lynch*, 672 F.3d 482, 489 (7th Cir. 2012) (finding that centralized policies—such as account distribution and team formation rules—could be challenged on a classwide basis even where local discretion existed, because the common issue was whether certain overarching corporate policies had a discriminatory impact).

*Second*, State Farm erroneously asserts that the typicality requirement for class certification cannot be met if the named Plaintiffs' claims were not processed by all the Phase II tools for which Plaintiffs seek general discovery. Specifically, State Farm argues Plaintiffs are precluded from seeking discovery on ███████████████████████. This is wrong, both factually and legally.

As an initial matter, State Farm ███████████████████████████. Thus, ███████████████████████████████████████ are relevant. Moreover, data from these three tools—which are ███████████████████—may well reveal that they function as part of the same overall policy or practice. *See, e.g., Scott v. Dart*, 99 F. 4th 1076, 1091 (7th Cir. 2024) (finding that district court "erred in concluding that individual variations among the proposed class members destroyed typicality"); *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact."). Finally, discovery into these three ███████ tools is necessary for Plaintiffs to define the scope of the affected class. As discussed *supra*, State Farm has thrice ███████████████. Discovery into whether or not ███████████████████████, and whether they operate differently for Black policyholders, will help define the scope of the affected class. *See, e.g., Ciesniewski v. Aries Cap. Partners, Inc.*, No. 1:16-cv-00817-JPH-TAB, 2019 WL 2869671, at *2 (S.D. Ind. July 3, 2019) (allowing pre-certification discovery into size of potential class).

14

### State Farm's Position[5]

The Court's discovery-phasing order allowed Plaintiffs to seek discovery aimed at determining whether there are any tools used by State Farm in respect to homeowners property claims that align with "the gravamen of [their] amended complaint." Dkt. 79; *see also* Dkt. 147, Tr. of Jan. 14, 2025 Hrg., at 27:25–28:1 (noting the "value in Phase I" and declining to vacate it). The expansive discovery that State Farm provided in Phase I accomplished that goal, and confirmed that during the period since January 1, 2018, State Farm has not used in its handling of homeowners property claims any tools that do what Plaintiffs allege in their pleading. *See, e.g.*, First Am. Compl. ¶ 4 (alleging, on information and belief, that "algorithmic decision-making tools drive claims handler workflow" and "direct[] employee tasks"). The documents and testimony provided by State Farm confirmed that there are no tools that direct a claim handler in how to handle a homeowners property claim, or that dictate whether or how many times a loss will be inspected, which or how many documents a claim handler should request from the policyholder when handling a claim for such a loss, how many times a claim handler should interact with the policyholder when handling such a claim, or how many questions he or she should ask of that policyholder when interacting with them. Likewise, although there are tools that assist State Farm in identifying claims that may have indicators of potential fraud, ██████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████.[6] And if that review results in the SIU's accepting a claim for handling, again, there are no tools that direct the SIU claim specialist to whom the claim is assigned in how to handle that claim.

That should be the end of this case. Plaintiffs, however, now ask the Court to allow them to pursue additional, extraordinarily broad and burdensome discovery, in complete disregard of the purpose of the phasing order and the already substantial discovery they have obtained. The further discovery that Plaintiffs propose would include, among other things, the production of detailed (and private) data regarding tens of thousands of insurance claims,[7] and a "deep dive" into multiple tools that were not even used until after the filing of this action and therefore could not possibly have a causal connection to the supposed disparate impact Plaintiffs have alleged. And to

---

[5] At 8:16 pm Central Time—fewer than four hours before the parties were due to file this Joint Status Report—Plaintiffs sent State Farm a revised version of Plaintiffs' Position, *supra*, that included more than ten single-spaced pages of new argument. It is impossible for State Farm to meaningfully digest and respond to each of those new arguments in the time remaining. Should the Court decide to schedule a status hearing, however, State Farm will be prepared to address Plaintiffs' new arguments at that time; alternatively, State Farm would be happy to submit supplemental briefing on those issues if the Court so desires.

[6] In that regard, State Farm notes that neither of the named Plaintiffs' insurance claims was ever even screened for potential SIU handling, so these tools have no relevance to their claims.

[7] State Farm has not determined the precise number of such claims. In another case that previously was pending in this District, however, State Farm filed a declaration explaining that, for the period between January 1, 2015 and December 29, 2021, for just a subset of Illinois ZIP Codes, State Farm received 54,777 claims. *See The Connectors Realty Group Corp. v. State Farm Fire and Cas. Co.*, No. 19-cv-00743 (N.D. Ill.), Dkt 143-9.

justify their position, Plaintiffs repeatedly mischaracterize what the record evidence demonstrates about the tools (including and in particular the ███████ tool) and how homeowners property claims are handled by State Farm.[8]

None of the further, burdensome discovery Plaintiffs seek should be allowed. Rule 26 does not allow a party to use discovery to go fishing for support for a claim it would like to bring. *See, e.g.*, *Loizon v Evans*, No. 18 C 2759, 2019 WL 13073426, at *2 (N.D. Ill. June 25, 2019), *adopted*, No. 18 C 2759, 2019 WL 13073423 (N.D. Ill. Oct. 2, 2019). Moreover, in the context of a class action, the proportionality standard of Rule 26 "supports the notion that pre-certification discovery should not exceed what is necessary to permit the Court to make an informed decision on class certification." *Miner v. Gov't Payment Serv., Inc.*, No. 14-CV-7474, 2017 WL 3909508, at *4 (N.D. Ill. Sept. 5, 2017). The Advisory Committee's Notes to Rule 23 similarly recognize that it is appropriate to limit pre-certification discovery "to those aspects relevant to making the certification decision on an informed basis." Fed. R. Civ. P. 23 Advisory Committee's Notes; *see also Harris v. comScore, Inc.*, No. 11 CV 5807, 2012 WL 686709, at *3 (N.D. Ill. Mar. 2, 2012) (quoting Advisory Committee Notes on Rule 23). As the court in *Harris* observed, "[p]roceeding with merits discovery" prior to a determination on whether a case will be certified may delay the certification decision and "frustrate the court's effort" to decide the certification question "[a]t an early practicable time, as mandated by Rule 23(c)(1)(A)." 2012 WL 686709, at *3. Finally, a defendant should not be subjected to burdensome merits discovery "if the plaintiffs' prospects for obtaining class certification are dim." *Christian v. Generation Mortg. Co.*, No. 12 C 5336, 2013 WL 2151681, at *4 (N.D. Ill. May 16, 2013). "[I]t would be utterly inefficient and unjust to subject a defendant to months, if not years, of onerous and expensive discovery so that the plaintiffs may continue a quixotic undertaking destined to fail." *Id.*

It is clear from the discovery provided by State Farm in Phase I that any attempt by Plaintiffs here to certify a class is "destined to fail." Plaintiffs should not be permitted to subject State Farm to additional, onerous and expensive discovery. To the contrary, this case is ripe for resolution of the class certification issue.

## I.     Progress with Phase I Discovery

In accordance with the discovery-phasing Order (*see* Dkt. 79), State Farm identified almost two dozen computer-based, automated and/or rules-based tools that (a) are (or were) used in the initial routing of homeowners property claims, or (b) can be used to assist in the identification of potentially fraudulent homeowners property claims. State Farm produced over 14,700 pages of documents relating to the identified tools and State Farm's claim handling practices.[9] And State Farm presented four separate corporate representative witnesses, who provided testimony on the use and operation of those tools; relevant background, context, and foundational information about State Farm's process for handling homeowners property claims to the extent necessary to allow Plaintiffs to discover and understand how State Farm processes, routes, and evaluates such claims using the identified tools; the facts set forth in RFP Nos. 4 through 8, 10 through 12, 14 through

---

[8] As noted above, State Farm will be prepared to discuss these mischaracterizations in detail at a status hearing, or in a supplemental brief if preferred by the Court.

[9] For example, State Farm produced voluminous Standard Claim Process documents, as well as Operation Guides.

27, and 32 of Plaintiffs' Third RFPs; and State Farm's denial of Paragraphs 4, 32 and 38 of the First Amended Complaint, as limited by the Court's January 14, 2025 Order.

Plaintiffs' complaints about the preparedness and knowledge of State Farm's corporate representative witnesses are baseless. The fact that a witness is not able to answer every question posed to him or her does not mean that the witness was not adequate or that the designating party did not satisfy its obligations to prepare the witness. *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 749 F. Supp. 2d 787, 802-03 (N.D. Ill. 2010); *see also LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3714992, at * (N.D. Ill. Sept. 14, 2010) (rejecting challenge to testimony of corporate designees who "were unable to answer each and every question asked of them"); *E.E.O.C. v. Celadon Trucking Svcs., Inc.*, No. 12-cv-275-SEB-TAB, 2013 WL 5915206, at *1 (S.D. Ind. Nov. 1, 2013) (finding that witness was an acceptable deponent, even though he was unable to answer some questions posed to him, and noting that Rule 30(b)(6) "does not promise a perfect deponent"). "The rule of reason applies to deciding if the selected Rule 30(b)(6) witness is capable of testifying about the *relevant* issues." *Georgia-Pacific Consumer Prods.*, 749 F. Supp. 2d at 802 (emphasis added).

The relevance limitation is particularly significant here, as the discovery-phasing Order made clear that this initial phase of discovery was *not* to include a "deep dive" into the tools. Dkt. 79. Indeed, the phasing order contemplated only the potential for "a short Rule 30(b)(6) deposition."

State Farm presented four corporate representative witnesses, for a full day of testimony each, regarding multiple topics. Each of those witnesses had spent many hours preparing to testify on his or her designated topics, including speaking with knowledgeable individuals within State Farm to become educated on the topics. Specifically, Ms. Markwardt testified that she spent approximately 14 hours (speaking with 4 individuals in addition to counsel who were present for those discussions) to prepare for her deposition; Mr. Golden testified that he spent more than 15 hours (speaking with 7 individuals in addition to attending counsel) to prepare for his deposition; Mr. Smoot testified that he spent more than 30 hours (speaking with 25 individuals beyond counsel attending the discussions) to prepare for his deposition; and Mr. Biddlecome testified that he spent several days (speaking with 18 individuals beyond counsel) to prepare for his deposition. It is true that, despite these extensive efforts, there were questions that the witnesses were unable to answer. The vast majority of those questions, however, were either entirely outside the scope of the designated topics,[10] or constituted precisely the kind of "deep dive" into the tools that this phase of discovery was *not* to include. As an example of the latter category of question, Ms. Markwardt was asked to explain the following table contained within a 102-page document regarding the ▮▮▮▮▮▮▮▮▮▮:

---

[10] Contrary to what Plaintiffs assert, State Farm's beyond-the-scope objections were entirely appropriate. For example, in some instances (such as when Plaintiffs' counsel asked Mr. Smoot about whether HAART interacted with the ▮▮ tool, *see supra* at 7), State Farm's counsel objected to a question asked of one witness because a different State Farm witness had been designated to speak to that topic or subject area.



Ms. Markwardt testified that to explain that table, she would need to speak with the Lead Software Engineer for ▇▇▇, Michael Green. She gave the same response to other questions that counsel asked about the technical minutiae of the ▇▇▇ document. Such highly technical questions, which could be answered only by the Lead Software Engineer, are simply outside the scope of the depositions that were contemplated by the discovery phasing Order.

In sum, the discovery that State Farm has provided to Plaintiffs through both thousands of pages of documents and four full days of corporate representative deposition testimony is more than sufficient to allow Plaintiffs to understand (a) what tools State Farm uses to route homeowners property claims, to identify potentially complex homeowners property claims, and to assist in the identification of potentially fraudulent homeowners property claims, (b) how those tools operate, and (c) how they fit into State Farm's claims process. For the reasons discussed above and in Section II, *infra*, there is no basis for allowing Plaintiffs to proceed with yet more discovery regarding any of these tools.

State Farm also disputes Plaintiffs' assertion that "significant Phase I discovery remains outstanding." *Supra* at 8. Plaintiffs should not be permitted to conduct a "deep dive" into tools that post-date the closing of their insurance claims and the filing of this action: *i.e.*, ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Plaintiffs likewise should not be permitted any further discovery on tools that relate to the identification of potentially fraudulent claims—TAC, ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇, SAS ▇▇▇▇▇▇, SAS ▇▇▇▇▇, and ▇▇▇▇—because they could not have been injured by the use of those tools and consequently do not have standing to challenge them.

## II.     Plaintiffs Are Not Entitled to the Phase II Discovery They Propose

### a.     Plaintiffs Should Not Be Allowed Any Further Discovery Regarding Tools That Post-Date Both Their Individual Insurance Claims and the Filing of This Case.

In their "Phase II" proposal, Plaintiffs seek to proceed with discovery concerning four tools that State Farm identified as part of Phase I discovery: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Excepting ▇▇▇, none of these tools was even in use during the time when the Plaintiffs' respective insurance claims were reported to and handled by State Farm. Plaintiff Huskey reported the loss underlying her insurance claim on

July 22, 2021, and her claim was closed on November 22, 2021. Plaintiff Wynn reported the loss underlying her insurance claim on March 6, 2022, and her claim was closed on December 21, 2022. It is undisputed, however, that the ███████████████████████████████ tools were not used by State Farm until ███████████████████████████, respectively. *See* Chart from State Farm's Supp. Resp. to Plfs.' Amended First Set of Interrogatories, attached hereto as Exhibit 1, at 1. The ████████████████████ was not even created until ████████████. *See* Excerpt from Tr. of Apr. 24, 2025 Dep. of Kerstin Markwardt, attached hereto as Exhibit 2, at 191:7–9.

Thus, none of the tools just mentioned has any possible bearing on Plaintiffs' insurance claims. Accordingly, none has any bearing on Plaintiffs' legal claims. *See, e.g.*, *Farrell v. Butler Univ.*, 421 F.3d 609, 617 (7th Cir. 2005) ("To have standing to bring a disparate impact claim, a plaintiff must show that she was personally injured by the defendant's alleged discriminatory practice."); *Payton v. Cty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("[A] person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.").

Moreover, as stated in their First Amended Complaint, Plaintiffs' claims of a purported disparate impact are premised on a survey of State Farm policyholders allegedly completed in 2021. Dkt. 23 ¶¶ 14–20.[11] The initial Complaint itself was filed on December 14, 2022. *See* Dkt. 1. Tools that were not used by State Farm until ████████████████████, could not possibly have caused the supposed disparate impact alleged by Plaintiffs, which pre-dates the use of those tools. *See Tex. Dep't of Hous. & Comty. Affairs v. Inclusive Communities Project*, 576 U.S. 519, 542 (2015) (requiring that plaintiffs asserting a disparate-impact claim show a "robust" causal connection between a statistical disparity and a specific policy of the defendant). They are thus entirely irrelevant and no further discovery concerning those tools should be permitted.

**b.    The Data Discovery Plaintiffs Propose to Pursue Should Not Be Permitted.**

Even as to ████████, which was used ████████████████████████████████, the data discovery that Plaintiffs now propose to pursue (*see supra* at 3-4) should not be permitted.

To proceed with a suit on behalf of a class, a plaintiff must show, among other things, that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a). In other words, to represent a class, a plaintiff must bring claims that "depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2251 (2011). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one

---

[11] In responding to State Farm's arguments about those allegations in its motion to dismiss the FAC, Plaintiffs asserted they were not required, at the pleading stage, to defend their methodology, and that State Farm would be "free to explore" the details of the survey in discovery. Dkt. 33 at 16-17; *see also* Mem. Op. and Order dated Sept. 11, 2023 (Dkt. 52) at 16 (agreeing with Plaintiffs that they were not required to defend their methodology at the pleading state and that State Farm would be "free to explore" those details in discovery). Despite these representations, Plaintiffs have now disclaimed any reliance on—and refused to produce any discovery related to—the YouGov survey.

of the claims in one stroke." *Id.* The class-wide claims data that Plaintiffs now intend to pursue, however, cannot and will not establish that "one stroke" resolution is possible in this litigation. According to Plaintiffs, they wish to seek such data in order "to perform an … analysis of disparate impact" or effect. *See supra* at 4. But as the Supreme Court made clear in *Dukes*, a "common *effect* does not establish a common *cause* for that effect, even in a disparate impact case" such as this one. *Christian v. Generation Mortg. Co.*, No. 12 C 5336, 2014 WL 4494860, at *2, 10 (N.D. Ill. Sept. 12, 2014) (discussing *Dukes* in declining to reconsider the district court's earlier rejection of a plaintiff's pre-class-certification request for class-wide data). And a disparity of impact here— even if one were found to exist—could not establish a common cause of that disparity because, as State Farm's corporate witness recently testified, "every claim [State Farm] evaluate[s]" is evaluated "upon its own merits." Excerpt from Tr. of Apr. 29, 2025 Dep. of Adrian Smoot, attached hereto as Exhibit 3, at 102:15–16.

████████████
████
██████████████████████████████████████████ the claim handler assigned to that claim "initiate[s] the claim process," which—no matter the FAE—will entail "speaking with [the] customer" at issue, "investigat[ing] the circumstances regarding the reported loss," and "estimating … the damages" claimed for that specific loss. Ex. 3 at 88:21–89:18, 105:8–17 (explaining that this general process is the same regardless of the environment in which the claim is handled); *see also id.* at 212:1–14 (similar). State Farm's "process" or practice for resolving homeowners property claims, in other words, is to defer to the judgment and discretion of the individuals handling those respective claims. There are no computer-based tools that direct a claim handler in how to handle a homeowners property claim, or that dictate (a) whether or how many times a loss will be inspected, (b) which or how many documents a claim handler should request from the policyholder when handling a claim for such a loss, (c) how many times a claim handler should interact with the policyholder when handling such a claim, or (d) how many questions he or she should ask of that policyholder when interacting with them. *Id.* at 274:15–276:1.

This is no less true for potential reassignments of claims to a different FAE. As State Farm's corporate witness explained, ████████████████████████████████████████
██████████, when looking at that claim once assigned to her, a claim handler in the ████████ environment may determine, "based upon [the claim's] merits," that it would be handled "more efficiently … in a different" one. *Id.* at 102:15–103:9; *see also id.* at 113:18–114:6, 114:17–115:3 (similar). Or the assigned claim handler may determine—again based on the merits of the claim— that
████████████████████████████████████████████
█████████████████████. *Id.* Critically, no tool—including ████████—makes that decision. "*People* make that decision." *Id.* at 103:15 (emphasis added);

The comparison Plaintiffs draw in their Amended Complaint illustrates the point. In that pleading, Plaintiffs allege that Plaintiff Wynn's insurance claim took longer to resolve than did the

claim of Wynn's white neighbor. *See* Dkt. 23 ¶ 12.[12] But ██████████ those two claims identically, so any differences in how the two claims were handled could not have been due to the operation of the tool. They are due, instead, to the decisions made by the individual claim handlers to whom the claims were assigned.

In short, no matter the FAE to which a claim is routed, the actual handling of that claim will depend upon factors unique to that claim and the discretion of the claim representative assigned to handle it. And in *Dukes*, the Supreme Court "squarely rejected the proposition that a company's policy of permitting [such] discretion can serve as the common link between individual claims." *Christian*, 2014 WL 4494860, at *2 (citing *Dukes*, 131 S. Ct. at 2554–55). Indeed, "the 'bare existence of delegated discretion' is no policy at all." *Id.* (quoting *Dukes*, 131 S. Ct. at 2554). Rather, it is "a policy *against having* a policy." *Id.* (emphasis added). A "showing that such a non-policy produces [a] disparate impact" therefore "does not suffice to satisfy Rule 23's commonality requirement." *Id.* (quoting *Dukes*, 131 S. Ct. at 2556) (internal quotation marks omitted); *see also Dukes*, 131 S. Ct. at 2554 (holding that a "'policy' of *allowing discretion* by [individual employees] … is just the opposite of a uniform … practice that would provide the commonality needed for a class action"); *In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*, 708 F.3d 704, 708 (6th Cir. 2013) (citing *Dukes* in holding that, absent "a uniform policy or practice guid[ing] *how* … actors exercise their discretion," policies "that grant broad discretion" do not satisfy the commonality requirement of Rule 23(a)).

"*Dukes* reiterates that statistical correlation, no matter how robust, cannot substitute for a specific finding of class-action commonality." *In re Countrywide*, 708 F.3d at 709 (citing *Dukes*, 131 S. Ct. at 2555). Accordingly, even if the extensive claims data Plaintiffs now wish to seek from State Farm were to show a statistical disparity, it would not "suffice to 'glue' [putative class members'] claims together in a way that satisfies Rule 23(a)(2)'s commonality requirement." *Christian v. Generation Mortg. Co.*, No. 12 C 5336, 2013 WL 2151681, at *4 (N.D. Ill. May 16, 2013). It would therefore be "utterly inefficient and unjust to subject [State Farm] to months, if not years, of onerous and expensive discovery" of such data. *Id.*

### c.    This Case Is Ripe for Ruling on Class Certification.

The substantial discovery Plaintiffs already have obtained regarding the tools used by State Farm and how those tools fit into its process for handling homeowners property claims is more than sufficient to establish that no class can be certified here. State Farm accordingly submits that this case is ripe for resolution of the class certification question, and anticipates moving for denial of class certification within the next 90 days.

---

[12] Notably, this allegation is untrue. The claim files State Farm has produced to Plaintiffs establish that the neighbor's claim was not closed until January 12, 2023—several weeks *after* handling was completed on Wynn's claim.

Dated: May 9, 2025

/s/ *David Tracey*

**Sanford Heisler Sharp, LLP**
David Tracey (*Pro Hac Vice*)
Albert Powell (*Pro Hac Vice*)
Sharon Kim (*Pro Hac Vice*)
Emma Stanton (*Pro Hac Vice*)
17 State Street, 37th Floor
New York, NY 10004
Phone: (646) 402-5667
dtracey@sanfordheisler.com
apowell@sanfordheisler.com
sharonkim@sanfordheisler.com
estanton@sanfordheisler.com

**Fairmark Partners, LLP**
Jamie Crooks (*Pro Hac Vice*)
Amanda Vaughn (*Pro Hac Vice*)
Michael Lieberman (*Pro Hac Vice*)
Kritika Tara Deb (*Pro Hac Vice*)
400 7th Street NW, Suite 304
Washington, DC 20004
Phone: (301) 458-0564
alexander@fairmarklaw.com
jamie@fairmarklaw.com
michael@fairmarklaw.com

**Center on Race, Inequality, and the Law at New York University School of Law**
Deborah N. Archer (*Pro Hac Vice*)
Jason D. Williamson (*Pro Hac Vice*)
139 MacDougal Street
New York, NY 10012
Phone: (212) 998-6882
deborah.archer@nyu.edu
jason.williamson@nyu.edu

*Counsel for Plaintiffs and the Proposed Class*

/s/ *Sondra A. Hemeryck*

**Riley Safer Holmes & Cancila LLP**
Patricia Brown Holmes
Joseph A. Cancila, Jr.
Sondra A. Hemeryck
Lauren Abendshien
1 South Dearborn Street, Suite 2200
Chicago, IL 60603
Phone: (312)-471-8700
pholmes@rshc-law.com
jcancila@rshc-law.com
shemeryck@rshc-law.com
labendshien@rshc-law.com

*Counsel for Defendant State Farm Fire and Casualty Company*