# EXHIBIT L

1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
3                            EASTERN DIVISION

4    JACQUELINE HUSKEY on behalf of          )
     themselves and all others similarly     ) Case No. 22 C 7014
5    situated, et al.,                       )
                                             )
6                    Plaintiffs,             )
                                             )
7              vs.                           )
                                             ) Chicago, Illinois
8    STATE FARM FIRE & CASUALTY COMPANY,     ) February 5, 2025
                                             ) 11:16 A.M.
9                    Defendant.              )

10                    TRANSCRIPT OF PROCEEDINGS - Status
        BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge
11
     APPEARANCES:
12
     For the Plaintiffs:        SANFORD HEISLER SHARP McKNIGHT, LLP
13                              17 State Street
                                37th Floor
14                              New York, New York  10004
                                BY:  MR. DAVID HAHN TRACEY
15                                   MS. EMMA STANTON

16   For the Defendant:         RILEY SAFER HOLMES & CANCILA LLP
                                One South Dearborn Street
17                              Suite 2200
                                Chicago, Illinois  60603
18                              BY:  MS. SONDRA A. HEMERYCK
                                     MS. LAUREN ABENDSHIEN
19

20

21
                         PAMELA S. WARREN, CSR, RPR
22                    Official Court Reporter - Retired
                         23869 N. High Ridge Drive
23                    Lake Zurich, Illinois   60047
                              312.823.0001
24

25   NOTE:  Please notify of correct speaker identification.

1          (Proceedings held in open court:)

2          THE CLERK:  22 C 7014, Huskey, et al. versus State

3   Farm Fire & Casualty Company.

4          THE COURT:  Okay.

5          MS. HEMERYCK:  Would you like us to do the same as

6   last time and share the table?

7          THE COURT:  Yeah.  Do you want to do that?  If you do

8   that, that would be fine.  And make sure you get the

9   microphones so that the record can be -- if we get a

10  transcript, it will be clear.

11         And then once you're settled, I'll get appear- -- I'll

12  take appearances for the plaintiffs and then for the defense.

13         MS. HEMERYCK:  So no court reporter today or --

14         THE COURT:  I did not order a court reporter today.  I

15  was not anticipating a very long hearing.  As I then prepared

16  for today, I could see why you would potentially want a court

17  reporter.

18         So be very careful to speak at least -- you don't have

19  to speak into the microphone like this, but have it pointed

20  toward you.  Speak clearly.  Identify yourselves for the record

21  as to who is speaking.  And then if we get a transcript

22  prepared, that's how we'll do it.

23         MS. HEMERYCK:  Just give us a minute to get our

24  materials together.

25         THE COURT:  That's okay.  Get yourself situated and

1    then we'll call the case.

2         Maybe plaintiffs could move just slightly to the left

3    at the table, give them slightly more room.  And also you'll be

4    able to be in front of the microphone that way too.

5         Ms. Hemeryck can move the microphone closer to you two

6    there.

7         All right.  You guys ready?  Heads nodding?  Okay.

8    Great.  We're going to call the case.

9         THE CLERK:  I called it already.

10        THE COURT:  You called it, all right.  Sorry.  That

11   will be good on the transcript.

12        Plaintiffs's appearances.

13        MR. TRACEY:  Good morning, your Honor.  David Tracey

14   of Sanford Heisler Sharp for the plaintiffs.

15        THE COURT:  Good morning.

16        MR. TRACEY:  Good afternoon.

17        MS. STANTON:  Good morning.  Emma Stanton from Sanford

18   Heisler Sharp for the plaintiffs.

19        THE COURT:  Okay.  Thanks for coming in.

20        For the defense.

21        MS. HEMERYCK:  Good morning, your Honor.  Sondra

22   Hemeryck and Lauren Abendshien for the defendant State Farm.

23        THE COURT:  Okay.  Great.  I read your status report.

24   It says you have made a lot of progress but then you have got

25   some disagreements.  But the one line you have got

1    disagreements, so I need to understand a little bit better the

2    disagreements in an attempt to resolve this so we go forward

3    here.

4            I wanted to first address the first page of your

5    status report that says defendant will substantially complete

6    its supplemental Phase I discovery productions consistent with

7    the Court's rulings by March 3rd and then you'll make future

8    productions as soon as practicable.

9            It's -- I know you're giving yourself an out here.

10   But I -- you know, in order to -- I would like a date by which

11   the supplemental productions are going to be done because

12   you're going to have to do depositions at -- you know, based on

13   that schedule.  And what I don't want to have happen is we're

14   still dribbling out documents to you, you know, the morning of

15   the deposition.

16           MS. HEMERYCK:  Well, we certainly don't anticipate

17   that, your Honor.  And I wish I could give you a firm date.

18   The problem -- one of the problems we have is that one of the

19   categories of documents that -- we have already produced some.

20   We produced some several months ago.  We produced a bunch more

21   yesterday -- are standard claim process documents.  And the

22   standard claim process documents, they're -- they're -- in a

23   few of them, not a lot, but in a few of them there is a little

24   box that is where there should be an image.  If you were

25   looking at the original document, it has an image.

1    The way the documents are pulled and processed and
2 archived, the images are not there.  And so in order to get the
3 images, someone has to actually manually go in, match them up
4 with the specific SEP (phonetic) we produced for the specific
5 date and pull the image so we can produce it.

6    So we have to produce the SEPs, but I don't know
7 exactly how long it is going to take us to get those images.
8 Again, it is not a lot, but that -- that was one of the things
9 that was driving that -- that issue.

10    THE COURT:  Okay.

11    MS. HEMERYCK:  And again -- you know, and then again,
12 you know, there are still some things that we are hunting for.

13    But no, we have -- you know, it is our intention to go
14 forward with the depositions on the dates that the parties have
15 agreed upon and not to be producing documents dribs and drabs
16 up to then.

17    THE COURT:  Okay.  Well, you're targeting depositions
18 the week of April 14th and April 24th and 25th?

19    MS. HEMERYCK:  Yes.

20    THE COURT:  In Chicago and in Phoenix.  Those are good
21 targets.

22    MS. HEMERYCK:  We actually have specific dates now for
23 the ones in Chicago.

24    THE COURT:  Okay.  And what are those dates?

25    MS. HEMERYCK:  April 15th and 16th.

1        THE COURT:  Okay.  And how many witnesses is that?

2        MS. HEMERYCK:  So that's two witnesses in Chicago and

3   then there are two witnesses in Phoenix.

4        THE COURT:  Oh, that's what it says here.  Okay.

5        Okay.  So that's plenty of time to complete the

6   production of documents and put the images in.

7        I want a date, however, by which that's going to

8   happen so that it is not April 12th.  And I think -- I mean, I

9   could ask plaintiffs's counsel, but I -- I'm sure they are not

10  getting a -- an overwhelming amount of material, let's put it

11  that way.

12       I would -- I would like to set that date as -- that

13  you will finish producing your arguments by March 12th.  If

14  that -- if you -- if knowing what you know about what you need

15  to do that squeezes too much, tell me.  But I -- again, I want

16  some dates that people at least are shooting for.

17       MS. HEMERYCK:  I have to admit I --

18       THE COURT:  It is over a month from today.

19       MS. HEMERYCK:  Yeah.  I -- I hope we'll be able to do

20  it by then.

21       THE COURT:  Uh-huh.

22       MS. HEMERYCK:  We will certainly communicate that

23  deadline to State Farm.

24       THE COURT:  Okay.  Based upon the glitch that you're

25  talking about and your representation that it is not a lot of

1    documents, I'm going to set that date.

2            MS. HEMERYCK:  Okay.

3            THE COURT:  I'm going to say State Farm shall complete

4    its production of documents responsive to plaintiffs's Phase I

5    discovery requests by March 12th.

6            And I'll tell you that if that can't be done, you can

7    file a motion with good cause.  I'm not going to be -- I don't

8    want -- I don't want it to move these deps.  And I want them to

9    have the dep -- the documents in plenty of time and in plenty

10   of time to look at them and call you and say, I got some

11   questions about this kind of stuff.  So that seems to me to be

12   enough time.

13           Ms. Stanton, enough time for you?  Or who is talking,

14   Mr. Tracey?  Ms. Stanton?

15           MR. TRACEY:  Yes, your Honor.  That should be enough

16   time.  Thank you.

17           THE COURT:  Okay.  So --

18           MS. HEMERYCK:  Your Honor, may I -- could I just have

19   one clarification?

20           THE COURT:  Yes.

21           MS. HEMERYCK:  When you say State Farm to complete

22   production documents responsive to plaintiffs's Phase I

23   discovery requests, I assume that means consistent with your

24   previous orders on January 14th.

25           THE COURT:  We could add that, consistent with the

1    Court's previous orders on January 14th.

2         MS. HEMERYCK:  Thank you.

3         THE COURT:  That's fine.  Yes.  That's what I meant.

4    And consistent with what I am going to say today probably too,

5    but I'm not going to say that yet.

6         Yes?

7         MR. TRACEY:  Your Honor, if I may.  One just point of

8    clarification.  Are we still keeping the substantial completion

9    target?

10        THE COURT:  No, it is complete.  I want this to be

11   complete.

12        MR. TRACEY:  What I refer to is we had an earlier

13   substantial completion target of March 3rd.  And the March 12th

14   date I could envision being the final, absolute completion

15   deadline.

16        THE COURT:  That's what --

17        MR. TRACEY:  It would be helpful if we --

18        THE COURT:  That's what I am intending it to be.

19        MR. TRACEY:  Okay.

20        THE COURT:  No, I'm intending it to be that.  I'm

21   intending to crystallize a conversation where Ms. Hemeryck

22   might say or Ms. Abendshien may say, we're done but we found

23   like this box hiding in a closet someplace and we need a little

24   bit more time.  In which case there would be a motion.  But I

25   want to catalyze that discussion.

1        But my intent is that it is not substantially complete

2   by the 12th, it is -- you got what you got, and then you're

3   going to do deps.  Clear?  Clear --

4            MS. HEMERYCK:  Yes, your Honor.

5            THE COURT:  -- Ms. Hemeryck?

6            Yeah.  Again, I just think we -- dates are helpful.

7            Okay.  Next.  The other issue about the 30(b)(6)

8   depositions.  I need to know a little bit more about what

9   plaintiffs want to ask about, that defendants are saying you

10  shouldn't be asking about.  And -- because I reviewed the

11  portions of the transcript, the 90-page transcript from the

12  last January 14th, 15th hearing.  I think the most germane

13  pages there are 45 to 65 of that transcript where we discuss

14  the dep topics and used or use and stuff like that.  And I -- I

15  need to know more about what plaintiffs want to ask that State

16  Farm says you shouldn't ask.

17           Mr. Tracey.

18           MR. TRACEY:  Okay.

19           MS. HEMERYCK:  Can I -- could I just interject one

20  thing, your Honor?

21           THE COURT:  Yeah.

22           MS. HEMERYCK:  Because, as I have told plaintiffs's

23  counsel, we have not said to them, and we're not taking the

24  position that they cannot ask about claim handling practices

25  generally or homeowners -- claim handling -- our processes for

1    handling homeowners claims.

2          THE COURT:  Okay.

3          MS. HEMERYCK:  What I -- what our position is, is that

4    is not an appropriate 30(b)(6) topic.  So they can ask the

5    witnesses.  And we have some very experienced witnesses, and

6    those witnesses will answer questions, but they will do so

7    based on their own experience and as individuals because I do

8    not think it is an inappropriate 30(b)(6) topic, which I'll

9    explain later.

10          But I just wanted to make sure to start out with

11    what -- the Court was clear on our position.

12          THE COURT:  Okay.  And I take what Ms. Hemeryck is

13    saying, I mean, is that the witnesses will be prepared to

14    provide context, process, some foundational information about

15    the claims handling process as necessary to animate or give

16    meaning to the things they are talking -- what they are talking

17    about in terms of how and whether algorithmic tools are used to

18    identify fraudulent or complex claims.  And that's imbedded in

19    the topic.

20          But this -- I want to know what the dispute is so that

21    I know how to respond to it and keep you on target.

22          MR. TRACEY:  Thank you, your Honor.  There are two

23    subissues here that I think will (unintelligible) it.

24          The first issue is, can we get an overview of the

25    claims process from a 30(b)(6) witness, a corporate designee,

1   who binds the corporation and is responsible for being prepared

2   to answer questions on behalf of the corporation beyond their

3   personal knowledge.

4          And the second question is are we able to ask

5   questions about tools that State Farm hasn't disclosed in their

6   interrogatory responses.

7          And there are three reasons, your Honor, why this is

8   relevant and proportional to the scope of Phase I.  First, your

9   Honor was clear at the last hearing, including you mentioned

10  starting on page 45 of the transcript, and also if you look on

11  page 43, 42, 39, you'll see -- you'll see similar commentary

12  from your Honor about this.  But you were clear that Phase I

13  involves not just -- and just now not just the identity of the

14  tools but the context.  The claims process is that context.

15         State Farm has essentially said to us -- and I think

16  we have maybe heard a more expansive view here in court today.

17  But in our meet and confers, our understanding was that they

18  would tell us on a tool-by-tool basis what the tools are used

19  for, how they are used, and when they are used.

20         But the problem is that we would get a little bit

21  about each of these tools individually but not how they get fit

22  together in the overall process and affect the life cycle of

23  the claim.  And it is important that we have 30(b)(6) testimony

24  on that because we are talking about stitching these tools

25  together over the life cycle of the claims process.

1          I don't want to be in a deposition where I am asking

2     the witness about the tools and they say, well, I don't know.

3     I -- I don't know how that tool fits into the claims process.

4     I don't know how it interacts with this other tool.  I don't

5     know how the full scope of how a claim comes in from intake to

6     payment because I have never supervised someone with that or I

7     have never had personal experience with that.  That's what

8     we're trying to avoid.

9          And of course we're trying to avoid a situation where

10    the corporation then gets to disclaim what their fact witness

11    says and says, well, that was just one fact witness.  You need

12    to talk to some other people.  We want corporate rep testimony

13    on this issue.

14         A second point, your Honor, that's important here is

15    that the testimony about the claims process is really critical

16    to our ability to fully understand and identity all the

17    algorithmic tools that are being used.

18         Right now State Farm is seeking to limit the

19    deposition to the tools that it has disclosed in its

20    interrogatory responses.  But if the deposition is cabined in

21    that way, then plaintiffs have no ability to test whether State

22    Farm's interrogatory responses were fully complete and

23    accurate.  In effect, we'll be able to -- we'll be unable to

24    cross examine the witness on the scope of the tools that are

25    actually being used.  And that is our chief concern.

13

1                And on the proportionality piece, your Honor, what's

2      interesting is State Farm has said here today that its first

3      30(b)(6) witness can testify as a fact witness about these

4      things that we're seeking.  So on the proportionality piece,

5      they have already identified an individual who they claim has

6      knowledge about this --

7                THE COURT:  Uh-huh.

8                MR. TRACEY:  -- so why can't that person be prepared

9      to testify on behalf of the corporation on these issues?

10               THE COURT:  Okay.  What's your third point?

11               MR. TRACEY:  Those were the three points.

12               THE COURT:  Those were the three points?

13               MR. TRACEY:  Two relevance -- two relevance points and

14     the one proportionality point.

15               THE COURT:  Okay.  I suppose I should hear from State

16     Farm on this.  I have -- I have certain reactions to what you

17     said, Mr. Tracey, so -- and I want you to know what my time

18     limit here is.  I'm -- I'm chairman of the Settlement

19     Assistance Program committee here.  We have a meeting at noon.

20     I need to be at that meeting.  There is no reason we can't

21     conclude this now.  I'm -- I actually am prepared to rule even

22     as to -- after what Mr. Tracey said, but --

23               MS. HEMERYCK:  I would like to respond.

24               THE COURT:  -- a response would be fine.

25               MS. HEMERYCK:  Thank you.  So, your Honor, you pointed

1  to pages 45 to 65 of the transcript.  I would actually point to

2  page 10 of the transcript.

3          THE COURT:  Yeah, it is up there too.

4          MS. HEMERYCK:  Because you said at the very beginning

5  of this hearing --

6          THE COURT:  Uh-huh.

7          MS. HEMERYCK:  -- that the discovery plaintiff has

8  been seeking is overbroad in many respects.  And the specific

9  example you gave was their Topic 4.  And you have said, an

10 example of this Topic 4 where you asked, without necessarily

11 limiting it, or, you know, State Farm's policies, practices

12 and/or procedures for handling homeowner insurance claims, full

13 stop.  And you said, I think you have got to focus on the

14 policies and procedures that relate to this kind of claims

15 processing.

16         So you already have ruled that what they are asking

17 for isn't an appropriate 30(b)(6) topic.  It is too broad.

18         And State -- State Farm is prepared to present

19 corporate representatives to do exactly what the Court has

20 said.  We'll test- -- our corporate representatives will

21 testify about the manner in which they identified tools to

22 operate and how State Farm used or uses them in its handling of

23 homeowners claims in the six states encompassed by the

24 plaintiffs's proposed class.  That's a reasonable topic.

25 That's a topic that's is proportional.  That's a topic that is

1  relevant.  And that is a topic that we can -- at least it is

2  relevant to Phase I.  And that's a topic on which we can

3  actually prepare somebody.

4         We cannot reasonably be expected to designate and

5  prepare a corporate representative witness to testify on behalf

6  of the company about, quote, State Farm's process for handling

7  homeowners insurance claims.  That is not reasonably

8  particularized as required by Rule 30(b)(6).

9         I also -- to address the proportionality issue --

10  there is a big difference in terms of burden and

11  proportionality between having a witness who has experience as

12  a claims section manager testifying based on his own personal

13  knowledge and having to try to, first of all, figure out what

14  the heck that topic means; and, second of all, prepare that

15  witness to give binding testimony on whatever aspects of it

16  plaintiffs plan to ask about.  So it is not proportional.

17         The topic is also beyond the scope of Phase I.

18         THE COURT:  What topic are we talking about?

19         MS. HEMERYCK:  This is the --

20         THE COURT:  The topic being what we have got here --

21         MS. HEMERYCK:  What they said in the --

22         THE COURT:  -- policies, practices, and procedures for

23  handling homeowners insurance claims --

24         MS. HEMERYCK:  Right.

25         THE COURT:  -- full stop, rather than tying them to

1    the use of algorithmic tools to identify fraudulent and

2    complex --

3            MS. HEMERYCK:  Exactly.

4            THE COURT:  -- claims.

5            MS. HEMERYCK:  They want us to designate a 30(b)(6)

6    witness on State Farm's process for handling homeowners

7    insurance claims.

8            THE COURT:  Okay.  Next point.

9            MS. HEMERYCK:  And that's -- so, right.

10           So it is also beyond the scope of Phase I because, as

11   you said, the proper scope of Phase I, the main focus of Phase

12   I is the identification of the tools.  And then to -- and then

13   as sort of a gloss on that, on -- I think you used the word

14   penumbra also -- to provide context for the use of those tools.

15   This is way beyond the penumbra when you go -- when you're not

16   even linking any more of the topic to the tools.

17           I say it is also beyond, frankly, the scope of

18   discovery under Rule 26(d).  It is not even -- even if we were

19   outside of the phasing order, it is not relevant.  You know,

20   plaintiffs's claims here concern algorithmic decision-making

21   tools employed by State Farm to screen out potentially

22   fraudulent or complex claims from straightforward homeowners

23   claims.  That's what Judge Harjani identified as the gravamen

24   of plaintiffs's complaint.

25           So State Farm's processes for handling homeowners

1    claims are only relevant to the extent they relate to the

2    operation of those -- and use of those tools.  And that's what

3    we have said we'll do.  So it is not an appropriate 30(b)(6)

4    topic.  But they can ask or the claims section manager can

5    testify about it.

6           Another -- going to the question of the -- of like

7    tools, other than the ones that we identified, so there is a

8    couple of things I would say on that.  First of all, we -- we

9    haven't limited it.  We haven't said we would limit it.  What

10   we have said is that we will present corporate representative

11   witnesses to testify about whether there are any other tools,

12   aside those that have been identified in State Farm's discovery

13   responses, that assist in the identification of potentially

14   fraudulent, et cetera, claims.

15          So we have said, we have said, you can ask these

16   witnesses.  They will testify on behalf of the company about

17   whether there are any other tools.  And they can also ask if

18   there are any tools that affect the level of scrutiny applied

19   to a claim.  That was your Honor's ruling.

20          What I can't do, what we cannot reasonably do is try

21   to essentially prepare a witness to testify about tools that

22   the company itself has not identified as fitting within the

23   scope of Phase I and somehow -- I don't know how to even -- how

24   to even prepare a witness to testify about how an unidentified

25   tool operates within the claim process.  I just have no -- I

1   wouldn't even know where to start with that.

2            THE COURT:  Uh-huh.

3            MS. HEMERYCK:  We have made a good faith effort, the

4   company has made a good faith effort to identify the tools that

5   were within the scope of Phase I.

6            They can ask if there are other tools.  As far as I

7   know there are not.  But they can certainly ask.  But to -- for

8   me to try to prepare a witness to testify about how the

9   claim -- how some unidentified tool fits into the claim

10  process, I would not know where to start.  It is not possible

11  to do that.

12           And the last thing I would say is in terms of other

13  tools, we also have said that we will prepare our corporate

14  representatives to testify about the factual statements that

15  are included in a bunch of our RFP responses, which

16  specifically address things like whether State Farm uses other

17  Varisk (phonetic) products, whether State Farm use any other

18  Duck Creek (phonetic) tools, whether it uses any tools from

19  Crawford, et cetera.  We have said that we will give you a

20  corporate representative on that.

21           THE COURT:  Okay.  Thank you, both of you.

22           I want to be very clear here.  Mr. Tracey, take the

23  depositions rather than anticipating how deficient the answers

24  are going to be before you start taking the depositions.  Don't

25  anticipate that a witness is going to be unable to answer a

1    question that you're going to ask at a deposition before you

2    have taken the deposition.

3           It is going to be impossible for me to micromanage

4    this process in a way that completely satisfies plaintiffs

5    before you sit down to take the deposition.  Depositions are

6    good ways to uncover information from knowledgeable people.

7    Sitting across the table, the possibilities of the follow-up

8    question are endless.  Okay?

9           I cannot anticipate ahead of time what the witness is

10   going to testify about, what knowledge the witness is going to

11   have and not going to have and how this whole process is going

12   to go.  And plaintiffs's desire to fine tune everything before

13   you sit down in a chair to take the deposition is not the way

14   we're going to do this.  Okay?

15          I understand -- and Ms. Hemeryck, I think, is also

16   saying that State Farm is approaching it this way -- that

17   plaintiffs need to understand how State Farm processes claims,

18   routes claims, evaluates claims as high risk or complex using

19   algorithmic tools.  That's what plaintiff has alleged.  And

20   State Farm has produced information and answered

21   interrogatories that they feel are responsive to those

22   questions.  And you have endlessly met and conferred about it.

23   And I have issued some rulings and other guidance on these

24   things up until now.  That's as much as we can possibly do

25   before we go into the deposition process.

1      And let me hasten to add in what I just characterized

2   as what you need to understand, I may not -- I hope that

3   encompasses what Ms. Hemeryck was talking about and what you're

4   wanting to inquire about without having a separate topic that

5   says that.

6      Did I misstate in your view, Ms. Hemeryck, what the

7   plaintiffs are -- should be able to do here?

8      MS. HEMERYCK:  You did not, your Honor.

9      THE COURT:  And what about you, Mr. Tracey?

10     MR. TRACEY:  Your Honor, my principal concern is that

11  this case is about discrimination in the claims process.  And

12  I'm not going to get discovery as to what the claims process

13  is.  How I describe for the jury how a claim moves from intake

14  to payment, that -- and the next order is how do the tools fit

15  into that process.

16     But unless I know what the foundational issue of what

17  the process is, the tools are kind of floating in space, and

18  that's my principal concern.

19     And it may be your Honor is saying, you got to go with

20  a fact witness on that.  And if that's what your Honor is

21  saying, I understand.

22     But my concern is we do need that discovery so that we

23  can understand that foundational issue about how does the claim

24  process work.

25     (Discussion off the record.)

21

1          THE COURT:  Sorry.  One second.

2      (Brief recess.)

3          THE COURT:  Let me ask you a question.  What I am

4   understanding Mr. Tracey to be saying -- and I really hope I

5   don't have to call you back this afternoon because I know

6   people came in from out of town.  But what I understand

7   Mr. Tracey to be saying, at least technically, I think, is his

8   understanding is that you're producing fact witnesses, not

9   30(b)(6) witnesses, who can provide context from the

10  organization about how the claims process works.

11          I do think you have to produce 30(b)(6) witnesses.  I

12  think they have to be prepared about how these tools fit into

13  the claims process.  How you describe that in a 30(b)(6) topic,

14  I don't know.

15          And you just shook your head yes, so you agree with

16  that, correct?

17          MS. HEMERYCK:  Yes.  We will provide 30(b)(6)

18  witnesses who will testify about how these tools fit into the

19  claims process.

20          THE COURT:  Okay.  I -- Mr. Tracey, I'm going to say

21  again for your -- in response to your last point, which was I'm

22  not going to be able to get information about the claims

23  process.  My response to that -- to you is, take the

24  depositions and find out.  Okay?  Because unless we get --

25          (Discussion off the record.)

1    THE COURT:  I am going with what Ms. Hemeryck

2  identified as what she's talking about.  I recognize, and you

3  should recognize too, that to the extent that this -- there has

4  to be testimony about how this fits into your claims process,

5  that may be -- how this, meaning the narrow issue that you're

6  focused on is the use of the algorithmic tools.  If the person

7  who is prepared for the 30(b)(6) topic, for example, doesn't

8  know how that differs from other parts of the claims process,

9  that may be a problem.  Okay?  I mean, there has to be some

10  context and foundation.  But I'm not going to micromanage that.

11  Okay?

12    I want the depositions to proceed.  And once you are

13  in that mode and are asking people, you will know a lot more

14  than you know right now.  And it is impossible to do this the

15  way you want it to be done.  We have done as much as possible

16  to set this up in a way that provides a possibility of success.

17  But we can't do 100 percent until you go forward.

18    Remember, both sides went to Judge Harjani and asked

19  for this bifurcated approach to -- and you'll say yes and no,

20  Mr. Tracey, but I view this, and I read the status report on

21  that before, that plaintiffs were willing to go down this road.

22  I don't think it is a bad road to go down.  Okay?  I don't

23  think it is a bad road to go down, but you have to go down it.

24    Judge Harjani's order was February 23rd, 2024.  We're

25  almost a year into that.  Part of that year was you were

1   briefing a whole bunch of motions that -- pending -- what

2   were -- were pending too long and then I addressed.

3           But part of the process is we just have to do this.

4   We need to find out, I need to find out, the parties need to

5   find out whether we're trying to fit a square peg in a round

6   hole, first of all.  Is it not possible to do the discovery in

7   phases.  All right?  If it is not possible, I'm going to open

8   up discovery for the entire case, merits discovery.  You can

9   spend two years doing that, maybe more, and then you can come

10  to summary judgment.

11          This wasn't -- this was -- and I don't think either

12  side wants to do that.  Okay?  It is going to be expensive for

13  the company and a huge delay for the plaintiffs, let alone the

14  imbedded costs there.

15          So I don't want to do it that way either.  But if

16  we -- if this is not going to work, then we're going to do it

17  that way.  All right?

18          And I know -- the square-peg-and-round-hole reference

19  is plaintiffs believe that State Farm is doing something and

20  that State Farm says we're not doing it.  Okay?  This was a way

21  to at least try and figure what the -- what that universe looks

22  like.  If you can't do that, I'm going to open up discovery for

23  everybody and we'll just -- you know, we'll take depositions

24  and documents and third parties and we'll just go for years.

25  And then when you're finally done with it, you'll do

24

1   dispositive motion practice.  I don't think that's in anybody's

2   interest yet.  Okay?  That's why I think we ought to do it this

3   way.  But if it is inevitable, then we'll -- then it will be

4   inevitable.

5          I also don't want to put plaintiffs in a box in this

6   process, and they are dreadfully prepared -- of being in a box.

7   I don't know if you're in a box yet or not.  But you got take

8   those depositions to see.

9          Am I precluding another deposition of somebody?  No.

10  Am I (unintelligible) they have to come back at some point?

11  No.  I don't want to get into that.  I think -- I don't think

12  the company wants to get into that.  So my guess is in the

13  deposition room, you're going to have some leeway.

14         If you're put in a box, you'll come back and tell me

15  I'm in a box.  But I don't want to anticipate what the contours

16  of that box are until I see that.

17         And again, if we can't get it done this way, there is

18  other ways to do it.  But I think this is the way to do it.

19         So I'm trying to provide -- I'm going to -- I am glad

20  that you went to the same pages that I went into the

21  transcript.  I know they are not completely enlightening.  I'm

22  not sure what I have said now is completely enlightening.  But

23  they are going to prepare their witnesses and you're going to

24  ask them questions and you will see what's going on.

25         And if you run into problems, talk to each other.

1    You'll be in the same room, for God's sakes.  You won't have to

2    send emails to each other.  You could talk to each other.  This

3    is not working.  Why is it not working?  If you want to do

4    something that they are not wanting you to do it because they

5    think it is beyond where we are here, fine, I'll look at it,

6    you know.  I just don't -- but you have to start -- get

7    started.

8              It is time to sit in a room with people and ask

9    questions and get answers and then follow up on those

10   questions.  And you have got some dates to do it in April.  Do

11   it.  Do it.  Do it.  Okay?

12             I don't think I can be any more clear on that.  You're

13   entitled to foundation.  You're entitled to context.  Where

14   does this fit?  How do you frame that question?  I don't know.

15   But you know, if -- I don't get the impression that State Farm

16   is going to be producing people that have blinders on

17   completely.  I mean, there are blinders because we're talking

18   about the use of algorithmic tools.  We're not talking about

19   other things.

20             But within that context there you should be allowed to

21   inquire broadly.  And the witness should be prepared to

22   respond.  And I can't zero in on what that means any more than

23   that.  Okay?

24             And I think on both sides -- well, plaintiffs is the

25   question -- have to be open to just go with the flow here,

1  figure -- in the deposition.  Find out what the witness can and

2  can't say.  Find out, you know, when I was a -- a problem with

3  depositions is that when the questioner goes in and assumes the

4  answer to the questions and assumes that they know more than

5  the witness knows about some thing.  That's -- these days

6  depositions should not proceed that way.  A lot of depositions

7  are, I have got to have documents and then I have got to ask

8  questions about the documents.

9          That's part of what we're doing.  But you have to be

10  open to listening and open to understanding what they are

11  trying to tell you so that you can react to that in follow-up

12  questions or other discovery.  It is -- you're going to finally

13  get a chance -- you know, who gets a chance in litigation to

14  sit down with the other side and start asking them questions

15  now without -- without knowing that it is necessarily

16  preclusive.  So do it.  Okay?  Just please do it and see what

17  happens.

18          If it a total bust and it is a total bust because of

19  the structure of this, I'll change it.  Right?  And you can go

20  do merits discovery for as long as you want to do it.  But try

21  and get done what you can get done.

22          Ms. Hemeryck, were you wanting to say something?  No?

23          MS. HEMERYCK:  No, your Honor.

24          THE COURT:  Thank you.

25          Next we have -- we're running out of time here.  All

1   right?

2         The other issue here was contracts with external

3   vendors who provide algorithmic tools and materials that are

4   used to train State Farm personnel on the claims process writ

5   large.  Okay?  Can I deal with the contracts first?

6         MS. HEMERYCK:  Yes.

7         THE COURT:  They are asking for contracts with vendors

8   who provide algorithmic tools.

9         MS. HEMERYCK:  That --

10         THE COURT:  It could be algorithmic tools for use in

11   the claims process, whatever.  I know algorithmic tools,

12   everything today is an algorithm.  So what's the objection to

13   it and what can you do?

14         MS. HEMERYCK:  So, first of all, as you just said,

15   your Honor, that's an extraordinarily broad request.

16         THE COURT:  Uh-huh.

17         MS. HEMERYCK:  There is no pending motion for any

18   documents.  What we have is the Court's rulings from January

19   14th.  And the Court in that hearing and then in Docket 144,

20   denied plaintiffs's motion to compel production of additional

21   documents, except as you specifically stated during the

22   hearing.

23         There was no mention any time during that hearing of

24   vendor agreements.  It was never discussed.  It was never

25   brought up.  I mean, I searched -- maybe I searched poorly, but

1  I searched the transcript for the word "agreement."  I searched

2  it for "contract."  It just did not come up during the hearing.

3         What the Court said during the hearing -- and the

4  Court's rulings cannot reasonably be construed to require State

5  Farm to produce vendor agreements.  What the Court said was,

6  the focus is -- you know, the focus of Judge Harjani's order

7  was identifying the tools and then that's what -- and he said

8  that's what you should be focusing on, and then with some gloss

9  for context so they can understand how tools are used in the

10 claim process.

11        We had produced documents relating to both the tools

12 themselves and, more broadly, to the claim process.  We

13 produced a whole bunch more yesterday pursuant to your

14 Court's -- to the Judge's order about supplemental production.

15        Vendor agreements do not (unintelligible) even the

16 penumbra or the gloss of Judge Harjani's order.  They

17 simply -- they are not going to and they are not necessary for

18 the plaintiffs to understand how the tools are used in claims

19 processing.

20        THE COURT:  Okay.

21        MS. HEMERYCK:  The documents -- and as your Honor has

22 said, the best way to figure that out is to take a deposition,

23 not to ask us.

24        In addition, vendor agreements, as I'm sure the Judge

25 knows, are highly confidential.  I mean, companies consider

1    these agreements to be highly confidential.  They shouldn't
2    just be produced on plaintiffs's whim because they hope there
3    is going to be something there.  State Farm, again, has engaged
4    in good faith to give them documents that they can look at and
5    then ask witnesses about to understand the claims process and
6    how the tools operate within the claims process.  The vendor
7    agreements are outside of that.  They are outside of the
8    Court's order and they shouldn't be required to be produced.
9            THE COURT:  Okay.  Mr. Tracey, address first the issue
10   of -- we didn't really discuss vendor -- we discussed whether
11   you could subpoena third-party vendors.  I said no.  We didn't
12   discuss at the hearing that we had before production of these
13   contracts.  So first address that really briefly.
14           MR. TRACEY:  Your Honor, at the hearing what was
15   discussed was the broad -- the broad boundaries of the types of
16   information that they were supposed to produce in discovery.
17   We didn't get down to brass tacks about each specific request
18   because that wasn't the nature of what was in the -- of what
19   was being discussed at the hearing.  That -- that's what I have
20   to say about that.
21            I will say, your Honor, that there are very specific
22   vendors at issue here.  Some of which we subpoenaed and you
23   denied that subpoena saying, you should go to State Farm for
24   that information first.
25            Well, one of the questions we asked of the third party

1   was, show us your contracts with State Farm.  There are

2   specific vendors here that -- to use the algorithmic tools that

3   we're talking about in this case.  Varisk is one.  Duck Creek

4   is another.  ███████████  is another.  Lexis/Nexis is

5   another.  And SAS Institute is another.  Those con- -- the

6   contracts are like -- are exremely relevant to identifying the

7   algorithmic tools that are being used here because these are

8   the foundational documents that establish State Farm's

9   relationship with those vendors to supply those tools.  This is

10  about identifying the -- these are relevant to identifying the

11  tools, relevant to identifying the vendors who are providing

12  the tools, and relevant to the context of a relationship

13  because the contract is the foundational document that

14  describes the context and scope of that relationship.

15          THE COURT:  Yeah.  I'm -- this should have been

16  included -- I know you took a breath, okay, but this is not

17  convincing to me, okay, at least at this point.

18          There was some discussion about some contracts in the

19  prior motion practice and the highly confidential nature of

20  those.  And to me the first question is what does State Farm do

21  with these people?  Okay?  Am I precluding you forever getting

22  the contracts produced on a highly confidential -- with a

23  highly confidential designation?  No, I'm not.  Is this going

24  to hamper your questioning of the witnesses about what they do

25  potentially with all these vendors?  Probably not.  Does a

1    witness have to come back because later I determine that that

2    was -- that you get the contracts and -- you know, if the case

3    proceeds and the person has to come back to talk about that,

4    maybe.  And that's State Farm's risk with respect to this.

5         Am I going to require them right now to produce all

6    contracts with external vendors, even these six or something

7    that you -- I wrote down just for my edification, Varisk, Duck

8    Creek, Lexis, SAS.  And then the -- there was one more.

9         MR. TRACEY:  ██████████████.

10        THE COURT:  What is it?

11        MR. TRACEY:  ██████████████.

12        THE COURT:  ██████████████.

13        My -- my view at this point is I don't -- I don't

14   think a big contract with these companies is going to

15   materially advance the ball for you at this point.  Again, this

16   is -- this is borne of, I'm taking discovery, and before I take

17   a deposition of somebody, I want to know everything I could

18   possibly know.  That's not this case.  That's not this case.

19        And you're shaking your head, and that's fine.  I'm

20   not going to require them to produce this stuff.  I'm just not,

21   right now.  Does that mean you're never going to get it?  No.

22   Does that mean that you might need it for these depositions and

23   I'm missing something?  Maybe.  Can you ask questions of

24   witnesses about what they do with these companies?  Maybe.

25   Will that allow you to identify a portion of the contract, an

1    addendum to the contract?  Maybe.  I don't know.

2           But I'm not going to require them before these

3    depositions that are going to start in April to start producing

4    contracts because I think it is overkill right now and if we

5    were going to talk about it, we should have talked about it

6    last month.  Okay?  Final answer on that.

7           Training materials on the claims process.  Your

8    objection is because -- we went through this the last time.

9    And I think I was told that you produced a video and that's all

10   you have in -- with respect to training materials.  I find that

11   hard to believe.  But I cannot require you to produce anything

12   that doesn't exist.  Can they ask questions about what kind of

13   training happens beyond that video?  I mean, I just -- I just

14   find it hard to believe that the only thing that trains people

15   to be claims processors is a single video.  But maybe

16   that's -- maybe that's how it is.

17          MS. ABENDSHIEN:  Your Honor, I think it is --

18          THE COURT:  Just identify yourselves for the record.

19   That's Ms.

20          MS. ABENDSHIEN:  Apologies.  Yes, Ms. Abendshien on

21   behalf of State Farm.

22          I think it is important to distinguish between two

23   different categories, if you will, of training materials.  On

24   the one hand there are training materials, as we discussed last

25   time, that speak to specific tools that have been identified by

1    State Farm in response to the Phase I discovery requests that

2    plaintiffs have propounded.  And by the way, there is no Phase

3    I discovery request that plaintiffs issued for training

4    materials.  There is no such request pending.

5         But setting that aside, so that's -- the first

6    category of training materials, to the extent such training

7    materials exist that speak to those specific tools, State Farm

8    has produced them, is producing them.  There is no disagreement

9    there.

10        Where the disagreement lies is what plaintiffs are now

11   asking for are training materials, as your Honor noted, whit

12   large.  All training materials that State Farm has provided to

13   its claim handlers for any part of the claim handling process.

14   And this is -- to put some framework on it, an each enormous

15   ask.

16        THE COURT:  Okay.  So let me interrupt you.

17        MS. ABENDSHIEN:  It is not proportional.

18        THE COURT:  I hear that.

19        MS. ABENDSHIEN:  Of course.

20        THE COURT:  Is that what you are asking for?

21        MR. TRACEY:  No.  Your Honor, what we're looking for

22   is the overview training materials.  The introductory training

23   materials.  Your Honor noted at the last hearing specifically

24   that State Farm just doesn't hire someone, pat them on the back

25   and say, go process claims.  They give them a training process.

1   And we're looking specifically for that introductory training

2   process so that we can have the same overview that the claims

3   processors have.

4          THE COURT:  Is there an introductory claims training

5   process other than the video?

6          MS. ABENDSHIEN:  So when -- when claim handlers come

7   to State Farm to learn how to do their job, we're not talking

8   about, you know, a couple of hours, they sit down and they know

9   how to do it.  We're talking on the order of not hours, not

10  weeks, but months.  And that's what I mean by an enormous ask.

11         I'm not sure that my -- my friend fully appreciates

12  the magnitude of that request.  In isolation it might seem

13  simple to say, just give us, you know, the things that these

14  individuals are taught to learn how to do their jobs.  Their

15  jobs are very complex.  And it is not done in a day or even a

16  week.

17         And so that -- that is the burden here.  And we don't

18  see that that burden is proportional to what Phase I is

19  designed to accomplish, which, as we have discussed earlier

20  today and previously when we were before your Honor in January,

21  it is to identify the tools and to provide, of course, the

22  context needed so that plaintiffs can understand how those

23  tools are used and how they fit into the broader claims

24  process.

25         But the training materials aren't necessary to provide

1  that context, and they are not necessary because State Farm has

2  produced and is continuing to produce standard claim process

3  documents, operating guides.  You know, these documents provide

4  an adequate foundation for the plaintiffs to be able to move

5  forward and have the productive depositions that need to take

6  place and that will take place in April.

7          THE COURT:  So it is the defendant's burden to tell me

8  that the burden is disproportional to the needs of the case at

9  a particular point in time.  They have done that.  Plaintiffs

10  haven't rebutted that with anything specific other than we'd

11  like introductory claims materials, we just need to know how

12  they are trained for the claims process.

13          I am not going to require that.  All right?  I'm not

14  going to prevent you from asking questions.  I'm not precluding

15  that at some point you're going to be able to tell me that

16  there is -- that you could drill down a little bit more on this

17  in terms of what kind of training materials you want.

18          But this is a big company and a big part of what the

19  company does is process claims.  And when we talk about, in

20  quotes, material that are used to train State Farm personnel on

21  the claims process, I view that as extremely broad.

22          Now is it -- is training on the claims process

23  relevant to some extent with respect to the use of tools that

24  have algorithmic operational?  Yes, it could be.  Am I

25  precluding you from questioning about that?  No, I'm not.

1    And I know that I spoke very vaguely here to the
2    extent you're going to then parse my words in the transcript.
3    So I would urge you not to do that because I'm speaking very
4    generally here.
5    But I'm not going to -- I don't think it is necessary
6    for me to order them to produce a large amount of material
7    about the claims -- about training personnel on the claims
8    process before you get in there and get some context for what
9    you're looking for.
10    Again, you're entitled to context.  All right?  It is
11    focused on the claims in your complaint, and this is not.  And
12    it is -- I'm convinced by the company's presentation here,
13    because it comports with common sense, that that would be a
14    tremendous amount of material and it would be very difficult to
15    limit it.
16    And you're shaking your head no, but I can't agree
17    with that based upon what I am hearing.  And you are a bit
18    handicapped, disabled in your ability to rebut that because you
19    haven't talked to anybody yet.
20    So again, let me finish this where I started.  Take
21    the depositions.  Start taking the depositions.  Be in a
22    deposition room with defendant's counsel.  Talk about things
23    with them.  Talk about things with the witnesses.
24    Is this the be all and end all?  Is this the only
25    discovery you're going to possibly get?  No.  But this is

1  designed to give you a better sense than you -- I can't believe

2  that after you finish these depositions you will not have a

3  better sense than you have right now about the use of

4  algorithmic tools, how they are used, how people are trained in

5  the claims process that uses these kind of things.

6        I have told you you're entitled to context,

7  foundation, how things work.  I'm not hearing State Farm

8  pushing back on that.

9        Yes, you guys have some disagreements as to how far

10  you can go.  So start taking the deps and see whether or not

11  you're totally disabled in discovering your case.

12        This has to move forward and it has to move forward

13  within the context of the Phase I order as I have interpreted

14  it on now a couple of occasions from Judge Harjani.  But the

15  order was entered a year ago, and we need to go forward and we

16  need to figure out what you're getting, what you're not

17  getting, what you need to get, whether your understanding of

18  what State Farm does is any different after you take these deps

19  than from when you filed your complaint.  And we won't end

20  there.  But this has to go forward.

21        So I'm not going to require all of the training

22  materials for their entire claims process based upon what

23  Ms. Abendshien is saying is a huge undertaking, not necessarily

24  proportional to the needs of the case.  That makes sense to me.

25  That just makes sense to me.  And I don't think it is necessary

1   to move forward with this.

2          That's my ruling on both of these disputed issues.

3          I have got the dates on the 15th and 16th.  You're

4   also trying to zero in on the 24th and 25th, right?

5          MS. HEMERYCK:  Yes.  Those are firm, your Honor.

6          THE COURT:  Okay.  About how many depositions are

7   going to be taken in this process?  How many 30(b)(6) witnesses

8   are you producing?

9          MS. HEMERYCK:  Four.

10         THE COURT:  Okay.  And all probably be taken in April?

11         MS. HEMERYCK:  That is the current plan.

12         THE COURT:  Good.  Okay.  Then what I would do is ask

13  for a status report, a joint status report at the end of April,

14  whether that's April 30th or -- 30 days have September. . . how

15  many days are in April?

16         MS. HEMERYCK:  30.  You were almost there, your Honor.

17         THE COURT:  Yeah, yeah.  I mean, if that's the last

18  business day --

19         THE CLERK:  It is.

20         THE COURT:  If you want me to put it into May, I'll

21  put it into May.  I want a joint status report.  The

22  parties's --

23         MS. HEMERYCK:  April 30th I think should be fine.

24         THE COURT:  Okay.  The parties's progress with Phase I

25  discovery.

```
 1          And I don't even -- with the first phase of discovery

 2   in this case, I don't have to label it.

 3          And I'll probably set you for a status after that to

 4   come in.  I don't have that date now because I really need

 5   to -- I'm now late for the meeting that I am chairing, so I

 6   want to do that.

 7          And if you need me before then, you know where to find

 8   me.  Okay?

 9          MS. HEMERYCK:  Thank you, your Honor.  And I hate to

10   delay you.  I have one very minor housekeeping issue.

11          THE COURT:  Uh-huh.

12          MS. HEMERYCK:  There was one vendor that Mr. Tracey

13   named that even the use -- even the fact that we use that

14   vendor is confidential.  So can we do the same thing with the

15   transcript that we did last -- I just need to take that out.

16          THE COURT:  Oy, yoy, yoy.  Okay.  Yes.

17          MS. HEMERYCK:  Thank you, your Honor.

18          THE COURT:  We'll do it -- enter the same order about

19   the seven-days thing.

20          MS. HEMERYCK:  Thank you, your Honor.

21      (Discussion off the record.)

22          THE COURT:  No, they're going to order a transcript.

23          Thank you.

24          MS. HEMERYCK:  Thank you.

25          THE COURT:  Have a good flight back to where you're
```

40

1    going.

2          MR. TRACEY:  Thank you, your Honor.

3          THE COURT:  Safe travels.  Safe depositions.

4    Productive depositions.  I'll see you when I see you.

5        (Which concluded the proceedings.)

6                    CERTIFICATE

7          I certify that the foregoing is a correct transcript

8    from the digital recording of proceedings in the above-entitled

9    matter to the best of my ability, given the limitation of using

10   a digital-recording system.

11

12

13   */s/Pamela S. Warren*                    February 5, 2025
     Official Court Reporter - Retired              Date
14   United States District Court
     Northern District of Illinois
15   Eastern Division

16

17

18

19

20

21

22

23

24

25