# EXHIBIT 3

## REDACTED VERSION

```
                                                             Page 1
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3     JACQUELINE HUSKEY and  )
       RIIAN WYNN, ON BEHALF  )
 4     OF THEMSELVES AND ALL  )
       OTHERS SIMILARLY       )
 5     SITUATED,              )
                              )
 6          Plaintiffs,       ) Case No.: 22-cv-7014
                              )
 7     VS.                    ) Hon. Jeffrey I. Cummings
                              )
 8     STATE FARM FIRE &      )Magistrate Judge Jeffrey T. Gilbert
       CASUALTY COMPANY,      )
 9                            )
            Defendants.       )
10
11                    - CONFIDENTIAL -
12                 ATTORNEYS' EYES ONLY
13
14
          The deposition of STATE FARM FIRE & CASUALTY
15     COMPANY, BY REPRESENTATIVE DEPONENT, ADRIAN SMOOT,
       taken at the instance of the Plaintiffs, herein,
16     pursuant to Notice as to time and place, pursuant to
       Fed. R. Civ. P. 30(b)(6), before Dawn M. Iseminger,
17     Registered Professional Reporter (RPR), via Zoom
       Video/Teleconference, and in person at RILEY SAFER
18     HOLMES & CANCILA, LLP, 1 South Dearborn Street,
       Suite 2200, Chicago, Illinois, on April 29th, 2025,
19     commencing at the hour of 9:30 a.m.
20
21
22
23
24
25
```

```
 1            A P P E A R A N C E S
 2     FAIRMARK PARTNERS, LLP
       BY AMANDA R. VAUGHN
 3     JAMIE CROOKS, appearing via Zoom
       MATTHEW LEACH, paralegal
 4     400 7th Street Northwest, Suite 304
       Washington, DC  20004
 5     amanda@fairmarklaw.com
                   On behalf of the Plaintiffs
 6
 7     RILEY SAFER HOLMES & CANCILA, LLP
       BY SONDRA A. HEMERYCK
 8     LAUREN ABENDSHIEN, appearing via Zoom
       1 South Dearborn Street, Suite 2200
 9     Chicago, Illinois  60603
       shemeryck@rshc-law.com
10                 On behalf of the Defendant
11
       NICK PAGE, Legal Videographer
12     VERITEXT LEGAL SOLUTIONS
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 88
 1    A    So, ████████████████████████████████████
 2         ████████. I'm not sure what your question is.
 3              There's -- you're asking a difference
 4         between --
 5    Q    Are these different teams, ██████████████████
 6         ███████████████████████████████████████████████
 7         ████████?
 8    A    I mean, the same team, they are ██████████. The
 9         ██████████████████ teams may handle claims from
10         ██████████████████. They may handle contents from
11         ███████████████████.
12    Q    Okay. And focusing on ████ for a minute, is there
13         a difference in the way that an ██████████████
14         handler does their job than a ████████ handler?
15    A    Can you specify "do their job differently?" I'm
16         not sure what you mean by that.
17    Q    Do they have different tasks they have to do to
18         handle a claim?
19              MS. HEMERYCK: Objection. Assumes facts not
20         in evidence.
21    A    I mean, in both ████████████████████████████████,
22         claim handler representatives are trained claim
23         individuals to evaluate, investigate, and resolve
24         claims.
25    Q    (BY MS. VAUGHN) Are there any differences in
```

```
1        how claims are processed and resolved in an
2        █████████████ versus a ████████?
3    A   When you say "process," could you clarify?
4    Q   Is there any difference in how the claim moves
5        through to resolution?
6    A   No.  I mean, the claim -- the difference between
7        the ████████████ and ████████, as I
8        previously stated, one is ████████████
9        ████████████████████████████████████████.
10       And the other is ████████████████████████
11       █████.
12           So the process of evaluating, resolving
13       claims, a claim representative in either one would
14       have the same processes in which to evaluate --
15       and evaluate the claims.  One may be ████████
16       █████████████████, and the other is not.  One
17       may ████████████████████████.  The other one
18       would not.
19   Q   So is the reason to send a claim to ████████
20       because █████████████████████████████████████?
21   A   That could be one reason, and I wouldn't say
22       "visit."  It could be for inspection.  It could be
23       to meet with a contractor.  It could be to -- you
24       know, the policyholder has requested.  It could be
25       a number of things.
```

Page 102

1  A   Again, you're saying "categorize."  If you're
2      referring to if another Function Area Environment
3      might handle the claim, is that what you're
4      referring to?
5  Q   Not quite yet.
6  A   Okay.
7  Q   But let's go there for a moment.  Are there
8      circumstances under which a claim, once it's been
9      sent to one FAE, actually gets sent to another one
10     instead?
11 A   Yes.
12 Q   Under what circumstances would that happen?
13         MS. HEMERYCK:  Objection.  Vague and
14     ambiguous.
15 A   So, what I'll start with is, you know, every claim
16     we evaluate based upon its own merits and the
17     facts of loss may indicate that the claim is more
18     efficiently handled in another area.
19         For example, previously we talked about
20     ███████████████  ████████████████
21     ████████████████████████████
22     ██████████████████████████████
23     ██████████████████████  ██████████████
24     ████████████████████████████████
25     ██████████████████████████

Page 103

1 [redacted]
2 [redacted]
3 [redacted]
4 [redacted]
5 [redacted]
6   So to answer your question; you know, based
7  upon the facts of the claim, based upon each claim
8  merits, that claim may be identified as being more
9  efficiently handled in a different area.
10 Q (BY MS. VAUGHN) Does the claim handler make
11  that decision on their own judgment or is there
12  a tool that helps a claim handler figure out,
13  actually, no, this [redacted] thing needs to
14  go to [redacted]?
15 A No. People make that decision. Specifically, a
16  management person would make that decision.
17 Q And is there any other point once a claim is first
18  sent to a claim handler, between that point and
19  resolved, is there any other point where a tool
20  assists a claim handler in deciding where else in
21  State Farm that claim may need to go?
22 A I'm sorry. That was a long -- can you -- can
23  you --
24 Q From the point a claim first gets sent to a claim
25  handler --

Page 104

```
1    A    Yes.
2    Q    -- to when it's resolved?
3    A    Uh-huh.
4    Q    Between those two points, is there any other time
5         that a tool assists a claim handler in deciding
6         whether they need to send that claim to a
7         different Team?
8    A    Is there any tool?  No, there are facts that may
9         indicate that that claim would be better resolved
10        in a different Environment.  But a tool?  There's
11        no tool.
12   Q    No other tool?
13   A    (Indicating.)
14   Q    And is  █████  a tool that helps claim handlers
15        review and resolve claims?
16             MS. HEMERYCK:  Objection.  Vague and
17        ambiguous.
18   A    Can you explain what you mean by "review and
19        resolve claims"?
20   Q    (BY MS. VAUGHN) Well, how do you all -- what do
21        you all call what a claim handler does when
22        they get -- from when they get a claim to
23        resolving it?  Is that processing a claim?
24        Reviewing a claim?  What do you all call that?
25   A    They call it "evaluating."  We call it -- part of
```

Page 105

```
1              it will be the "claim investigation process and
2              resolution"; so...
3       Q      If I say a claim -- "when a claim handler
4              evaluates and resolves a claim," do you understand
5              that as referring to sort of the claim handler
6              gets the claim and does whatever they need to do
7              to get it resolved?
8       A      Yes.  I understand that as a claim handler will
9              receive the claim, they will initiate the claim
10             process, which is, you know, speaking with our
11             customer; they'll evaluate the damages; they'll
12             investigate the circumstances regarding the
13             reported loss, or the stated loss, the factors
14             involved with that; and move that claim to the
15             resolution, which includes the estimating for the
16             damages and, ultimately, through the payment of
17             the meritorious claims and finalization of that.
18      Q      And you said "evaluate the damages."  Are there
19             any tools that help claim handlers evaluate
20             damages on a property claim?
21                  MS. HEMERYCK:  Objection.  Beyond the scope
22             and vague and ambiguous.  But you can answer if
23             you can understand it and if you know.
24      A      Evaluate in what manner?
25      Q      (BY MS. VAUGHN) Well, what do you mean when you
```

```
                                                          Page 113
 1      Q     And in understanding --
 2      A     And let me clarify.  Not differently, but handled
 3            in another Environment.
 4      Q     And understanding that it's claim management that
 5            makes the decision, is it on the claims handler to
 6            flag for management that a claim might need to be
 7            moved?  Or, I mean, how does claim management
 8            identify, Okay, this claim where a car ran into
 9            this person's house needs to be moved to another
10            Environment?
11      A     ████████████████████████████████████████████████
12            ████████████████████████████████████████████████
13            ██████████████████████████████████.  So, for
14            example, as I stated before, our customer may
15            report a wind claim when, in fact, it's hail, or
16            maybe wind and hail.
17      Q     Okay.
18      A     ████████████████████████████████████████████████
19            ██████████████████████████████████████
20            ████████████████████████████████████████████████
21            To them, it's a storm.  Hey, it was a storm that
22            came through and I had some wind that caused
23            damage.  But during the course of the initial
24            claim handling and the Quality First Contact in
25            the investigation, the facts as initially reported
```

1          have changed to where it is hail.  So if that wind
2          claim was initially routed to our ▮▮▮▮▮▮▮▮
3          ▮▮▮▮▮▮▮, then now that it's identified as hail,
4          then that would be an indicator in which the claim
5          representative would identify for their claim
6          management and the decision of moving that claim.
7     Q    I see.  Okay.  So just to make sure I understand
8          this.  So the claim handler or claim
9          representatives -- are those the same titles?
10    A    I'm using those interchangeably, yes:  Claim
11         specialist, claim handler, claim representative.
12    Q    So a claim handler figures out through their
13         investigation that what they thought was a wind
14         claim is actually a hail claim; and then they go
15         and let management know that this may need to go
16         to the hail Environment instead of wind?
17    A    Right.  And again, it's not what they thought
18         initially.  It's what was initially reported by
19         the customer, or the facts of loss or new
20         information have become available which have
21         changed that.
22              But, yes, they would notify their
23         leadership.  And which, if that claim were to
24         be better served in a different Environment, it
25         could be.  However, that's not always the case.

Page 115

1      Again, depending upon the facts of loss,
2      depending upon to the extent that the claim has
3      been in process.
4   Q  Okay.  And then when the claim manager is making a
5      decision about whether a claim should move, are
6      there any tools ▮▮▮▮▮▮ or something that
7      assists the claim manager in making that decision?
8   A  Again, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  Q  Okay.  So are there any other decision making
14     tools like that, though, that help a claim manager
15     figure out for sure whether a claim needs to go to
16     another Environment?
17        MS. HEMERYCK:  Again, vague and ambiguous as
18     to "decision making tools."
19  A  I would ask you, could you clarify what you mean
20     by "decision making tools"?
21  Q  (BY MS. VAUGHN) Well, I guess, is the claim
22     manager sitting at their desk and saying, Okay,
23     there's hail here; like, send it to hail; or is
24     there some system they're using to help them
25     figure out if it needs to go to another

Page 212

```
1              But again, once the claim has been routed
2         to the FAE, it's going to be the same process
3         from the standpoint of the claim representative
4         would contact the customer with the initial
5         Quality First Contact to gain further
6         information or clarify.
7    Q    If we could pull up Tab 27.
8    A    I wasn't finished -- I'm sorry.
9    Q    I apologize.
10   A    And the other part of that is once again, because
11        each claim is different and handled on its own
12        merits, it can be from, you know, the type of loss
13        that is being reported.  So those questions look
14        different from the type of loss.
15   Q    Got it.  Thank you.  And, I'm sorry; I didn't mean
16        to cut you off.
17   A    That's okay.  That's okay.
18   Q    All right.  Tab 27, which we'll have marked as
19        Exhibit 11.
20                     (Plaintiffs' Smoot Exhibit 11
21                     marked for identification.)
22   Q    (BY MS. VAUGHN) All right.  Mr. Smoot, have you
23        seen what's been marked as Smoot Exhibit 11
24        before today?
25   A    Yes, I have seen this.
```

Page 274

1       Farm has not used Duck Creek Claims?
2  A   That is accurate.
3  Q   Do you know what Salesforce Financial Services
4       Cloud is?
5       MS. HEMERYCK:  And again, we're specifically
6       talking here about in the handling of homeowners
7       claims?
8       MS. VAUGHN:  Yes.
9       MS. HEMERYCK:  Okay.
10      THE WITNESS:  No.
11      MS. VAUGHN:  All right.  That's all I have.
12      Thank you, Mr. Smoot.
13      THE WITNESS:  Okay.
14          CROSS-EXAMINATION
15  Q   (BY MS. HEMERYCK) Mr. Smoot, is there any
16      computer-based tool used by State Farm that
17      directs a claim handler in how to handle a
18      homeowner's property claim?
19  A   No.
20  Q   Is there any computer-based tool used by State
21      Farm that dictates whether a homeowner's property
22      loss is going to be inspected?
23  A   No.
24  Q   Is there any computer-based tool used by State
25      Farm that dictates how many times homeowners

Page 275

```
1            property loss should be inspected?
2     A      No, there is not.
3     Q      Is there any computer-based tool used by State
4            Farm that dictates the documents a claim handler
5            should request from the policyholder when handling
6            a homeowner's property damage claim?
7     A      Are there any computer-based tools?
8     Q      That dictates the documents a claim handler should
9            request from the policyholder when handling a
10           homeowner's property claim?
11    A      No.
12    Q      Is there any computer-based tool that dictates how
13           many documents a claim handler should request from
14           a policyholder when handling a homeowner's
15           property claim?
16    A      No.
17    Q      Is there any tool that dictates, computer-based
18           tool, that dictates how many questions a claim
19           handler should ask of the policyholder when
20           handling a homeowner's property damage claim?
21    A      No.  There is no such.
22    Q      Okay.  Is there any computer-based tool that
23           dictates how many times a claim handler should
24           interact with the policyholder when handling a
25           homeowner's property claim?
```

```
                                                          Page 276
1       A    No.
2       Q    Okay.  Now I'm going to mark an exhibit.
3                    (Defendant's Smoot Exhibit 17
4                     marked for identification.)
5       Q    (BY MS. HEMERYCK) For the record, Smoot
6            Exhibit 17 is just a printout of the first tab
7            of a spreadsheet that was produced with Bates
8            numbers ending in 5913.  And that tab -- the
9            name of that tab on the spreadsheet is,
10           ███████████████████
11              So, Mr. Smoot, have you seen the
12           spreadsheet that has been printed out as Smoot
13           Exhibit 17 before; this particular part of the
14           spreadsheet?
15      A    Yes, I have.
16      Q    And do you recognize Smoot Exhibit 17 as
17           ████████████████████████████████████████████████
18           ████████████████████████████
19      A    Yes.
20      Q    What I want to ask you is -- so first of all,
21           there are columns for ████████████████████
22           ████████████████.  Is that right?
23      A    That is correct.
24      Q    And why are there these different columns on this
25           spreadsheet?  What is that indicating?
```